*FILED UNDER SEAL*

FILED

MAY 20 2024

CLERK, U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS
BY ______ DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA ex rel. RANDALL MOLNAR, | § | |
| *Plaintiff,* | § | |
| | § | Civ. No. 5:24-__-___ |
| V. | § | |
| | § | JURY DEMANDED |
| CADENCE MCSHANE CONSTRUCTION COMPANY LLC | § | |
| *Defendants.* | § | |

SA24CA0522KP

**ORIGINAL COMPLAINT**
**Qui Tam Action Filed Under Seal Pursuant to False Claims Act**

Relator Randall Molnar ("Relator" or "Molnar") files this Original Complaint on his own behalf and on behalf of the United States of America to recover damages and penalties pursuant to the False Claims Act, 31 U.S.C. § 3729 *et seq.* against Defendant Cadence McShane Construction Company LLC ("Cadence McShane" or "Defendant"), and would show as follows:

**INTRODUCTION**

1. Cadence McShane has defrauded the United States Department of Housing and Urban Development ("HUD") and the San Antonio Housing Authority out of more than $4 million in connection with the development of a low-income housing project in San Antonio, Texas. This fraud is evidenced by, among other things, internal Cadence McShane communications, wherein an executive leader instructs employees to fabricate false change orders to disguise unlawful profits in excess of HUD's caps. After the employees, including Relator Randall Molnar, refused to participate in this fraud, the Cadence McShane executive leader created the false change orders himself, which Cadence McShane then used to make false claims for payment under a HUD-guaranteed loan.

## 2. PARTIES

3. Relator and individual Plaintiff Randall Molnar is an individual currently residing in Bexar County, Texas.

4. Defendant Cadence McShane Construction Company LLC is a Delaware Limited Liability Company that has the right to transact business in the State of Texas. Defendant can be served through its registered agent for service of process, C T CORPORATION SYSTEM, 1999 Bryan Street., Suite 900, Dallas, TX 75201.

## JURISDICTION AND VENUE

5. This Court has jurisdiction pursuant to 28 U.S.C. § 1331, because Plaintiff is bringing suit pursuant to 31 U.S.C. § 3732(a), the False Claims Act.

6. Venue is proper in this district under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claim occurred in the District.

## PROCEDURAL REQUISITES

7. All conditions precedent to filing this lawsuit have been met.

8. The facts and circumstances of the False Claims Act violations alleged in this Complaint have not been publicly disclosed in a criminal, civil or administrative hearing, not in any congressional, administrative, or government accounting office report, hearing, audit investigation, or in the news media.

9. Relator is the original source of the information upon which this Complaint is based, as that term is used in the False Claims Act.

10. After filing this Complaint under seal, Relator will promptly disclose the allegations of this Complaint and written disclosure of substantially all material evidence and information to the United States in accordance with the False Claims Act, 31 U.S.C. § 3730(b).

*FILED UNDER SEAL*

## FACTS

### I. San Antonio Housing Authority Develops a Plan with Private Partners to Develop a New Affordable Housing Project Called Horizon Pointe.

11. The National Housing Act of 1934 was enacted to encourage private industry to provide housing for low-income families. The Act authorizes HUD to guarantee private mortgage loans to construct new housing and rehabilitate old structures for "families with incomes so low that they could not otherwise decently house themselves." 12 U.S.C. §§ 1703, 1701t (2001).

12. In 1937, the United States Housing Act was enacted to provide housing by making payments directly to local housing authorities. Section 8 was added to this Act in 1974 to authorize the making of "assistance payments" to encourage private property owners to provide housing. Public housing was established to provide decent and safe rental housing for eligible low-income families, the elderly, and persons with disabilities. HUD administers Federal aid to local housing agencies that manage the housing for low-income residents at rents they can afford.[1]

13. The San Antonio Housing Authority ("SAHA," since renamed Opportunity Home San Antonio) is San Antonio's housing agency. SAHA receives the majority of its funding from HUD, including Section 8 funding for housing rental assistance and Section 9 subsidies for operating costs and capital and management activities.

14. One of SAHA's major initiatives is to "[s]trategically expand the supply of affordable housing."[2] By at least June 2020, SAHA had identified a proposed affordable housing development called Horizon Pointe.

