IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA ex rel. RANDALL MOLNAR AND ANDREA HUGHES, | § | |
| *Plaintiff,* | § | |
| V. | § | Civ. No. 5:24-cv-522 |
| | § | JURY DEMANDED |
| CADENCE MCSHANE CONSTRUCTION COMPANY LLC | § | |
| *Defendants.* | § | |

**SECOND AMENDED COMPLAINT**
**Qui Tam Action Pursuant to False Claims Act**

Relators Randall Molnar ("Molnar") and Andrea Hughes ("Hughes") (collectively, Relators") file this Second Amended Complaint on their own behalf and on behalf of the United States of America to recover damages and penalties pursuant to the False Claims Act, 31 U.S.C. § 3729 *et seq.* against Defendant Cadence McShane Construction Company LLC ("Cadence McShane" or "Defendant"), and would show as follows:

## INTRODUCTION

1. Cadence McShane has defrauded the United States government and taxpayers out of millions of dollars in connection with the development of a low-income housing project in San Antonio, Texas. This fraud is evidenced by, among other things, internal Cadence McShane communications, wherein an executive leader instructs employees to fabricate false change orders to disguise unlawful profits in excess of Housing and Urban Development's caps. After Molnar and Hughes refused to participate in this fraud, the Cadence McShane executive leader created the false change orders himself, which Cadence McShane then used to make false claims for payment

under a HUD-guaranteed loan. Cadence McShane's fraudulently inflated construction costs also artificially inflate the eligible basis of the project, which harms the United States by increasing the tax credits associated with the project.

## PARTIES

2. Relator and individual Plaintiff Randall Molnar is an individual currently residing in Bexar County, Texas.

3. Relator and Individual Plaintiff Andrea Hughes is an individual currently residing in Bexar County, Texas.

4. Defendant Cadence McShane Construction Company LLC is a Delaware Limited Liability Company that has the right to transact business in the State of Texas. Defendant has made an appearance in this lawsuit and can be served through its counsel of record. .

## JURISDICTION AND VENUE

5. This Court has jurisdiction pursuant to 28 U.S.C. § 1331, because Plaintiffs are bringing suit pursuant to 31 U.S.C. § 3732(a), the False Claims Act.

6. Venue is proper in this district under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claim occurred in the District.

## PROCEDURAL REQUISITES

7. All conditions precedent to filing this lawsuit have been met.

8. The facts and circumstances of the False Claims Act violations alleged in this Complaint have not been publicly disclosed in a criminal, civil or administrative hearing, not in any congressional, administrative, or government accounting office report, hearing, audit investigation, or in the news media.

9. Relators are the original source of the information upon which this Complaint is based, as that term is used in the False Claims Act.

10. After filing this Complaint under seal, Relator Molnar promptly disclosed the allegations of this Complaint and written disclosure of substantially all material evidence and information to the United States in accordance with the False Claims Act, 31 U.S.C. § 3730(b).

## FACTS

### I. San Antonio Housing Authority Develops a Plan with Private Partners to Develop a New Affordable Housing Project Called Horizon Pointe.

11. The National Housing Act of 1934 was enacted to encourage private industry to provide housing for low-income families. The Act authorizes HUD to guarantee private mortgage loans to construct new housing and rehabilitate old structures for "families with incomes so low that they could not otherwise decently house themselves." 12 U.S.C. §§ 1703, 1701t (2001).

12. In 1937, the United States Housing Act was enacted to provide housing by making payments directly to local housing authorities. Section 8 was added to this Act in 1974 to authorize the making of "assistance payments" to encourage private property owners to provide housing. Public housing was established to provide decent and safe rental housing for eligible low-income families, the elderly, and persons with disabilities. HUD administers Federal aid to local housing agencies that manage the housing for low-income residents at rents they can afford.[1]

13. The San Antonio Housing Authority ("SAHA," since renamed Opportunity Home San Antonio) is San Antonio's housing agency. SAHA receives the majority of its funding from HUD, including Section 8 funding for housing rental assistance and Section 9 subsidies for operating costs and capital and management activities.

14. One of SAHA's major initiatives is to "[s]trategically expand the supply of

[1] *See* https://www.hud.gov/topics/rental_assistance/phprog (last accessed May 7, 2024).

affordable housing."[2] By at least June 2020, SAHA had identified a proposed affordable housing development called Horizon Pointe.

15. Pursuant to 24 CFR 905.606, prior to developing public housing, public housing authorities must submit a Development Proposal to HUD which contains information about the project. Submission of a Development Proposal allows HUD to assess the viability and financial feasibility of a proposed development and to assure compliance with public housing regulations.

16. In approximately 2020 or 2021, developer Integrated Realty Group ("IRG") and SAHA approached HUD to obtain financial backing for the Horizon Pointe low-income housing development. After receiving preliminary approval, IRG approached Defendant Cadence McShane to submit a general contractor bid for Horizon Pointe.

17. On or about October 7, 2021, SAHA's Board of Directors met to consider and approve Resolution 21FAC-09-23, authorizing the Horizon Pointe Apartments transaction. Horizon Pointe was to be located off 1-10 on San Antonio's east side, in the Judson Independent School District and San Antonio City Council District 2. It promised 312 units, 20 of which would be reserved for households earning less than 30% of the Area Median Income, 35 of which would be reserved for households earning less than 40% AMI, 106 of which would be reserved for households earning less than 50% AMI, and the remainder reserved for households earning less than 70% AMI.[3]

18. At that time, the construction costs were budgeted at $39,277,776.00. (*Id.*). This amount was submitted by IRG to SAHA based on Cadence McShane's bid.

19. As part of the Project, the San Antonio Housing Facility Corporation received

---

[2] *See* https://homesa.org/wp-content/uploads/2020/06/ProposedGoalsAndBudgetFiscalYear2020-2021.pdf (last accessed May 7, 2024) (p. 27).

[3] *See* https://homesa.org/wp-content/uploads/2021/10/FAC100721.pdf (last accessed May 7, 2024), pp. 15-16.

approval to purchase land and lease it to Horizon Point Apartments, LP. SAHA noted, "The Project will be permanently financed with a HUD loan in the approximate amount of $35,000,000.00, taken out at the same time as the bonds are issued. Each month, as construction progresses, there will be a draw on the HUD loan. The HUD loan draw will be deposited into a trust securing the Bonds and a like amount of Bond proceeds will be used to pay the contractor. In this way the Bonds are always 100% secured."[4] The SAHA Board approved the motion and authorized the San Antonio Housing Facility Corporation to serve as a joint venturer in the general contract.[5]

20. On October 21, 2021, SAHA (through its public facility corporation,[6] the San Antonio Housing Facility Corporation) and Cadence McShane entered into the Joint Venture Agreement of Horizon Pointe Joint Venture.