15. Pursuant to 24 CFR 905.606, prior to developing public housing, public housing authorities must submit a Development Proposal to HUD which contains information about the

[1] *See* https://www.hud.gov/topics/rental_assistance/phprog (last accessed May 7, 2024).
[2] *See* https://homesa.org/wp-content/uploads/2020/06/ProposedGoalsAndBudgetFiscalYear2020-2021.pdf (last accessed May 7, 2024) (p. 27).

*FILED UNDER SEAL*

project. Submission of a Development Proposal allows HUD to assess the viability and financial feasibility of a proposed development and to assure compliance with public housing regulations.

16. In approximately 2020 or 2021, developer Integrated Realty Group ("IRG") and SAHA approached HUD to obtain financial backing for the Horizon Pointe low-income housing development. After receiving preliminary approval, IRG approached Defendant Cadence McShane to submit a general contractor bid for Horizon Pointe.

17. On or about October 7, 2021, SAHA's Board of Directors met to consider and approve Resolution 21FAC-09-23, authorizing the Horizon Pointe Apartments transaction. Horizon Pointe was to be located off 1-10 on San Antonio's east side, in the Judson Independent School District and San Antonio City Council District 2. It promised 312 units, 20 of which would be reserved for households earning less than 30% of the Area Median Income, 35 of which would be reserved for households earning less than 40% AMI, 106 of which would be reserved for households earning less than 50% AMI, and the remainder reserved for households earning less than 70% AMI.[3]

18. At that time, the construction costs were budgeted at $39,277,776.00. (*Id.*). This amount was submitted by IRG to SAHA based on Cadence McShane's bid.

19. As part of the Project, the San Antonio Housing Facility Corporation received approval to purchase land and lease it to Horizon Point Apartments, LP. SAHA noted, "The Project will be permanently financed with a HUD loan in the approximate amount of $35,000,000.00, taken out at the same time as the bonds are issued. Each month, as construction progresses, there will be a draw on the HUD loan. The HUD loan draw will be deposited into a trust securing the Bonds and a like amount of Bond proceeds will be used to pay the contractor. In this way the

---

[3] *See* https://homesa.org/wp-content/uploads/2021/10/FAC100721.pdf (last accessed May 7, 2024), pp. 15-16.

*FILED UNDER SEAL*

Bonds are always 100% secured."[4] The SAHA Board approved the motion and authorized the San Antonio Housing Facility Corporation to serve as a joint venturer in the general contract.[5]

20. On October 21, 2021, SAHA (through its public facility corporation,[6] the San Antonio Housing Facility Corporation) and Cadence McShane entered into the Joint Venture Agreement of Horizon Pointe Joint Venture.

21. The Joint Venture Agreement requires any profits to be distributed in proportion to each venturer's respective Percentage Interests. (Section 3.1(a)((iv)). Here, SAHA maintains a 99% Interest, and Cadence McShane has a 1% Interest. Accordingly, for every million dollars of profits, SAHA is entitled to $990,000 and Cadence McShane is entitled to only $10,000. Consequently, Cadence McShane has an incentive to fabricate fake construction costs to minimize the project's profits, which would overwhelmingly flow to SAHA.

22. The Joint Venture Agreement requires Horizon Pointe Joint Venture to enter into a "Construction Contract Lump Sum" on HUD form HUD-92442M with Horizon Pointe, LP (the "Construction Contract"). The Joint Venture Agreement requires that Horizon Pointe Joint Venture serve as general contractor for the performance of construction services and that Horizon Pointe, LP serve as Owner. Horizon Pointe Joint Venture's Manager is Cadence McShane, and therefore Cadence McShane is responsible for all work under the Construction Contract. (Section 4.2(a).

---

[4] *See* https://homesa.org/wp-content/uploads/2021/10/FAC100721.pdf (last accessed May 7, 2024).

[5] *See* https://homesa.org/wp-content/uploads/2022/01/FinalPacket-FAC-2222.pdf (last accessed May 7, 2024).