21. The Joint Venture Agreement requires any profits to be distributed in proportion to each venturer's respective Percentage Interests. (Section 3.1(a)((iv)). Here, SAHA maintains a 99% Interest, and Cadence McShane has a 1% Interest. Accordingly, for every million dollars of profits, SAHA is entitled to $990,000 and Cadence McShane is entitled to only $10,000. Consequently, Cadence McShane has an incentive to fabricate fake construction costs to minimize the project's profits, which would overwhelmingly flow to SAHA.

22. The Joint Venture Agreement requires Horizon Pointe Joint Venture to enter into a "Construction Contract Lump Sum" on HUD form HUD-92442M with Horizon Pointe, LP (the

---

[4] *See* https://homesa.org/wp-content/uploads/2021/10/FAC100721.pdf (last accessed May 7, 2024).
[5] *See* https://homesa.org/wp-content/uploads/2022/01/FinalPacket-FAC-2222.pdf (last accessed May 7, 2024).
[6] Under Local Government Code Chapter 303, local governmental entities like SAHA can create a public facility corporation that, in exchange for contracting with developers to create mixed-income housing, can provide a 100% property tax exemption to the developer). *See* Heather Way, *Public Facility Corporations and the Section 303.042(f) Tax Break for Apartment Developers: A Boon for Affordable Housing or Windfall for Apartment Developers?*, University of Texas School of Law Entrepreneurship and Community Development Clinic, *available at* https://law.utexas.edu/wp-content/uploads/sites/11/2020/09/2020-ECDC-PFC-Report.pdf (last accessed May 8, 2024).

"Construction Contract"). The Joint Venture Agreement requires that Horizon Pointe Joint Venture serve as general contractor for the performance of construction services and that Horizon Pointe, LP serve as Owner. Horizon Pointe Joint Venture's Manager is Cadence McShane, and therefore Cadence McShane is responsible for all work under the Construction Contract. (Section 4.2(a)).

23. The Construction Contract guarantees Cadence McShane a "guaranteed payment" consisting of the Builder's Profit and/or the Contractor's Fee defined in the Construction Contract. The Construction Contract does not identify a Contractor's Fee, but it specifies that the Builder's Profit is $2,455,142, or 6% of the total cost. (Construction Contract, Exhibit D, Line 46). This guaranteed payment is made before other distributions to the partners. (Joint Venture, Section 3.2(b)). Any remaining profit, including construction cost savings, belongs to the Joint Venture as an entity. Those remaining funds are distributed to the partners according to their Percentage Interests. (Joint Venture, Section 3.2(a)). The funds are therefore distributed, first, to any Venturers with a deficit in their Capital Account; second, to all Venturers as a return of their initial Capital Contributions (here, $990 to SAHFC and $10 to Cadence McShane); and, third, to all Venturers split in accordance with the Percentage Interests (here, 99% to SAHFC and 1% to Cadence McShane). The fact that the Construction Contract is a lump sum contract does not change these distributions and Cadence McShane is not permitted to keep all profits of the Joint Venture. Instead, after Cadence McShane receives its contractual Builder's Profit of 6%,[7] SAHA is entitled to 99% of the remaining savings distributed by the Joint Venture.

24. Horizon Pointe Joint Venture and Horizon Pointe Apartments, LP are the parties to the Construction Contract. Horizon Pointe Apartments, LP's sole member is SAHA Horizon

[7] Moreover, because the Builder's Profit is contractually tied to the total construction cost, falsely inflating the cost also fraudulently increases the Builder's Profit.

Pointe GP, LLC, and SAHA is the sole member of SAHA Horizon Pointe GP, LLC. Accordingly, for all practical purposes, the Construction Contract governing the Horizon Pointe Project is between Cadence McShane as Contractor and SAHA as Owner.

25. The Construction Contract warns: "**Warning**: Federal law provides that anyone who knowingly or willfully submits (or causes to submit) a document containing any false, fictitious, misleading, or fraudulent statement/certification or entry may be criminally prosecuted and may incur civil administrative liability. Penalties upon conviction can include a fine and imprisonment, as provided pursuant to applicable law, which includes, but is not limited to, 18 U.S.C. 1001, 1010,[[8]] 1012; 31 U.S.C. 3729[[9]], 3802, 24 C.F.R. Parts 25, 28 and 30, and 2 C.F.R. Parts 180 and 2424."

26. The Construction Contract requires Cadence McShane to make a monthly request on HUD-92448 for payment for work done in the preceding month (a "Pay Application"). (Article 5.A). HUD must approve each Pay Application submitted by Cadence McShane.

27. The Construction Contract specifies that the project is financed by a building loan insured by HUD.

28. The Construction Contract requires that Cadence McShane certify, on HUD's own form, its cost incurred in the performance of the Project, if HUD determines there is an Identity of

[8] "Whoever, for the purpose of obtaining any loan or advance of credit from any person, partnership, association, or corporation with the intent that such loan or advance of credit shall be offered to or accepted by the Department of Housing and Urban Development for insurance, or for the purpose of obtaining any extension or renewal of any loan, advance of credit, or mortgage insured by such Department, or the acceptance, release, or substitution of any security on such a loan, advance of credit, or for the purpose of influencing in any way the action of such Department, makes, passes, utters, or publishes any statement, knowing the same to be false, or alters, forges, or counterfeits any instrument, paper, or document, or utters, publishes, or passes as true any instrument, paper, or document, knowing it to have been altered, forged, or counterfeited, or willfully overvalues any security, asset, or income, shall be fined under this title or imprisoned not more than two years, or both."

[9] 31 U.S.C. 3729 is the False Claims statute.

Interest between the Horizon Pointe Joint Venture (between Cadence McShane and SAHA) and Horizon Pointe Apartments, LP (of which SAHA is the sole member). On information and belief, HUD determined that there was an Identity of Interest and therefore required Cadence McShane to execute a Cost Breakdown Schedule of Values on Form HUD-2328. This document is a separate false claim submitted to HUD.