[6] Under Local Government Code Chapter 303, local governmental entities like SAHA can create a public facility corporation that, in exchange for contracting with developers to create mixed-income housing, can provide a 100% property tax exemption to the developer). *See* Heather Way, *Public Facility Corporations and the Section 303.042(f) Tax Break for Apartment Developers: A Boon for Affordable Housing or Windfall for Apartment Developers?*, University of Texas School of Law Entrepreneurship and Community Development Clinic, *available at* https://law.utexas.edu/wp-content/uploads/sites/11/2020/09/2020-ECDC-PFC-Report.pdf (last accessed May 8, 2024).

23. Horizon Pointe Joint Venture and Horizon Pointe Apartments, LP are the parties to the Construction Contract. Horizon Pointe Apartments, LP's sole member is SAHA Horizon Pointe GP, LLC, and SAHA is the sole member of SAHA Horizon Pointe GP, LLC. Accordingly, for all practical purposes, the Construction Contract governing the Horizon Pointe Project is between Cadence McShane as Contractor and SAHA as Owner.

24. The Construction Contract warns: "**Warning**: Federal law provides that anyone who knowingly or willfully submits (or causes to submit) a document containing any false, fictitious, misleading, or fraudulent statement/certification or entry may be criminally prosecuted and may incur civil administrative liability. Penalties upon conviction can include a fine and imprisonment, as provided pursuant to applicable law, which includes, but is not limited to, 18 U.S.C. 1001, 1010,[[7]] 1012; 31 U.S.C. 3729[[8]], 3802, 24 C.F.R. Parts 25, 28 and 30, and 2 C.F.R. Parts 180 and 2424."

25. The Construction Contract requires Cadence McShane to make a monthly request on HUD-92448 for payment for work done in the preceding month (a "Pay Application"). (Article 5.A). HUD must approve each Pay Application submitted by Cadence McShane.

26. The Construction Contract specifies that the project is financed by a building loan insured by HUD.

---

[7] "Whoever, for the purpose of obtaining any loan or advance of credit from any person, partnership, association, or corporation with the intent that such loan or advance of credit shall be offered to or accepted by the Department of Housing and Urban Development for insurance, or for the purpose of obtaining any extension or renewal of any loan, advance of credit, or mortgage insured by such Department, or the acceptance, release, or substitution of any security on such a loan, advance of credit, or for the purpose of influencing in any way the action of such Department, makes, passes, utters, or publishes any statement, knowing the same to be false, or alters, forges, or counterfeits any instrument, paper, or document, or utters, publishes, or passes as true any instrument, paper, or document, knowing it to have been altered, forged, or counterfeited, or willfully overvalues any security, asset, or income, shall be fined under this title or imprisoned not more than two years, or both."

[8] 31 U.S.C. 3729 is the False Claims statute.

27. The Construction Contract requires that Cadence McShane certify, on HUD's own form, its cost incurred in the performance of the Project, if HUD determines there is an Identity of Interest between the Horizon Pointe Joint Venture (between Cadence McShane and SAHA) and Horizon Pointe Apartments, LP (of which SAHA is the sole member). On information and belief, HUD determined that there was an Identity of Interest and therefore required Cadence McShane to execute a Cost Breakdown Schedule of Values on Form HUD-2328. This document is a separate false claim submitted to HUD.

## II. Cadence McShane Implemented a Scheme to Increase Its Profits Above HUD's Caps and Unlawfully Disguise Them as Construction Costs.

28. Cadence McShane began working on the Horizon Pointe Project shortly after the Joint Venture Agreement and the Construction Contract were signed.

29. After a series of setbacks that delayed project completion, Cadence McShane hired Plaintiff Randall Molnar in March 2023 to take over project management. Molnar is an experienced engineer who worked for decades on industrial projects before moving into multifamily housing project management.

30. During Molnar's first week of work, he met with his supervisor, Vice President and Business Unit Leader Tyler Earle, to discuss the history of the Horizon Point Project. During that meeting, Earle boasted that he was able to pad the project bid as part of Cadence McShane's efforts to increase its profits on the Project.

31. Specifically, Earle told Molnar that soon after Cadence McShane submitted its initial bid to IRG and SAHA for the general contracting of the Horizon Point Project for $39 million, Cadence McShane increased its bid to $45 million. Although Cadence McShane claimed that the increase was based on increased construction costs during the pandemic, Earle bragged to Molnar that the true reason was to pad Cadence McShane's profits and that the scheme was Earle's

own idea. Earle stated that he expected to earn Cadence McShane $7 million in profits on the project, which is approximately 17% profit.