## II. The Low Income Tax Credit, Established to Encourage Private Investors to Fund Affordably Rental Housing Projects, Provided the Horizon Pointe Developer With Millions in Tax Credits.

29. The Tax Reform Act of 1986 established the Low-Income Housing Tax Credit ("LIHTC") program to encourage the development of affordable rental housing. Pub. L. No. 99-514, § 252, 100 Stat 2085, 2189-208 (codified at 26 U.S.C. § 42). The statute provides tax subsidies for "qualified low-income housing project[s]." 26 U.S.C. § 42(g)(1). The program is premised on a model of leveraging private-sector equity to facilitate cash flow into the development and rehabilitation of low-income housing. The credits are first apportioned by Congress, based on population, to state and local Housing Credit Agencies ("HCAs"), id. § 42(h)(3), which then allocate the credits to sponsors of and investors in affordable housing projects ("grants"), *see id.* § 42(m).

30. Texas's HCA is the Texas Department of Housing and Community Affairs ("TDHCA"), which is the state's lead agency responsible for homeownership, affordable rental housing, and community and energy assistance programs, and other housing-related activities primarily serving low-income Texans.

31. Because the credits allocated by the federal government to each state's HCA are limited, each HCA, including the TDHCA, is required to enact a Qualified Allocation Plan ("QAP") establishing the body's priorities for allocating the credits through grants. *Id.* §

42(m)(1)(B). Each QAP must set forth selection criteria, give preference to projects benefiting people most in need of affordable housing, and provide a procedure for the HCA to monitor noncompliance by project sponsors. *Id*.

32. At the federal level, the LIHTC program is administered by Treasury, which has the authority to "prescribe such regulations as may be necessary or appropriate." 26 U.S.C. § 42(n). Treasury also has the power to deny or recapture a LIHTC claimed by a noncompliant investor. *Id. § 42(j)*. It is likewise empowered to issue revenue rulings, publish guidance, and issue notices regarding all provisions of the Tax Code, including those governing LIHTCs. *See id.* § 7805(a); 26 C.F.R. § 601.601(d). Only HCAs, however, have the power to choose what projects will receive LIHTCs. *See* 26 U.S.C. § 42(m).

33. The LIHTC arrangement typically goes as follows: A low-income housing developer first applies to a state housing credit agency for a grant of federal tax credits. If the state agency grants the application, the developer then enters into a limited partnership as a general partner with a private investor as a limited partner. Often, the investor is a bank or another financial entity that has ample annual tax liability of its own that makes acquiring the nonrefundable tax credits a worthwhile investment. The limited partner investor then provides the capital needed to build and develop the low-income housing development. In return, the partnership allocates the vast majority (usually 99.99%) of tax credits and other tax benefits to the investor. These benefits alone provide the investor with a significant return on investment that makes the arrangement attractive and worthwhile to the investor. *See generally*, *Sunamerica Hous. Fund 1050 v. Pathway of Pontiac, Inc.*, 33 F.4th 872 (6th Cir. 2022).

34. LIHTC allows investors to claim the tax credits through the arrangement annually over a ten-year period. 26 U.S.C. § 42(b)(1)(B). Housing developments that receive LIHTC tax

credits must comply with income-eligibility requirements and rent limits for an initial 15-year compliance period, and, for projects that began in 1990 or later, an additional 15-year extended use period. See id. § 42(h)(6)(D), (i)(1). During the initial 15-year compliance period, the tax credits can be recaptured by the IRS if the developer violates the LIHTC requirements for the housing developments, such as certain rent or income restrictions, or if the development faces serious physical damage or financial problems. *See* id. § 42(j). Beyond this initial period, however, the IRS cannot recapture any tax credit and the program is then enforced primarily by the state housing agencies. *See id.*

35. For the duration of the compliance period, property owners must submit annual compliance reports to both the Internal Revenue Service (IRS) and a state monitoring agency. *AMTAX Holdings 227, LLC v. Tenants' Dev. II Corp.*, 15 F.4th 551, 553 (1st Cir. 2021).

36. The annual credit claimed by a taxpayer equals a credit percentage multiplied by the project's qualified basis. The percentage is larger for new construction or substantial rehabilitation (roughly 9 percent) than for properties acquired for rehabilitation. The qualified basis equals the fraction of the cost of the housing project rented to tenants meeting the income tests.

37. State housing finance agencies may allocate enhanced tax credits to qualified projects in areas where the need is greatest for affordable rental housing or development is the most difficult. Under the program, these "difficult development areas" or "qualified census tracts" can get a 30 percent boost in available credits.

38. Horizon Pointe was funded through the LIHTC incentives and received a grant from the TDHCA, funded by the federal government. The project was entitled to this 30% boost in credits. Therefore, 130% is the appropriate basis to calculate tax credits for the project, based on the project's "eligible basis." This eligible basis is derived primarily from construction and

development costs, so any inflated construction costs would materially overstate the project's eligible basis.

39. According to the Tax Policy Center, the Joint Committee on Taxation estimates LIHTC will cost the U.S government and taxpayers around $13.2 billion in 2023, increasing to $15.2 billion by 2025. It is by far the largest federal program encouraging the creation of affordable rental housing for low-income households.

## III. Cadence McShane Implemented a Scheme to Increase Its Profits Above HUD's Caps and Unlawfully Disguise Them as Construction Costs.

40. Cadence McShane began working on the Horizon Pointe Project shortly after the Joint Venture Agreement and the Construction Contract were signed.

41. After a series of setbacks that delayed project completion, Cadence McShane hired Plaintiff Randall Molnar in March 2023 to take over project management. Molnar is an experienced engineer who worked for decades on industrial projects before moving into multifamily housing project management.

42. Shortly after hiring Molnar, Cadence McShane also hired Andrea Hughes as Project Manager. Hughes is also an experienced project manager with decades of experience.

43. During Molnar's first week of work, he met with his supervisor, Vice President and Business Unit Leader Tyler Earle, to discuss the history of the Horizon Point Project. During that meeting, Earle boasted that he was able to pad the project bid as part of Cadence McShane's efforts to increase its profits on the Project.