32. During that same March 2023 meeting, Earle name-dropped Michael Wibracht as an example of a general contractor making large profits on government contracts. Molnar did not know that Wibracht had pled guilty two years before to a long-running scheme to defraud the United States. Molnar also did not know that Wibracht was back in the local news in March 2023 when he avoided prison time at his federal sentencing.

33. Although by 2023 it was clear that the extra $5 - $6 million was not needed to cover Cadence McShane's construction costs, Cadence McShane did not report the excess estimate to SAHA or to HUD. Instead, Cadence McShane took active steps to cover up the excess and to hide it as false change orders.

34. On April 18, 2023, Cadence McShane Vice President Tyler Earle emailed Molnar and other employees assigned to the Horizon Pointe Project. The subject of the email was "Horizon Pointe Financial Adjustments." Earle began the email by confirming that he was sending it at the request of President Will Hodges and Executive Vice President Srinath Pai Kasturi: "I want to own the delay in getting this back to Will and Sri, I committed that they would have this over a week ago and didn't deliver."

35. The remainder of the email confirms Cadence McShane's specific attempts to submit false change orders to hide its true profits on the Horizon Pointe Project. Earle states, "Current forecasted projections show the current Buyout Savings for 12-0256 [the internal contract number for the Project] on the Budget in Procore in the amount of $4,263,158.32." Buyout savings refers to the cost reductions or financial benefits achieved when a subcontract costs less than the contractor budgeted.

*FILED UNDER SEAL*

36. Earle explains, however, that $4,263,158.32 "is not currently the number that is shown on the JCSJ [Job Cost Status Journal]," so Cadence McShane needed to create change orders to make up the difference. Earle identifies six adjustments:

RE: Horizon Pointe Financial Adjustments

Tyler Earle

Thu 5/25/2023 1:08 PM

All

To begin I want to own the delay in getting this back to Will and Sri, I committed that they would have this over a week ago and didn't deliver. Below has been reviewed by all parties and the group is on the same page with the steps outlined below.

Current forecasted projections show the current Buyout Savings for 12-0256 on the Budget in Procore in the amount of $4,263,158.32. This has been validated with the team and worked through again last week to ensure that the resources have been properly allocated and forecasted (thank you Brian). ***Please note that we need to push the Budget to ERP and update to Sage, as this is not currently the number that is shown on the JCSJ – and I would like to make sure that everything pushes correctly and that all systems are in agreement.***

After final adjustments and pushing to ERP confirming that this is the correct number then the steps should be as follows:

1. Write a Change Order to the Subcontract 02560302S – Cadence McShane Concrete in the amount of $425,000.00 for ***Exterior Improvements***
2. Write a Change Order to the Subcontract 02560601S – Cadence McShane Wood Framing in the amount of $2,100,000.00 for ***Wood Framing – Trusses***
3. Write a Change Order to the Subcontract 02560601S – Cadence McShane Wood Framing int the amount of $865,000.00 for ***Wood Framing Modifications***
4. Create New Cadence McShane Subcontract for ***"Low Voltage"*** in the amount of $225,000.00
5. Create New Cadence McShane Subcontract for ***"Punch/Turnover Labor"*** in the amount of $648,158.32
6. Re-run JCSJ and review as a project team with accounting to ensure correctness and memorialize.

Once these steps are completed this should relocate the funds correctly into the cost codes reflected above and sweep out all misclassified monies from the 12-0256 project and reallocate to the CMC job. This should allow for the adjustment of how we forecast the gross profit and result in ultimately the same final financial position we have been referencing the past two quarters.

Regards

Tyler Earle | Vice President - Business Unit Leader
Cadence McShane Construction Company

37. It is no coincidence that the six adjustments add up to exactly $4,263,158.32, the exact amount of buyout savings that Cadence McShane was attempting to conceal. Mr. Earle instructs employees to write change orders for Cadence McShane Concrete and Cadence McShane Wood Framing; however, Cadence McShane does not perform any concrete or wood framing work; rather, it engages outside subcontractors to perform all such work.