44. Specifically, Earle told Molnar that soon after Cadence McShane submitted its initial bid to IRG and SAHA for the general contracting of the Horizon Point Project for $39 million, Cadence McShane increased its bid to $45 million. Although Cadence McShane claimed that the increase was based on increased construction costs during the pandemic, Earle bragged to

Molnar that the true reason was to pad Cadence McShane's profits and that the scheme was Earle's own idea. Earle stated that he expected to earn Cadence McShane $7 million in profits on the project, which is approximately 17% profit.

45. During that same March 2023 meeting, Earle name-dropped Michael Wibracht as an example of a general contractor making large profits on government contracts. Molnar did not know that Wibracht had pled guilty two years before to a long-running scheme to defraud the United States. Molnar also did not know that Wibracht was back in the local news in March 2023 when he avoided prison time at his federal sentencing.

46. Although by 2023 it was clear that the extra $5 - $6 million was not needed to cover Cadence McShane's construction costs, Cadence McShane did not report the excess estimate to SAHA, HUD, or the IRS. Instead, Cadence McShane took active steps to cover up the excess and to hide it as false change orders.

47. On April 18, 2023, Cadence McShane Vice President Tyler Earle emailed Molnar, Hughes, and other employees assigned to the Horizon Pointe Project. The subject of the email was "Horizon Pointe Financial Adjustments." Earle began the email by confirming that he was sending it at the request of President Will Hodges and Executive Vice President Srinath Pai Kasturi: "I want to own the delay in getting this back to Will and Sri, I committed that they would have this over a week ago and didn't deliver."

48. The remainder of the email confirms Cadence McShane's specific attempts to submit false change orders to hide its true profits on the Horizon Pointe Project. Earle states, "Current forecasted projections show the current Buyout Savings for 12-0256 [the internal contract number for the Project] on the Budget in Procore in the amount of $4,263,158.32." Buyout savings refers to the cost reductions or financial benefits achieved when a subcontract costs less than the

contractor budgeted.

49. Earle explains, however, that $4,263,158.32 "is not currently the number that is shown on the JCSJ [Job Cost Status Journal]," so Cadence McShane needed to create change orders to make up the difference. Earle identifies six adjustments:

RE: Horizon Pointe Financial Adjustments

Reply | Reply All | Forward

Tyler Earle
To Brian Cox; Andrea Hughes; Randy Molnar
Cc Rayito Gonzales; Alexis Stecker; Craig Morris; Astin Isbell

Thu 5/25/2023 1:08 PM

All

To begin I want to own the delay in getting this back to Will and Sri, I committed that they would have this over a week ago and didn't deliver. Below has been reviewed by all parties and the group is on the same page with the steps outlined below.

Current forecasted projections show the current Buyout Savings for 12-0256 on the Budget in Procore in the amount of $4,263,158.32. This has been validated with the team and worked through again last week to ensure that the resources have been properly allocated and forecasted (thank you Brian). ***Please note that we need to push the Budget to ERP and update to Sage, as this is not currently the number that is shown on the JCSJ – and I would like to make sure that everything pushes correctly and that all systems are in agreement.***

After final adjustments and pushing to ERP confirming that this is the correct number then the steps should be as follows:

1. Write a Change Order to the Subcontract 02560302S – Cadence McShane Concrete in the amount of $425,000.00 for ***Exterior Improvements***
2. Write a Change Order to the Subcontract 02560601S – Cadence McShane Wood Framing in the amount of $2,100,000.00 for ***Wood Framing – Trusses***
3. Write a Change Order to the Subcontract 02560601S – Cadence McShane Wood Framing int the amount of $865,000.00 for ***Wood Framing Modifications***
4. Create New Cadence McShane Subcontract for ***"Low Voltage"*** in the amount of $225,000.00
5. Create New Cadence McShane Subcontract for ***"Punch/Turnover Labor"*** in the amount of $648,158.32
6. Re-run JCSJ and review as a project team with accounting to ensure correctness and memorialize.

Once these steps are completed this should relocate the funds correctly into the cost codes reflected above and sweep out all misclassified monies from the 12-0256 project and reallocate to the CMC job. This should allow for the adjustment of how we forecast the gross profit and result in ultimately the same final financial position we have been referencing the past two quarters.

Regards

**Tyler Earle** | Vice President - Business Unit Leader
**Cadence McShane Construction Company**

50. It is no coincidence that the six adjustments add up to exactly $4,263,158.32, the exact amount of buyout savings that Cadence McShane was attempting to conceal. Mr. Earle instructs employees to write change orders for Cadence McShane Concrete and Cadence McShane Wood Framing; however, Cadence McShane does not perform any concrete or wood framing work; rather, it engages outside subcontractors to perform all such work. Vice President Earle, Director of Operations Cox, President Hodges and Executive Vice President Kasturi all knew that the change orders were illegitimate and they took this step with the specific and deliberate attempt to illegally hide Cadence McShane's true profits from the federal government and other stakeholders. On May 24, 2023, Earle spelled out that the "Punch/Turnover Labor subcontract value may vary. This value derived from deducting the other outlined values from the total value

in 12-0256 buyout contingency code as of 4/18/23." In other words, the Punch/Turnover Labor subcontract would be worth the difference between the other five values and $4,263,158.32, making it clear that the stated value of the subcontract was tied not to any true value but only to the amount of buyout savings Cadence McShane needed to hide.

51. Earle asked Molnar and Hughes to prepare the change orders. They refused, knowing that the change orders were fraudulent. On May 25, Earle wrote, "I noticed that the Change orders had not been completed yesterday so I went through and completed them for the team . . . ." He also confirmed that President Will Hodges and Executive Vice President Sri Kasturi "required" it be completed before Memorial Day weekend. Molnar and Hughes did not play any part in creating or submitting the fraudulent change orders or subcontracts.

52. On June 14, 2023, Cadence McShane ran two Job Cost Status Journals: an internal JCSJ (Job 02-0224) and an external JCSJ (Job 12-0256). In case there was any doubt, Cadence McShane even titled the JCSJ for Job 02-0224 the "Horizon Pointe CMC Internal JCSJ 6-14-23."