38. On May 24, 2023, Earle spelled out that the "Punch/Turnover Labor subcontract value may vary. This value derived from deducting the other outlined values from the total value in 12-0256 buyout contingency code as of 4/18/23." In other words, the Punch/Turnover Labor subcontract would be worth the difference between the other five values and $4,263,158.32, making it clear that the stated value of the subcontract was tied not to any true value but only to the amount of buyout savings Cadence McShane needed to hide.

39. Earle asked Molnar and his colleague, Andrea Hughes, to prepare the change orders. They refused, knowing that the change orders were fraudulent. On May 25, Earle wrote, "I noticed that the Change orders had not been completed yesterday so I went through and completed them for the team . . . ." He also confirmed that President Will Hughes and Executive Vice President Sri Kasturi "required" it be completed before Memorial Day weekend. Molnar did not play any part in creating or submitting the fraudulent change orders or subcontracts.

40. In a fixed price contract not subject to HUD regulations, valid buyout savings can generally be retained as profit. However, HUD regulations restrict the profits a general contractor can earn on any contract. Current HUD Cost Control and Safe Harbor Standards allow only the following three contractor fees: (1) Overhead of 2%; (2) Profit of 6%; and (3) General Conditions of 6%.

41. Moreover, under the Joint Venture Agreement with SAHA, properly reported profits had to be shared with SAHA, with SAHA retaining 99% of all appropriate profits. Not only did Cadence McShane have an incentive to hide its true profits with fraudulent accounting so that it could keep in excess of HUD's allowable safe harbor limits, it also had an incentive to disguise profits and construction costs to avoid paying SAHA 99% of the profits.

42. Had Cadence McShane retained its original true bid of $39,2777,776, it would have been lawfully allowed to retain $785,555.52 in Overhead, $2,356,666.56 in Profit, and $2,356,666.56 in General Conditions, for a total of $5,498,888.64 in safe harbor contractor fees. Cadence McShane would then have had to share 99% of the $2,356,666.56 in profit with SAHA.

43. Even if Cadence McShane relied on its fraudulent second bid of approximately $45,132,156, it would have been lawfully allowed to retain $902,643.12 in Overhead, $2,707,929.36 in Profit, and $2,707,929.36 in General Conditions, for a total of $6,318,501.84 in

*FILED UNDER SEAL*

safe harbor contractor fees. Cadence McShane would then have had to share 99% of the $2,707,929.36 in profit with SAHA.

44. Instead of limiting itself to HUD's safe harbor contractor fees, to date Cadence McShane has made approximately $7.7 million in profit on the Horizon Pointe Project by submitting false pay applications, sworn under the penalties of perjury by Vice President Sri Kasturi, to both SAHA and to HUD.

45. These numbers are confirmed by Cadence McShane's internal Monthly Status Reports. The MSR from February 2023, for example, identified a 17.04% anticipated gross profit, with a Total Potential Gross Profit amount of $7,727,525 through February 2023—immediately before Earle bragged to Molnar that he was going to make Cadence McShane $7 million in profit (or approximately 17%) on the Project.

46. But Cadence McShane did not report its real profits to HUD. Instead, the February 2023 Pay Application paints a very different picture—one that instead purports to comply with HUD's safe harbor limits for a $45 million contract:

| ITEM NO. | DESCRIPTION OF WORK | SCHEDULED VALUE | WORK COMPLETED FROM PREVIOUS APPLICATION (D + E) | WORK COMPLETED THIS PERIOD |
|---|---|---|---|---|
| 1 | **General Requirements** | **$2,134,745.00** | **$1,717,072.00** | |
| | **Builder's Overhead** | **$818,381.00** | **$421,824.00** | **$37,583.00** |
| | **Builder's Profit** | **$2,455,142.00** | **$1,265,472.64** | **$112,746.87** |

47. Cadence McShane, through Tyler Earle, attested to this Pay Application's accuracy under the penalties of perjury:

*FILED UNDER SEAL*

The undersigned Contractor certifies that to the best of the Contractor's knowledge. information and belief the Work covered by this Application for Payment has beei completed in accordance with the Contract Documents. that all amounts have been paid by the Contractor for Work for which previous Certificates for Payment were issued and payments received from the Owner. and that current payment shown herein is now due

CONTRACTOR: **Cadence McShane Construction**

By: Tyler Earle Date: 3/16/2023

48. Following Cadence McShane's scheme to hide its true profits with fraudulent change orders, Cadence McShane submitted numerous monthly Pay Applications and Contractor's Requisitions on HUD form 92448. Each of these submissions was signed under penalties of perjury by Cadence McShane. On HUD form 92448, Cadence McShane was required to certify "that the Work covered by this requisition has been completed in accordance with the Contract Documents." This is false. HUD relied on Cadence McShane's false claims by authorizing and guaranteeing payments under the applicable loan.