53. Cadence McShane's then-controller, Michelle Tea, annotated both JCSJs. The external JCSJ maintained to hide the inflated costs appeared as follows:

Cadence McShane Construction — Job Cost Status Journal — 06/14/23 — Page 1

| Cost Dv/Code | Description | Original Budget | Budget Mods | Change Orders | Revised Budget | Committed Cost | MTD Cost | JTD Cost | Estimated Cost to Complete | Estimated Cost at Completion | Savings /(Loss) |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Project: 12-0256 | Horizon Pointe Apartments San Antonio TX | | | | | | | | | | |
| 03 CONCRETE | | | | | | | | | | | |
| 03-0050 4 | Concrete Turnkey | 2,932,680 | 145,171 | 137,278 | 3,215,129 | 3,640,129 | 0 | 2,187,000 | 1,038,657 | 3,225,657 | -10,528 |
| 03-5000 4 | Cast Dcks and Undrlymnt | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | |
| | Division Totals | 2,932,680 | 145,171 | 137,278 | 3,215,129 | 3,640,129 | 0 | 2,187,000 | 1,038,657 | 3,225,657 | -10,528 |
| 04 M | | | | | | | | | | | |
| 04-0 | | | 55,827 | 0 | 1,421,000 | 1,371,000 | 253,224 | 591,464 | 829,536 | 1,421,000 | |
| | | | 55,827 | 0 | 1,421,000 | 1,371,000 | 253,224 | 591,464 | 829,536 | 1,421,000 | 0 |
| 05 M | | | | | | | | | | | |
| 05-7000 4 | Decorative Metal | 826.942 | -268.602 | 0 | 558.340 | 558.340 | 15.624 | 471.373 | 86.967 | 558.340 | |

**BLUE** = OK; This is CMC subcontract and includes SCOs noted per BUL e-mail.

425K Concrete

**Update revised budget and cost at completion.**



| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| **06 WOOD, PLASTICS, AND COMPOSITES** | | | | | | | | | | |
| 06-1000 2 Rough Carpentry | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | |
| 06-1100 4 Wood Framing | 8,913,516 | 0 | 0 | 8,913,516 | 11878,516 | 0 | 8,384,173 | 529,343 | 8,913,516 | |
| 06-2500 4 Punch/Turn Over | 0 | 0 | 0 | 0 | 589,376 | 0 | 0 | 0 | 0 | |
| 06-4100 4 Architectural Wd Caswrk | 69,137 | 4,663 | 0 | 73,800 | 73,800 | 19,300 | 19,300 | 54,500 | 73,800 | |
| **Division Totals** | 8,982,653 | 4,663 | 0 | 8,987,316 | 12541,692 | 19,300 | 8,403,473 | 583,843 | 8,987,316 | 0 |
| **07** | | | | | | | | | | |
| 07 | | -267,270 | 0 | 0 | 0 | 0 | | | | |
| 07 | | 44,049 | 0 | 547,018 | 547,018 | 0 | | | | |
| 07 | | -168,428 | 0 | 384,502 | 384,502 | 3,002 | | | | |
| 07 | | 102,000 | 0 | 102,000 | 102,000 | 0 | | | | |
| 07 | | 0 | 0 | 0 | 0 | 0 | | | | |
| 07-8400 2 Firestopping | 0 | -151,770 | 0 | -151,770 | -75,885 | 0 | -75,885 | -75,885 | -151,770 | |





| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| **33 UTILITIES** | | | | | | | | | | |
| 33-0050 4 Utilities Turnkey | 1,255,380 | 102,306 | 38,104 | 1,395,790 | 1,395,790 | 0 | 1,393,290 | 31,397 | 1,424,687 | -28,897 |
| 33-2000 4 Dry Utilities | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | |
| 33-2001 4 Low Voltage Underground | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | |
| **Division Totals** | 1,255,380 | 102,306 | 38,104 | 1,395,790 | 1,395,790 | 0 | 1,393,290 | 31,397 | 1,424,687 | -28,897 |
| **85 COST OF WORK GENERAL COND** | | | | | | | | | | |
| 85-1300 1 Foreman | 0 | 0 | 0 | 0 | 0 | | | | 0 | |
| 85-1310 1 Carpenter | 0 | 0 | 0 | 0 | 0 | | | | 0 | |
| 85-1320 1 Laborer | 0 | 143,828 | 0 | 143,828 | 0 | | | | 828 | |
| 2 | 0 | 102,119 | 0 | 102,119 | 0 | | | | 119 | |



54. In the above excerpts, CMC refers to Cadence McShane Construction. BUL refers to Tyler Earle, the "Business Unit Leader." SCO means "sub-contract change order." Ms. Tea is therefore noting that for Wood Framing, the Original Budget called for $8,913,516. The Revised Budget also called for $8,913,516. But, once Cadence McShane complied with Tyler Earle's directive to issue subcontract change orders for $2,100,000 in framing trusses and $865,000 in framing modifications, the Committed Cost increased to $11,878,516 (exactly the amount of the Revised Budget plus the two wood framing subcontract change orders Earle directed). But the internal JCSJ proves these subcontract change orders are fraudulent, because the Committed Cost was in fact $8.9 million:

Cadence McShane Construction — Job Cost Status Journal — 06/14/23 — Page 4

Project: 02-0224 CMC Horizon Pointe Apts San Antonio TX

| Cost Dv/Code | Description | Original Budget | Budget Mods | Change Orders | Revised Budget | Committed Cost | MTD Cost | JTD Cost | Estimated Cost to Complete | Estimated Cost at Completion | Savings /(Loss) |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 06 | WOOD, PLASTICS, AND COMPOSITES | | | | | | | | | | |
| 06-1100 4 | Wood Framing | 8,913,516 | -1,856,064 | 0 | 7,057,452 | 7,071,116 | 277,593 | 6,628,940 | 428,511 | 7,057,452 | |
| 06-1753 3 | Wood Trusses | 0 | 1,891,688 | 0 | 1,891,688 | 1,901,399 | 0 | 1,905,783 | -14,095 | 1,891,688 | |
| 4 | | 0 | 0 | 0 | 0 | 4,384 | 0 | 0 | 0 | 0 | |
| | Division Totals | 8,913,516 | 35,624 | 0 | 8,949,140 | 8,976,899 | 277,593 | 8,534,723 | 414,416 | 8,949,140 | 0 |

55. Critically, these false statements are subsumed within the Pay Applications Cadence McShane submitted to HUD. The Pay Application for April 2023, signed under penalties of perjury, claims that Cadence McShane has received $1,645,687.20 in profit out of a total allowable profit of $2,455,142.00. But the Job Cost Status Journals make clear that the profit is actually far in excess of that amount by, at least, April 2023. Each and every Pay Application Cadence McShane signed under penalties of perjury is knowingly false, because Cadence McShane made clear, documented, and successful efforts to hide their true profits from the eyes of the federal government and its local partners.