## FIRST CAUSE OF ACTION

### 31 U.S.C. § 3729(a)(1)(A): False Claims Act Violations

49. Plaintiff incorporates by reference all of the allegations made in the proceeding paragraphs.

50. Through the acts described above, Defendant, its agents, and employees knowingly presented and caused to be presented to the United States Government false and fraudulent claims for payment or approval.

51. The United States and its fiscal intermediaries, unaware of the falsity of the claims made or submitted by Defendant, its agents, and employees, paid and are believed to continue to pay Defendant for claims that would not have been paid had Defendant not submitted false and fraudulent claims for payment.

52. The United States has sustained damages as a result of Defendant's false or fraudulent claims in an amount to be determined at trial.

**SECOND CAUSE OF ACTION**
**31 U.S.C. § 3729(a)(1)(B): False Statements**

53. Plaintiff incorporates by reference all of the allegations made in the proceeding paragraphs.

54. Through the acts described above, Defendant, its agents, and employees knowingly made, used, or caused to be made or used a false record or statement material to a false or fraudulent claim in order to obtain federal funds for work that was never completed.

55. The United States and its fiscal intermediaries, unaware of the falsity of the records or statements that were material to false or fraudulent claims made or submitted by Defendant, its agents, and employees, paid and are believed to continue to pay Defendant for claims that would not have been paid had Defendants not submitted false and fraudulent claims for payment.

56. The United States has sustained damages as a result of Defendants' use of false records or statement material to false or fraudulent claims in an amount to be determined at trial.

**THIRD CAUSE OF ACTION**
**31 U.S.C. § 3729(a)(1)(G): Obligation to Pay**

57. Plaintiff incorporates by reference all of the allegations made in the proceeding paragraphs.

58. Through the acts described above, Defendant, its agents, and employees knowingly made, used, or caused to be made or used a false record or statement material to an obligation to pay or transmit money or property to the United States Government, or knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money or property to the United States Government.

59. The United States has sustained damages as a result of Defendant's use of false records or statement material to an obligation to pay or transmit money or property to the United States Government, or by knowingly concealing, avoiding, or decreasing an obligation to pay or transmit money to the United States Government in an amount to be determined at trial.

## ATTORNEYS FEES AND COSTS

60. Plaintiff is entitled to litigation costs, expert witness fees, and reasonable attorney fees under 31 U.S.C. § 3729 et seq.

## JURY DEMAND

61. Plaintiff requests a trial by jury on all issues.

## PRAYER

62. For these reasons, Plaintiff asks for judgment against Defendants for the following:

a. That Defendant cease and desist from violating the False Claims Act;

b. That Defendant is liable to Plaintiff in an amount equal to three times the amount of damages the United States has sustained as a result of Defendant's actions, as well as a civil penalty against Defendant for each violation of the False Claims Act;

c. That Relator be awarded the maximum amount allowed pursuant to 31 U.S.C. § 3730(d);

d. pre-judgment and post-judgment interest as provided by law;

e. reasonable attorney's fees;

f. all costs of court; and

g. any other relief to which Plaintiff may be entitled, whether in law or equity, including all relief necessary to make Plaintiff whole.

*FILED UNDER SEAL*

Respectfully submitted,

/s/ Lawrence Morales II
Lawrence Morales II
ATTORNEY-IN-CHARGE
State Bar No. 24051077
Allison Sarah Hartry
State Bar No. 24083149
**THE MORALES FIRM, P.C.**
6243 IH 10 West, Suite 132
San Antonio, Texas 78201
Telephone No. (210) 225-0811
Facsimile No. (210) 225-0821
lawrence@themoralesfirm.com
ahartry@themoralesfirm.com
***ATTORNEYS FOR PLAINTIFF***