56. In a fixed price contract not subject to HUD regulations, valid buyout savings can generally be retained as profit. However, HUD regulations restrict the profits a general contractor can earn on any contract. Current HUD Cost Control and Safe Harbor Standards allow only the following three contractor fees: (1) Overhead of 2%; (2) Profit of 6%; and (3) General Conditions of 6%.

57. Cadence McShane executives plainly recognized this 6% Profit restriction. In a call, Director of Operations Brian Cox told Hughes and other employees, "Anything that was above the 6% should technically go back to the owner and SAHA. So we shifted all that money via internal

change orders to those [sub]contracts we had issued, to get the money out of the 12 [account] and into the 02 job so it was shielded."

58. This meeting occurred after Mr. Molnar's departure and the information Mr. Cox shared in the meeting was shared with the government by Ms. Hughes.[10] This information is independent of and materially adds to the information Mr. Molnar provided to the government while this case was under seal. Ms. Hughes also participated in a fact-finding interview with the U.S. Department of Justice and provided information and materials to the government separate and apart from the information provided by Mr. Molnar, including new information and documentation created after Mr. Molnar left Cadence McShane and was therefore not available to him without Ms. Hughes's participation.

59. Moreover, under the Joint Venture Agreement with SAHA, properly reported profits had to be shared with SAHA, with SAHA retaining 99% of all appropriate profits. Not only did Cadence McShane have an incentive to hide its true profits with fraudulent accounting so that it could keep in excess of HUD's allowable safe harbor limits, it also had an incentive to disguise profits and construction costs to avoid paying SAHA 99% of the profits.

60. Had Cadence McShane retained its original true bid of $39,2777,776, it would have been lawfully allowed to retain $785,555.52 in Overhead, $2,356,666.56 in Profit, and $2,356,666.56 in General Conditions, for a total of $5,498,888.64 in safe harbor contractor fees.

61. Even if Cadence McShane relied on its fraudulent second bid of approximately $45,132,156, it would have been lawfully allowed to retain $902,643.12 in Overhead, $2,707,929.36 in Profit, and $2,707,929.36 in General Conditions, for a total of $6,318,501.84 in safe harbor contractor fees.

[10] The False Claims Act provides that an "original source" is one who "has knowledge that is independent of and materially adds to the publicly disclosed allegations or transactions." 31 U.S.C. § 3730(e)(4)(A).

62. Instead of limiting itself to HUD's safe harbor contractor fees, to date Cadence McShane has made approximately $7.7 million in profit on the Horizon Pointe Project by submitting false pay applications, sworn under the penalties of perjury by Vice President Sri Kasturi, to both SAHA and to HUD.

63. These numbers are confirmed by Cadence McShane's internal Monthly Status Reports. The MSR from February 2023, for example, identified a 17.04% anticipated gross profit, with a Total Potential Gross Profit amount of $7,727,525 through February 2023—immediately before Earle bragged to Molnar that he was going to make Cadence McShane $7 million in profit (or approximately 17%) on the Project.

64. But Cadence McShane did not report its real profits to HUD. Instead, the February 2023 Pay Application paints a very different picture—one that instead purports to comply with HUD's safe harbor limits for a $45 million contract:

| ITEM NO. | DESCRIPTION OF WORK | SCHEDULED VALUE | WORK COMPLETED | |
|---|---|---|---|---|
| | | | FROM PREVIOUS APPLICATION (D + E) | THIS PERIOD |
| 1 | **General Requirements** | $2,134,745.00 | $1,717,072.00 | |
| | **Builder's Overhead** | $818,381.00 | $421,824.00 | $37,583.00 |
| | **Builder's Profit** | $2,455,142.00 | $1,265,472.64 | $112,746.87 |

65. Cadence McShane, through Tyler Earle, attested to this Pay Application's accuracy under the penalties of perjury:

The undersigned Contractor certifies that to the best of the Contractor's knowledge, information and belief the Work covered by this Application for Payment has beei completed in accordance with the Contract Documents, that all amounts have been paid by the Contractor for Work for which previous Certificates for Payment were issued and payments received from the Owner, and that current payment shown herein is now due

CONTRACTOR: **Cadence McShane Construction**

By: Tyler Earle Date: 3/16/2023

66. Following Cadence McShane's scheme to hide its true profits with fraudulent change orders, Cadence McShane submitted numerous monthly Pay Applications and Contractor's Requisitions on HUD form 92448. Each of these submissions was signed under penalties of perjury by Cadence McShane. On HUD form 92448, Cadence McShane was required to certify "that the Work covered by this requisition has been completed in accordance with the Contract Documents." This is false. HUD relied on Cadence McShane's false claims by authorizing and guaranteeing payments under the applicable loan.

67. Through counsel, and at the request of an Assistant U.S. Attorney in the criminal division of the Western District of Texas, Ms. Hughes shared with the United States the Job Cost Status Journals that Cadence McShane finalized in February 2025. These two status journals are the last Cadence McShane completed for the Horizon Pointe project, and they were completed after Mr. Molnar's departure from the company.

68. Ms. Hughes shared two final Job Cost Status Journals: one for the "02" project and one for the "12" project. The internal Status Journal shows a total of $4,242,029 in savings:

Cadence McShane Construction Job Cost Status Journal 02/26/25 Page 5

| Cost Dv/Code | Description | Original Budget | Budget Mods | Change Orders | Revised Budget | Committed Cost | MTD Cost | JTD Cost | Estimated Cost to Complete | Estimated Cost at Completion | Savings /(Loss) |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **Total** | **Contract** | **0** | **0** | **0** | **0** | **12319,729** | **0** | **-4,248,278** | **6,249** | **-4,242,029** | **4,242,029** |

69. The external Status Journal, on the other hand, purports to show that Cadence McShane operated the project at a loss:

Cadence McShane Construction Job Cost Status Journal 02/26/25 Page 10

| Cost Dv/Code | Description | Original Budget | Budget Mods | Change Orders | Revised Budget | Committed Cost | MTD Cost | JTD Cost | Estimated Cost to Complete | Estimated Cost at Completion | Savings /(Loss) |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **Project:** | **12-0256 Horizon Pointe Apartments** | | **San Antonio** | **TX** | | | | | | | |

| | | Original Budget | Budget Mods | Change Orders | Revised Budget | Committed Cost | MTD Cost | JTD Cost | Estimated Cost to Complete | Estimated Cost at Completion | Savings /(Loss) |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | **Total Contract** | **45,132,156** | **0** | **1,084,867** | **46,217,023** | **40778,676** | **-6,164** | **46,767,466** | **106,835** | **46,874,301** | **-657,279** |

70. Moreover, the final Job Cost Status Journals confirm that the accounting changes Ms. Tea requested in June 2023 continued until the final entries in February 2025. For example, the external JCSJ asserts that the Revised Budget, Committed Cost, Job to Date Cost, and Estimated Cost at Completion for Wood Framing were each $11,880,126, and the Punch/ Turn Over was $589,376.

Cadence McShane Construction — Job Cost Status Journal — 02/26/25 — Page 2

**Project: 12-0256 Horizon Pointe Apartments San Antonio TX**
**06 WOOD, PLASTICS, AND COMPOSITES**

| Cost Dv/Code | Description | Original Budget | Budget Mods | Change Orders | Revised Budget | Committed Cost | MTD Cost | JTD Cost | Estimated Cost to Complete | Estimated Cost at Completion | Savings /(Loss) |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 06-1000 2 | Rough Carpentry | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | |
| 06-1100 4 | Wood Framing | 8,913,516 | 2,965,000 | 1,610 | 11,880,126 | 11878,516 | 0 | 11,878,516 | 0 | 11,878,516 | 1,610 |
| 06-2500 4 | Punch/Turn Over | 0 | 589,376 | 0 | 589,376 | 589,376 | 0 | 589,376 | 0 | 589,376 | |
| 06-4100 4 | Architectural Wd Caswrk | 69,137 | 5,511 | 0 | 74,648 | 74,648 | 0 | 74,648 | 0 | 74,648 | |
| | **Division Totals** | 8,982,653 | 3,559,887 | 1,610 | 12,544,150 | 12542,540 | 0 | 12,542,540 | 0 | 12,542,540 | 1,610 |

71. The internal, or true, accounting instead showed those costs were fraudulent, saving Cadence McShane $3,445,941 in unearned and unlawful gains:

Cadence McShane Construction — Job Cost Status Journal — 02/26/25 — Page 4

**Project: 02-0224 CMC Horizon Pointe Apts San Antonio TX**

**06 WOOD, PLASTICS, AND COMPOSITES**

| Cost Dv/Code | Description | Original Budget | Budget Mods | Change Orders | Revised Budget | Committed Cost | MTD Cost | JTD Cost | Estimated Cost to Complete | Estimated Cost at Completion | Savings /(Loss) |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 06-1100 2 | Wood Framing | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | |
| 4 | | 8,913,516 | 1,059,217 | 0 | 9,972,733 | 7,002,043 | 0 | 7,036,229 | 0 | 7,036,229 | 2,936,504 |
| 06-1753 3 | Wood Trusses | 0 | 1,905,783 | 0 | 1,905,783 | 1,905,783 | 0 | 1,905,783 | 0 | 1,905,783 | |
| 4 | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | |
| 06-2500 4 | Punch/Turn Over | 0 | 589,376 | 0 | 589,376 | 79,939 | 0 | 79,939 | 0 | 79,939 | 509,437 |
| | **Division Totals** | 8,913,516 | 3,554,376 | 0 | 12,467,892 | 8,987,765 | 0 | 9,021,951 | 0 | 9,021,951 | 3,445,941 |

72. Cadence McShane's fraudulent sworn representations about its true construction

costs has also led and will continue to lead to false claims (1) to the TDHCA for grants funded by the federal government; and (2) to the federal government for tax credits.

73. First, Opportunity Home and the Horizon Pointe lender and developer applied for and received a grant from the TDCHA. Although the grant was issued by Texas, all funding for the grant was issued with funds belonging to the U.S. Treasury. Because the grant application depended on and included false claims about the cost of the project, and because those false claims were submitted by Cadence McShane, Cadence McShane's false construction costs are a false claim for payment.

74. Second, as soon as a low-income housing project is "placed in service," the developer must begin its annual reporting obligations to the IRS. On information and belief, Horizon Pointe was placed in service in 2024.

75. On IRS Form 8609, the Low-Income Housing Credit Allocation and Certification, the TDHCA first uses representations from the housing project to certify the maximum applicable credit percentage allowable, the maximum qualified basis, the percentage of the aggregate basis financed by tax-exempt bonds, and the date the building was placed in service. All of this information comes from the Joint Venture, which in turn relied on Cadence McShane's representations regarding the total construction cost of the project. Because Cadence McShane falsely attested that the construction cost was approximately 4.2 million dollars more than it actually was, and because the appropriate qualified basis is 130%, Cadence McShane's false information caused and will cause the TDHCA to affirm $5,460,000 in additional tax credits.

76. Form 8609 caused and will cause the TDHCA to confirm the following: "Under penalties of perjury, I declare that the allocation made is in compliance with the requirements of section 42 of the Internal Revenue Code, and that I have examined this form and to the best of my

knowledge and belief, the information is true, correct, and complete."

77. Once the TDHCA completes its portion of the form based on Cadence McShane's false representations, the building owner itself also must swear under penalties of perjury the eligible basis of building and other information on Form 8609. Again, Cadence McShane's fraudulent representations of the construction costs led to inaccurate submissions since Horizon Pointe was placed in service in 2024.By inflating the construction costs through fabricated change orders and false cost reporting, Cadence McShane caused the project's eligible basis to be materially overstated, thereby inducing the allocation or preservation of federal tax credits in excess of the amount lawfully permitted.

78. The end user of credits, which on information and belief here is IRG, therefore was allocated too much in tax credits. As a result, the developer took too many tax credits and too quickly. The developer therefore paid less tax and cost the U.S. government millions of dollars in unpaid tax revenue.

79. It makes no difference that Cadence McShane itself did not sign a Form 8609 or any other claim for payment. Because Cadence McShane knowingly signed monthly pay application forms and numerous other documents swearing to false construction costs, and because those false construction costs were and will be submitted to the IRS on Form 8609, Cadence McShane's actions led to the harm suffered by the U.S. government and its taxpayers. "A method that makes uses of innocent individuals or businesses to reach and defraud the United States is not for that reason beyond the scope of" the False Claims Act. *Tanner v. United States*, 483 U.S. 107, 129, 107 S. Ct. 2739, 2752 (1987). "[T]he fact that a false claim passes through the hands of a third party on its way from the claimant to the United States does not release the claimant from culpability under the [False Claims] Act." *Id.*

80. Cadence McShane's fraudulent conduct is not new. In 2016, Michael Runyan pled guilty to conspiracy to steal government money and property under 18 U.S.C. 371. *See United States v. Runyan*, 15-20473-CR-UNGARO(s), S.D. Fla. (2015) (Dkt. 72). Runyan stipulated to the following facts: he owned and operated a general contractor that built low-income housing developments with CDG, a low-income housing developer. CDG applied for federal tax credits and grant monies issued by the federal government through Florida's version of the TDHCA. (*Runyan*, Dkt. 73). Florida authorized the allocation of tax credits and grant monies based on development costs. CDG conspired with Runyan to inflate the contract amount on numerous low income housing projects, totaling $36 million in inflated construction costs, causing the federal grant allocations and tax credits to be artificially enhanced. (*Runyan*, Dkt. 73). The government made clear that this fraud was, in fact, theft of government money: "Stealing money from the federal government is not a victimless crime. In this case, 36 million in taxpayer dollars intended for low-income housing developments never reached the needy but instead lined the pockets of Lloyd Boggio and his co-conspirators," said William J. Maddalena, Assistant Special Agent in Charge, FBI Miami.[11]

81. Here, too, Cadence McShane's fraud stole from the federal government and its taxpayers. Approximately $4.2 million taxpayer dollars intended to provide housing for low-income Americans instead was—in Cadence McShane's own words—"shielded" inside its internal Job Cost Status Journal to hide the profits it unlawfully retained beyond HUD limits. The federal government disburses a limited pool of grant money to the TDHCA each year. By overstating its construction costs and therefore seeking and obtaining a larger grant allocation from TDHCA than necessary, Cadence McShane wrongfully caused TDHCA, and in turn the federal

[11] https://www.justice.gov/usao-sdfl/pr/former-carlisle-ceo-and-consultant-pleads-guilty-fraud-scheme-involving-low-income (last accessed Apr. 9, 2026).

government as the source of the TDHCA's grant funds, to disburse grant allocations to the Horizon Pointe project that could and should have helped low-income Americans find high-quality affordable housing.

## FIRST CAUSE OF ACTION
## 31 U.S.C. § 3729(a)(1)(A): False Claims Act Violations

82. Plaintiffs incorporate by reference all of the allegations made in the proceeding paragraphs.

83. Through the acts described above, Defendant, its agents, and employees knowingly presented and caused to be presented to the United States Government false and fraudulent claims for payment or approval.

84. The United States and its fiscal intermediaries, unaware of the falsity of the claims made or submitted by Defendant, its agents, and employees, paid and are believed to continue to pay Defendant for claims that would not have been paid had Defendant not submitted false and fraudulent claims for payment.

85. The United States has sustained damages as a result of Defendant's false or fraudulent claims in an amount to be determined at trial.

## SECOND CAUSE OF ACTION
## 31 U.S.C. § 3729(a)(1)(B): False Statements

86. Plaintiffs incorporate by reference all of the allegations made in the proceeding paragraphs.

87. Through the acts described above, Defendant, its agents, and employees knowingly made, used, or caused to be made or used a false record or statement material to a false or fraudulent claim in order to obtain federal funds for work that was never completed.

88. The United States and its fiscal intermediaries, unaware of the falsity of the records

or statements that were material to false or fraudulent claims made or submitted by Defendant, its agents, and employees, paid and are believed to continue to pay Defendant for claims that would not have been paid had Defendants not submitted false and fraudulent claims for payment.

89. The United States has sustained damages as a result of Defendants' use of false records or statement material to false or fraudulent claims in an amount to be determined at trial.

## THIRD CAUSE OF ACTION
## 31 U.S.C. § 3729(a)(1)(G): Obligation to Pay

90. Plaintiffs incorporate by reference all of the allegations made in the proceeding paragraphs.

91. Through the acts described above, Defendant, its agents, and employees knowingly made, used, or caused to be made or used a false record or statement material to an obligation to pay or transmit money or property to the United States Government, or knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money or property to the United States Government.

92. The United States has sustained damages as a result of Defendant's use of false records or statement material to an obligation to pay or transmit money or property to the United States Government, or by knowingly concealing, avoiding, or decreasing an obligation to pay or transmit money to the United States Government in an amount to be determined at trial.

## ATTORNEYS FEES AND COSTS

93. Plaintiffs are entitled to litigation costs, expert witness fees, and reasonable attorney fees under 31 U.S.C. § 3729 et seq.

## JURY DEMAND

94. Plaintiffs request a trial by jury on all issues.

## PRAYER

95. For these reasons, Plaintiffs ask for judgment against Defendant for the following:

a. That Defendant cease and desist from violating the False Claims Act;

b. That Defendant is liable to Plaintiffs in an amount equal to three times the amount of damages the United States has sustained as a result of Defendant's actions, as well as a civil penalty against Defendant for each violation of the False Claims Act;

c. That Relator be awarded the maximum amount allowed pursuant to 31 U.S.C. § 3730(d);

d. pre-judgment and post-judgment interest as provided by law;

e. reasonable attorney's fees;

f. all costs of court; and

g. any other relief to which Plaintiffs may be entitled, whether in law or equity, including all relief necessary to make Plaintiffs whole.

Respectfully submitted,

/s/ Lawrence Morales II
Lawrence Morales II
ATTORNEY-IN-CHARGE
State Bar No. 24051077
Allison Sarah Hartry
State Bar No. 24083149
**THE MORALES FIRM, P.C.**
6243 IH 10 West, Suite 132
San Antonio, Texas 78201
Telephone No. (210) 225-0811
Facsimile No. (210) 225-0821
lawrence@themoralesfirm.com
ahartry@themoralesfirm.com
***ATTORNEYS FOR PLAINTIFF***

**CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the foregoing was filed electronically with the Court, which will provide notice to all counsel of record for Defendant, and also provided to the U.S. Government through its counsel, Erin Van der Walle, on this 14th day of April, 2026.

/s/ Allison S. Hartry
Allison S. Hartry