IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA ex rel. RANDALL MOLNAR and ANDREA HUGHES | § | |
| | § | |
| Plaintiff-Relator, | § | |
| | § | |
| vs. | § | Civil Action No. 5:24-cv-522 |
| | § | |
| | § | |
| CADENCE MCSHANE CONSTRUCTION COMPANY LLC, | § | |
| | § | |
| | § | |
| Defendant. | § | |

**DEFENDANT CADENCE MCSHANE CONSTRUCTION COMPANY LLC'S MOTION TO DISMISS RELATORS' SECOND AMENDED COMPLAINT**

# TABLE OF CONTENTS

**Page**

I. Introduction....1

II. Background....2

III. Legal Standard....5

IV. Argument....6

A. Tax Credits Cannot Be the Basis of FCA Liability....6

B. Because the Loan at Issue Never Defaulted, There Is No Claim for Payment to Trigger FCA Liability....9

C. The SAC Does Not Plead Fraud with Particularity, and in Particular Does Not Adequately Plead Materiality and Scienter....11

D. The False Claims Act's *Qui Tam* Provisions Violate Article II....14

E. The SAC Should Be Dismissed with Prejudice....20

V. Conclusion....20

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*In re Aiken Cnty.*,
725 F.3d 255 (D.C. Cir. 2013) .......... 15

*Almeida v. United Steelworkers of Am. Int'l Union, AFL-CIO*,
50 F. Supp. 2d 115 (D.R.I. 1999) .......... 7

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) .......... 6

*U.S. ex rel. Barber v. Paychex, Inc.*,
No. 09-20990-Civ., 2010 WL 2836333 (S.D. Fla. July 15, 2010), *aff'd sub nom. Barber v. Paychex Inc.*, 439 F. App'x 841 (11th Cir. 2011) .......... 7

*Blackburn v. City of Marshall*,
42 F.3d 925 (5th Cir. 1995) .......... 6

*Buckley v. Valeo*,
424 U.S. 1 (1976) .......... 14, 16, 17

*City of Clinton, Ark. v. Pilgrim's Pride Corp.*,
632 F.3d 148 (5th Cir. 2010) .......... 6

*The Confiscation Cases*,
74 U.S. (7 Wall.) 454 (1868) .......... 18

*Department of Transportation v. Association of American Railroads*,
575 U.S. 43 (2015) .......... 19

*Edmond v. U.S.*,
520 U.S. 651 (1997) .......... 16

*U.S. ex rel. Eisenstein v. City of N.Y.*,
556 U.S. 928 (2009) .......... 15, 16

*U.S. ex rel. Fago v. M&T Mortg. Corp.*,
518 F. Supp. 2d 108 (D.D.C. 2007) .......... 10

*Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*,
561 U.S. 477 (2010) .......... 15, 19

*U.S. ex rel. Gentry v. Encompass Rehab. Hosp. of Pearland, L.L.C.*,
157 F.4th 758 (5th Cir. 2025) .......... 14

*U.S. ex rel. Graves v. ITT Educ. Servs., Inc.*,
284 F. Supp. 2d 487 (S.D. Tex. 2003), *aff'd*, 111 F. App'x 296 (5th Cir. 2004) ..... 11

*Great Plains Trust Co. v. Morgan Stanley Dean Witter & Co.*,
313 F.3d 305 (5th Cir. 2002) ..... 20

*Guerra v. Castillo*,
82 F.4th 278 (5th Cir. 2023) ..... 6

*Hardin v. DuPont Scandinavia (ARA-JET)*,
731 F. Supp. 1202 (S.D.N.Y. 1990) ..... 8

*U.S. ex rel. Harman v. Trinity Indus., Inc.*,
872 F.3d 645 (5th Cir. 2017) ..... 12

*Heckler v. Chaney*,
470 U.S. 821 (1985) ..... 15

*Herrmann Holdings Ltd. v. Lucent Techs. Inc.*,
302 F.3d 552 (5th Cir. 2002) ..... 20

*Home Builders Ass'n of Mississippi, Inc. v. City of Madison, Miss.*,
143 F.3d 1006 (5th Cir. 1998) ..... 5

*U.S. ex rel. Kelly v. Boeing Co.*,
9 F.3d 743 (9th Cir. 1993) ..... 18

*U.S. ex rel. Lissack v. Sakura Global Capital Mkts., Inc.*,
No. 95 Civ. 1363, 2003 WL 21998968 (S.D. N.Y. Aug. 21, 2003), *aff'd*, 377 F.3d 145 (2d Cir. 2004) ..... 7

*U.S. ex rel. Longhi v. Lithium Power Techs., Inc.*,
513 F. Supp. 2d 866 (S.D. Tex. 2007) ..... 10

*Lucia v. SEC*,
585 U.S. 237 (2018) ..... 16, 17

*U.S. ex rel. Lusby v. Rolls-Royce Corp.*,
570 F.3d 849 (7th Cir. 2009) ..... 15

*Martin v. Hunter's Lessee*,
14 U.S. (1 Wheat.) 304 (1816) ..... 19

*U.S. ex rel. Montcrief v. Peripheral Vascular Assocs., P.A.*,
133 F.4th 395 (5th Cir. 2025) ..... 14

*U.S. ex rel. Montcrieff v. Peripheral Vascular Assocs., P.A.*,
507 F. Supp. 3d 734 (W.D. Tex. 2020) ..... 10

*Morrison v. Olson*,
487 U.S. 654 (1988) .......... 17, 20

*Patriot Tax Int'l, LLC v. Diaz*,
Civil Action No. 07-262, 2008 WL 2705450 (E.D. Ky. July 3, 2008) .......... 7

*U.S. ex rel. Penelow v. Janssen Prods. LP*
No. 12-7758 (3d Cir. appeal docketed April 29, 2025) .......... 14

*Ramming v. United States*,
281 F.3d 158 (5th Cir. 2001) .......... 5

*Riley v. St. Luke's Episcopal Hosp.*,
252 F.3d 749 (5th Cir. 2001) (en banc) .......... 14, 20

*Seila Law LLC v. CFPB*,
591 U.S. 197 (2020) .......... 14, 15, 17, 19, 20

*Smit v. SXSW Holdings, Inc.*,
903 F.3d 522 (5th Cir. 2018) .......... 5

*U.S. ex rel. Taylor v. Healthcare Assocs. Of Tex.*,
No. 25-10842 (5th Cir. appeal docketed July 21, 2025) .......... 14

*U.S. ex rel. Thompson v. Columbia/HCA Healthcare Corp.*,
125 F.3d 899 (5th Cir. 1997) .......... 11, 13

*Torrey v. Infectious Diseases Soc'y of Am.*,
86 F.4th 701 (5th Cir. 2023) .......... 6

*TransUnion LLC v. Ramirez*,
594 U.S. 413 (2021) .......... 14

*United States v. Cochran*,
235 F.2d 131 (5th Cir. 1956) .......... 9

*United States v. Marlin Med. Sols. LLC*,
579 F. Supp. 3d 876 (W.D. Tex. 2022) .......... 11

*United States v. Shell Oil Co.*,
Civ. A. No. H-91-2157, 1992 WL 281671 (S.D. Tex. Aug. 28, 1992) .......... 7

*United States v. Southland Mgmt. Corp.*,
326 F.3d 669 (5th Cir. 2003) .......... 11

*United States v. Texas*,
599 U.S. 670 (2023) .......... 14

*United States v. Vanoosterhout*,
898 F. Supp. 25 (D.D.C. 1995), *aff'd*, 96 F.3d 1491 (D.C. Cir. 1996) ............ 11

*Univ. Health Servs., Inc. v. U.S. ex rel. Escobar*,
579 U.S. 176 (2016) ............ 12, 13

*Vt. Agency of Nat'l Res. v. U.S. ex rel. Stevens*,
529 U.S. 765 (2000) ............ 15, 16, 18

*Yates v. Pinellas Hematology & Oncology, P.A.*,
21 F.4th 1288 (11th Cir. 2021) ............ 16

*U.S. ex rel. Zafirov v. Fla. Med. Assocs., LLC*,
751 F. Supp. 3d 1293 (M.D. Fla. 2024), *appeal docketed*, No. 24-13581 (11th Cir.) ............ 14, 18

**Rules and Statutes**

False Claims Act, 31 U.S.C. § 3729 *et seq.* ............ 7, 12, 13, 15, 16, 17, 18

I.R.C. § 7401 ............ 8

FED. R. CIV. P. 8 ............ 1

FED. R. CIV. P. 9 ............ 1, 11, 12, 13

FED. R. CIV. P. 12 ............ 1, 5, 7, 9

**Other Authorities**

U.S. CONST. art. II ............ 6, 14, 15, 18

Pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6), Defendant Cadence McShane Construction Company LLC ("CMC") files this Motion to Dismiss Relators' Second Amended Complaint (Dkt. No. 25) (the "Motion").

## I. INTRODUCTION

The Government has declined to intervene in this *qui tam* False Claims Act ("FCA") case, which Plaintiff-Relators brought despite the fact that the Government has not paid out a single penny. The Second Amended Complaint ("SAC") alleges that CMC made false statements related to a real estate project that inflated its profits. But nowhere in the SAC is there an allegation that the Government paid money that it would not have otherwise paid as a result of CMC's alleged conduct. Desperate to find a hook, Plaintiff-Relators' latest amendment evinces a whole new theory of liability that is no more viable than their original unworkable theory. The SAC should be dismissed on both statutory and constitutional grounds.

First, Plaintiff-Relators allege that the investor in the underlying project received increased tax credits as a result of Defendant's statements. But claims related to taxes are not actionable.

Second, Plaintiff-Relators allege that Defendant's statements fraudulently caused the U.S. Department of Housing and Urban Development ("HUD") to insure the loan that funded the project. But the loan was privately funded and never defaulted, so HUD never paid out any funds. Accordingly, that theory cannot support FCA liability, either.

Third, the SAC suffers from multiple pleading deficiencies under Federal Rules of Civil Procedure 8 and 9. Plaintiff-Relators have failed to allege fraud with particularity, and have adequately plead neither materiality nor scienter.

Finally, constitutional infirmities of the *qui tam* provisions of the FCA exist such that Plaintiff-Relators cannot prosecute this action, because they were not appointed to do so by the President with the advice and consent of the Senate.

CMC has done nothing wrong, and the allegations in the SAC are false. But even if the facts in the SAC were true (and despite the fact that Plaintiff-Relators fail to provide adequate evidence on the face of the SAC to support their claims), they would not make for a viable FCA claim. This Court should dismiss Plaintiff-Relators' twice-amended claims with prejudice.

## **II. BACKGROUND**

Founded in 1985, CMC is a longstanding Texas-based general contractor that provides construction management and design-build services across the multifamily, senior living, commercial, industrial, and education sectors from its offices in Austin, Dallas, Houston, and San Antonio.

The Government has declined to intervene in this *qui tam* action by Plaintiff-Relator Randall Molnar, a former CMC employee, and Plaintiff-Relator Andrea Hughes, a current CMC employee. On April 14, 2026, following CMC's notice of its intention to dismiss Molnar's First Amended Complaint pursuant to this Court's Standing Order in Civil Cases, Plaintiff-Relators filed the SAC (Dkt. No. 25). The SAC describes multiple interviews that Plaintiff-Relators participated in with the United States Government, yet none appear to have been compelling enough to result in any intervention by the United States (Dkt. No. 12).

In October 2021, the San Antonio Housing Authority's (n/k/a Opportunity Home San Antonio) non-profit public-facility-corporation affiliate and CMC entered into a Joint Venture Agreement for the Horizon Pointe project, a 312-unit affordable-housing development in San Antonio (the "Project"). They formed a Joint Venture ("JV"), the essential purpose of which was sales tax savings. By eliminating sales tax for construction materials, the JV structure resulted in a lower Project cost, thus supporting the affordable-housing mission.

On or about October 21, 2021, the JV entered into a construction contract with Horizon Pointe Apartments, LP, the Owner of the Project. The construction contract provided that the Owner would pay a single lump sum for the construction of the Project. As part of that contract and its

operation within the JV structure, CMC at all times solely bore the responsibility and risk with respect to the actual construction of the Horizon Pointe project, including all labor, materials, equipment, supervision, and services to be provided for CMC to complete the Project.

Plaintiff-Relators imply that CMC had a motive to overstate costs, suppress reported savings, and avoid distributions. Plaintiff-Relators contend that the JV Agreement entitled a non-profit public facilities corporation to 99% of the profits associated with the Project, while CMC bore all responsibility and risk. Relators posit that CMC doctored a set of "change orders" to reflect fictitious sums and wrongfully inflate Project costs on paper.[1] Plaintiff-Relators rely on an April 18, 2023, email titled "Horizon Pointe Financial Adjustments," sent before the final accounting and closing of the Project, which they construe as directing Project personnel to create change orders and other accounting entries to account for what the email actually described as "buyout savings."

Plaintiff-Relators' own pleading alleges that CMC hired Molnar and Hughes in 2023, well after the COVID-era 2021 JV Agreement and construction documents were executed, and after the Project had already encountered delays. Dkt. No. 25 ¶¶ 41-42. Initially, Molnar alleged that CMC purportedly increased the Project price from roughly $39 million to roughly $45 million, used change orders and accounting entries to move alleged "buyout savings" into committed costs, and, in turn, into HUD-related payment requests and certifications. The subsequent SAC also alleges that those disputed cost figures supposedly carried forward into qualified-basis calculations and IRS Form 8609 certifications after Horizon Pointe was placed in service in 2024. Plaintiff-Relators do not explain the nature of "buyout savings" and offer no proof as to what was actually spent on the Project.

[1] In crafting their fictitious narrative, Plaintiff-Relators went too far by accusing CMC of having a history of criminal conduct. Plaintiff-Relators boldly tell this Court that "Cadence McShane's fraudulent conduct is not new" and then proceed to describe the *Runyan* criminal case in the Southern District of Florida. *See* Dkt. No. 25 ¶ 80. However, *Runyan* had nothing to do with CMC. To the extent any connection is implied between CMC and Runyan, or that CMC has been found guilty of fraud previously, that implication is false.

As a matter of course, nearly every construction project will face unexpected additional costs due to unforeseen—and unforeseeable—conditions on the project and in the market. For example, if copper costs suddenly increase due to a Chilean mine collapse reducing global copper stocks, the cost of electrical materials such as wiring are bound to increase later, when the materials must be purchased for use in the project, compared to the cost when the project was originally bid and contracted months prior to the mine collapse. Ordinarily, general contractors incorporate contingency buffers for those unforeseen expenses and to provide flexibility to manage changes. By contrast, on a HUD project, there are no considerations given to contingencies in the overall project budget. The general contractor has to create "buyout savings" in order to manage such unexpected changes. As the process unfolds, the general contractor consistently monitors the status of subcontractor "buyout" expenses and compares them with the initial estimates. If discrepancies arise, it's crucial for the general contractor to "pencil-in" these fluctuating savings and swiftly adapt by making any necessary adjustments to initial "buyout savings" calculations and adopting cost-savings strategies, where necessary.

"Buyout savings" accounting during construction plays a vital role in managing project costs and providing flexibility for actual or unexpected expenses. Because a general contractor rarely self-performs all of the work on a project—instead, hiring specialty contractors to perform specific scopes of work—the actual anticipated costs of subcontractors and suppliers are merely forecasted projections until a project is fully complete. When a general contractor successfully negotiates and awards subcontracts at competitive rates, it can result in savings for the overall project budget. These "buyout savings" are then used over the life of a project to address unbudgeted and unexpected costs or changes that may arise during the construction process and for addressing contingencies. Management of "buyout savings" is an iterative process throughout the course of construction. Allocating funds from "buyout savings" to other such expense categories is necessary to ensure that

the anticipated project costs on the books actually reflect anticipated cost changes without exceeding the project budget.

The SAC alleges that because there are differences between the interim presentations of the Project's anticipated costs and committed amounts, and on the strength of that comparison alone, monthly HUD payment applications and related certifications must have understated CMC's actual profit while overstating costs. The SAC extends that same faulty implication across multiple pay applications and requisitions submitted during construction. This allegation is untrue.

The SAC also applies the same flawed accounting theory to the Project's tax-credit component. It alleges that the Project received Low-Income Housing Tax Credits ("LIHTC") through the Texas Department of Housing and Community Affairs and that the amount of available credits depended in part on the Project's eligible basis, which Plaintiff-Relators say was driven principally by construction and development costs. Plaintiff-Relators therefore assert that any overstatement of construction costs would in turn overstate the Project's eligible basis, affect information later reflected on IRS Form 8609, and improperly increase federal tax credits associated with the Project. On that basis, the SAC attempts to plead not only false-claim and false-statement counts, but also a reverse-false-claim theory. These allegations are as untrue as they are not actionable under the FCA.

## III. LEGAL STANDARD

Prior to assessing an attack on the merits, the Court must assure itself of its own jurisdiction to hear the case. *See, e.g.*, *Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001). A case should be dismissed for lack of subject-matter jurisdiction where "the plaintiff cannot prove any set of facts in support of his claim that would entitle plaintiff to relief." *Id.* (citing *Home Builders Ass'n of Mississippi, Inc. v. City of Madison*, 143 F.3d 1006, 1010 (5th Cir. 1998)).

To survive a motion to dismiss under Rule 12(b)(6), a complaint must contain sufficient facts to "state a claim to relief that is plausible on its face." *Smit v. SXSW Holdings, Inc.*, 903 F.3d 522, 527

(5th Cir. 2018). Facial plausibility requires "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Courts "disregard 'conclusory allegations, unwarranted factual inferences, [and] legal conclusions,'" *Torrey v. Infectious Diseases Society of America*, 86 F.4th 701, 704 (5th Cir. 2023), as well as "naked assertions devoid of further factual enhancement," *Guerra v. Castillo*, 82 F.4th 278, 284 (5th Cir. 2023). "[P]laintiffs must allege facts that support the elements of the cause of action in order to make out a valid claim." *City of Clinton v. Pilgrim's Pride Corp.*, 632 F.3d 148, 152–53 (5th Cir. 2010). The Court must dismiss a claim "if the complaint lacks an allegation regarding a required element necessary to obtain relief." *Blackburn v. City of Marshall*, 42 F.3d 925, 931 (5th Cir. 1995).

## IV. ARGUMENT

Plaintiff-Relators' SAC should be dismissed for four reasons. First, the FCA's prohibition on using alleged tax code violations as predicate violations renders Plaintiff-Relators' theory that CMC's allegedly false statements allowed an investor to receive tax credits non-viable. Second, because the HUD loan which financed the Project never defaulted (and because Plaintiff-Relators fail to allege any default), the Government never paid any money, and therefore there was no "claim for payment" within the meaning of the FCA. Third, the SAC fails to plead fraud with particularity and fails to adequately plead materiality and scienter. And fourth, the *qui tam* provisions of the FCA violate Article II of the U.S. Constitution.

### A. Tax Credits Cannot Be the Basis of FCA Liability.

Plaintiff-Relators allege that CMC caused tax credits to be awarded by the Government that otherwise would not have been awarded. *See, e.g.*, Dkt. No. 25 ¶ 29 (describing the LIHTC). CMC maintains that Plaintiff-Relators' allegations are false, and it did not engage in any unlawful conduct. But regardless, claims related to the LIHTC cannot lead to FCA liability as a matter of law.

The FCA expressly prohibits actions based on tax code violations. 31 U.S.C. § 3729(d) provides that "[t]his section does not apply to claims, records, or statements made under the Internal Revenue Code of 1986" (also known as the FCA's "Tax Bar"). On its face, then, putatively false claims related to payment of taxes, tax credits, claims for tax refunds, and tax returns are not actionable under the FCA. The Tax Bar applies specifically to the LIHTC, as noted in prior FCA litigation. In *Sears v. Livingston Management, Inc.*, the plaintiffs alleged that the defendants falsified tenant files and certifications to obtain low interest rural development programs and LIHTCs. Civil Action No. 09-0045-SDD, 2013 WL 5816690 (M.D. La. Oct. 29, 2013). The court, citing the "Tax Bar" of the FCA, dismissed the claims arising under the LIHTC program: "to the extent that Plaintiffs seek to recover, *Qui Tam*, for allegedly ill-gotten tax credits under the LIHTC, this Court lacks jurisdiction."[2] *Id.* at *1.

The same logic holds true for other areas of the Internal Revenue Code: the FCA categorically does not apply to claims made to the IRS or pursuant to the Code. *See, e.g.*, *U.S. ex rel. Barber v. Paychex, Inc.,* No. 09-20990-Civ., 2010 WL 2836333, at *5 (S.D. Fla. July 15, 2010) ("Under the plain language of the Tax Bar, any and all causes of action involving fraudulent claims, records, or statements made to the government under the Tax Code are expressly excluded from the scope of the FCA.") (cleaned up), *aff'd sub nom. Barber v. Paychex Inc.*, 439 F. App'x 841 (11th Cir. 2011)*; Patriot Tax Int'l, LLC v. Diaz*, Civil Action No. 07-262, 2008 WL 2705450, at *3 (E.D. Ky. July 3, 2008) ("Although the FCA seems rather broad, it contains one major exception, known as the Tax Bar."); *U.S. v. Shell Oil Co.*, Civ. A. No. H-91-2157, 1992 WL 281671, at *3 (S.D. Tex. Aug. 28, 1992) ("[T]he 1986 Amendment to the

[2] Courts are divided on the (largely academic) question of whether the Tax Bar is jurisdictional in nature or is simply a determination on the merits, and therefore whether motions to dismiss grounded in the Tax Bar should be brought under Rule 12(b)(1) or Rule 12(b)(6). *Compare, e.g.*, *U.S. ex rel. Lissack v. Sakura Global Capital Mkts., Inc.*, No. 95 Civ. 1363, 2003 WL 21998968, at *4–8 (S.D.N.Y. Aug. 21, 2003), *aff'd*, 377 F.3d 145 (2d Cir. 2004) *with Almeida v. United Steelworkers of Am. Int'l Union, AFL-CIO*, 50 F. Supp. 2d 115, 126–27 (D.R.I. 1999). Out of an abundance of caution, CMC brings this motion under both subsections of Rule 12.

False Claims Act specifically excluded tax cases from coverage under the Act."); *Hardin v. DuPont Scandinavia (ARA-JET)*, 731 F. Supp. 1202, 1204 (S.D.N.Y. 1990) ("The legislative history of § 3729(e) indicates Congress added it to the FCA to remove all income tax cases from the scope of § 3729. . . . Thus, actions to recover income taxes are not authorized by the *qui tam* provisions of § 3730.").

The *Hardin* court provides some additional support for this conclusion. The Tax Bar—written into law in 1986—simply codified existing precedent. Even before the Tax Bar, the Code itself precluded an FCA suit based on taxes. The court in *Hardin* cited I.R.C. § 7401, which provides that "[n]o civil action for the collection or recovery of taxes . . . shall be commenced unless the Secretary [of the Treasury] authorizes or sanctions the proceedings and the Attorney General . . . directs that the action be commenced." *Hardin*, 731 F. Supp. at 1204. Prior to enactment of the Tax Bar, courts routinely cited I.R.C. § 7401 to dismiss income tax-based FCA cases. *Id.* (collecting cases).

The SAC tries hard to intimate—without ever clearly alleging—that the Government paid out Treasury funds for this Project, unrelated to taxes. Indeed, the word "grant" appears 17 times in the SAC, in paragraphs 29, 31, 33, 38, 72, 73, 80, and 81. But a closer look reveals the "grant" language as mere smoke and mirrors. The SAC's use of the term "grant" actually refers to tax credits. Paragraph 29 of the SAC describes the LIHTC regime, and explains that tax credits are first allocated to the states by Congress, and then state and local housing credit agencies "allocate the credits to sponsors of and investors in affordable housing projects ('grants')." Dkt. No. 25 ¶ 29. In other words, the SAC simply chooses to call tax credits "grants."

The SAC's wordplay cannot circumvent the Tax Bar. Plaintiff-Relators' allegations that Defendant's conduct caused the Government to award tax credits to the investor in the Project which it otherwise would not have awarded cannot, as a matter of law, form the basis of a cognizable FCA claim. For that reason, the SAC should be dismissed.

### B. Because the Loan at Issue Never Defaulted, There Is No Claim for Payment to Trigger FCA Liability.

Longstanding FCA case law holds that the FCA applies only to government payments arising from defaults, not government loan guarantees or insurance, under these circumstances. In complying with this Court's Rule 12(b)(6) conference process, defense counsel apprised Plaintiff-Relators' counsel of this case law. Hence, it is not surprising that the SAC diminishes the importance of, but does not clearly disclaim, the theory that, because HUD insured the loan that financed the Project, CMC is liable under the FCA. Regardless, this theory of recovery remains a non-starter.

The FCA imposes liability on individuals or entities that present or cause to be presented false claims for payment to the Government. CMC vigorously disputes that it made any false claim. But even assuming, *arguendo*, everything in the SAC is true, there was never any claim ***for any payment*** in connection with this Project because the relevant loan never defaulted.

Where the Government has only guaranteed a loan, but has not paid out any funds, there can be no FCA liability. *United States v. McNinch* involved a home improvement loan insured by the Federal Housing Administration ("FHA"), a HUD agency. 356 U.S. 595 (1958). The court noted that "[i]n agreeing to insure a home improvement loan ***the FHA disburses no funds*** nor does it otherwise suffer immediate financial detriment. It simply contracts, for a premium, to reimburse the lending institution in the event of future default, if any." *Id.* at 599 (emphasis added). Because it was in essence interpreting a criminal statute and so needed to carefully restrict the scope of application, the court found that "an application for credit insurance does not fairly come within the scope that Congress intended the Act to have."[3] *Id.* The *McNinch* court also noted that the Fifth Circuit had previously adopted the same reasoning in *United States v. Cochran*, 235 F.2d 131 (5th Cir. 1956).

[3] The Court specifically noted that its analysis might have been different in the event of a default: "Since there has been no default here, we need express no view as to whether a lending institution's demand for reimbursement on a defaulted loan originally procured by a fraudulent application would be a 'claim' covered by the False Claims Act." *Id.* at 599 n.6.

Subsequently decided cases confirm that, when it comes to the context of a loan guarantee by the Government, the FCA only applies following a loan default. For example, in *United States ex rel. Souza v. Embrace Home Loans, Inc.*, the court denied summary judgment on an FCA claim involving certification of compliance with HUD regulations. 808 F. Supp. 3d 314 (D.R.I. 2025). Importantly, in *Souza*, the relevant loan had defaulted. In analyzing the proximate cause requirement, the court noted that "the plaintiff must put forward evidence showing that it was 'reasonably foreseeable' that the . . . false certification of compliance with HUD regulations 'played some role in causing or increasing the risk of a subsequent default.' . . . Simple but-for causation (i.e., that HUD would not have insured the loan 'but for' the false certification) is not enough." *Id.* at 362. The court then reasoned that "***the defaults are important because they are what triggers HUD's payment obligations under the federal insurance program.***" *Id.* (cleaned up and emphasis added). The court then concluded that the relator had presented sufficient expert testimony that the noncompliance proximately caused the higher risk of eventual default, allowing the case to proceed. *See also U.S. ex rel. Montcrieff v. Peripheral Vascular Assocs., P.A.*, 507 F. Supp. 3d 734, 758 (W.D. Tex. 2020) ("The FCA attaches liability, not to the underlying fraudulent activity, but to the claim for payment.") (cleaned up); *U.S. ex rel. Fago v. M&T Mortg. Corp.*, 518 F. Supp. 2d 108, 117 (D.D.C. 2007) (collecting cases and noting that "the false application for a guaranteed loan . . . ***establishes only an 'inchoate' violation*** . . . that does not ripen into a claim actionable under the statute until a later event of legal consequence between the lender and the Government") (emphasis added); *U.S. ex rel. Longhi v. Lithium Power Techs., Inc.*, 513 F. Supp. 2d 866, 873 (S.D. Tex. 2007) ("Fraudulent conduct and false statements remain inchoate until a claim for payment causing the government to disburse funds is made.") (internal quotation omitted).

In other contexts, too, courts have concluded that the relevant event for FCA purposes is the actual claim for payment, not the insurance of the loan. For example, in *United States v. Rivera*, the court granted summary judgment to the Government in an FCA case against a hospital for diverting

proceeds of a federally insured mortgage loan. 55 F.3d 703 (1st Cir. 1995). The court held that the relevant "claim for payment" was the application submitted by the lender, Merril Lynch, for payment after the loan defaulted. *Id.* at 710; *see also U.S. ex rel. Graves v. ITT Educ. Servs., Inc.*, 284 F. Supp. 2d 487, 495–96 (S.D. Tex. 2003) ("The cases recognize that when there is a government-insured loan, a claim under the False Claims Act only occurs when the borrower defaults and the government must make payment."), *aff'd*, 111 F. App'x 296 (5th Cir. 2004); *United States v. Vanoosterhout*, 898 F. Supp. 25, 29 (D.D.C. 1995), *aff'd*, 96 F.3d 1491 (D.C. Cir. 1996). In other words, there is no liability under the FCA for a false statement unless that statement results in payment of a false claim by the Government. *See United States v. Southland Mgmt. Corp.*, 326 F.3d 669, 674–75 (5th Cir. 2003); *United States v. Marlin Med. Sols. LLC*, 579 F. Supp. 3d 876, 884 (W.D. Tex. 2022).

The SAC never alleges that any loan related to this Project defaulted, and indeed there was no default. Therefore, the Government never paid any money in connection with this Project. Absent a "claim for payment" within the meaning of the FCA, this case should be dismissed.

### C. The SAC Does Not Plead Fraud with Particularity, and in Particular Does Not Adequately Plead Materiality and Scienter.

#### 1. The SAC Does Not Plead Fraud with Particularity.

Federal Rule of Civil Procedure 9(b) requires that "in alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." In the Fifth Circuit, this standard requires a relator to allege the "who, what, when, where, and how" of each alleged false claim. *U.S. ex rel. Thompson v. Columbia/HCA Healthcare Corp.*, 125 F.3d 899, 903 (5th Cir. 1997).

But the SAC merely alleges that "numerous" Pay Applications ("PAs") were submitted. Dkt. No. 25 ¶ 66. It fails to make any allegations concerning (1) the total number of PAs submitted, (2) the date of each, (3) the dollar amount claimed on each, or (4) what was false about each PA. With respect to the application to the Texas Department of Housing and Community Affairs, the SAC lacks any particular allegations at all. It does not identify when the "grant" application was submitted, who

prepared or submitted it, what specific cost figures were false and incorporated into the application, or how much of the "grant" was attributable to the alleged false costs. The SAC does not come close to satisfying Fed. R. Civ. P. 9(b), and should therefore be dismissed.

2. The SAC Does Not Adequately Plead Materiality.

The FCA's materiality standard is "demanding." *Univ. Health Servs., Inc. v. U.S. ex rel. Escobar*, 579 U.S. 176, 194 (2016). A misrepresentation is material only if it has "a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." 31 U.S.C. § 3729(b)(4). *Escobar* specifically warned that materiality is not met merely because the government designates a requirement as a condition of payment; courts must look to the Government's actual conduct. Critically, if the government "regularly pays a particular type of claim in full despite actual knowledge that certain requirements were violated," that is "very strong evidence" against materiality. 579 U.S. at 195. The Fifth Circuit applies *Escobar*'s demanding standard rigorously. *See, e.g.*, *U.S. ex rel. Harman v. Trinity Indus., Inc.*, 872 F.3d 645 (5th Cir. 2017). But the SAC does not contain any allegation that HUD ever refused, suspended, withheld, or threatened to withhold payment on a PA because a contractor exceeded the HUD safe harbor profit caps, and under Escobar, the government's *actual response* to the alleged conduct is the most probative evidence of materiality.

The SAC alleges that "HUD relied on Cadence McShane's false claims by authorizing and guaranteeing payments under the applicable loan." Dkt. No. 25 ¶ 66. But this bare assertion of reliance, without more, is insufficient to meet the *Escobar* materiality standard. The SAC fails to allege:

- That HUD has ever denied a pay application from CMC or any similarly situated contractor on the basis of exceeding profit caps;
- That HUD has ever clawed back funds or initiated enforcement based on profit-cap violations; or
- That HUD, upon learning of CMC's actual profits, has taken any remedial action or suspended further payments.

With respect to the LIHTCs, there is no allegation that any state agency or the IRS would have denied or recaptured credits had they known of the true construction costs. There is also no allegation that any agency's grant or credit allocation was conditioned on construction cost accuracy.

The SAC contains specific allegations about Plaintiff-Relators' contact with the Government. *See, e.g.*, Dkt. No. 25 ¶ 67 (describing an alleged meeting between Relator Hughes and an AUSA). But there is no allegation that, afterward, HUD or the Department of Justice suspended payments, demanded refunds, moved to enforce the profit caps, or took any action at all.

As *Escobar* clarified, the FCA's materiality inquiry demands more. The SAC does not adequately plead materiality and should be dismissed.

3. The SAC Does Not Adequately Plead Scienter.

The FCA requires that a defendant act "knowingly," meaning: with actual knowledge, deliberate ignorance, or reckless disregard of the truth or falsity of information. 31 U.S.C. § 3729(b)(1). Under Rule 9(b), fraud—including FCA fraud—must be pled with particularity as to the "who, what, when, where, and how" of the alleged misrepresentations. *Thompson*, 125 F.3d at 903. While Rule 9(b) permits scienter to be alleged generally, the complaint must still plead a factual basis from which scienter can be inferred; bare legal conclusions are insufficient.

The SAC's scienter allegations are woefully insufficient. The SAC does not allege that CMC or any of its officers or employees knew that any allegedly false construction costs would be transmitted to the Government or would affect the amount of tax credits allocated. Further, the SAC only makes allegations concerning Form HUD-2328 "on information and belief." *See* Dkt. No. 25 ¶ 28. Not only does that not satisfy Rule 9(b), but the SAC does not even identify the individual who signed the form, offers no allegations about their state of mind, fails to specify what information on the form was false, and fails to allege what knowledge the signer had of its falsity. Just as with materiality, the SAC fails to adequately plead scienter, and it should be dismissed on that basis as well.

### D. The False Claims Act's *Qui Tam* Provisions Violate Article II.

Under the FCA, private plaintiff-relators exercise core executive power, determining whether, when, and how to bring lawsuits on the Government's behalf. That scheme violates both the Appointments Clause and the Vesting and Take Care Clauses of Article II of the U.S. Constitution.[4]

#### 1. FCA Relators Exercise Core Executive Power.

Article II sets the Executive Branch apart as the only branch in which power is centralized in a single person: the President. "Under our Constitution, the 'executive Power'—all of it—is 'vested in a President.'" *Seila Law LLC v. CFPB*, 591 U.S. 197, 203 (2020) (quoting U.S. Const. Art. II, § 1, cl. 1). Article II gives the President broad powers, among the most important of which is the "authority to enforce federal law." *United States v. Texas*, 599 U.S. 670, 678 (2023). Because an enforcement action on behalf of the United States is "the ultimate remedy for a breach of the law," *Buckley v. Valeo*, 424 U.S. 1, 138 (1976), the authority to initiate and litigate such actions is a "quintessentially executive power," *Seila Law*, 591 U.S. at 219; *see TransUnion LLC v. Ramirez*, 594 U.S. 413, 429 (2021).

Although officers can assist with enforcement, those "lesser officers must remain accountable to the President, whose authority they wield," and only they may exercise executive power on the

[4] In the past, the Fifth Circuit has addressed the Article II constitutionality of the FCA *qui tam* provisions and upheld them. *See, e.g.*, *Riley v. St. Luke's Episcopal Hosp.*, 252 F.3d 749, 753–57 (5th Cir. 2001) (en banc). But more recently, Fifth Circuit commentary has called that conclusion into question. *See U.S. ex rel. Gentry v. Encompass Rehab. Hosp. of Pearland, L.L.C.*, 157 F.4th 758, 766–67 (5th Cir. 2025) (Ho, J., concurring) ("Judge Smith's dissent in Riley demonstrates why we should not discourage lonely voices from speaking out and attempting to uncover the truth. However the chips may fall, the law is advanced when we allow a single judge to stand against the tide and identify error."); *U.S. ex rel. Montcrief v. Peripheral Vascular Assocs., P.A.*, 133 F.4th 395, 410, 412 (5th Cir. 2025) (Duncan, J., concurring) (stating that the FCA "defies" the Constitution "twice over" and that he "hop[ed] this anomalous practice will someday come to an end"); *see also U.S. ex rel. Taylor v. Healthcare Assocs. of Tex.*, No. 25-10842 (5th Cir. appeal docketed July 21, 2025). Other federal circuits are likewise considering the constitutionality of the FCA's *qui tam* provisions as well. *See, e.g.*, *U.S. ex rel. Zafirov v. Fla. Med. Assocs., LLC*, 751 F. Supp. 3d 1293 (M.D. Fla. 2024), *appeal docketed*, No. 24-13581 (11th Cir.); *U.S. ex rel. Penelow v. Janssen Prods. LP*, No. 12-7758 (3rd Cir. appeal docketed April 29, 2025). Accordingly, any perceived settled precedent appears to be in legal doubt given more recent developments in the law.

President's behalf. *Seila Law*, 591 U.S. at 213. Otherwise, "the President could not be held fully accountable" if he failed faithfully to execute the laws; "the buck would stop somewhere else." *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 514 (2010); *see* U.S. Const. Art. II, § 3.

The FCA's *qui tam* provisions disregard that fundamental constitutional structure and delegate core law-enforcement power to self-appointed relators. The FCA empowers unaccountable private parties, who have suffered no personal injury and sue only as partial assignees of the Government's claim, to bring lawsuits on its behalf. The constitutional problems with this scheme are apparent from the start: the FCA authorizes private individuals to choose whether and when to file suit on the government's behalf and thus supplants the Executive Branch's discretion not to do so. "One of the greatest unilateral powers a President possesses . . . is the power to protect individual liberty by essentially underenforcing federal statutes regulating private behavior." *In re Aiken Cnty.*, 725 F.3d 255, 264 (D.C. Cir. 2013) (opinion of Kavanaugh, J.) (emphasis omitted). For that reason, the Supreme Court has long recognized that "an agency's decision not to prosecute or enforce . . . is a decision generally committed to an agency's absolute discretion." *Heckler v. Chaney*, 470 U.S. 821, 831 (1985).

Under the FCA, however, a relator can usurp the Executive Branch's enforcement discretion. The relator decides whether to sue and what claims to pursue. And if the Government declines to intervene, the relator controls the litigation going forward, including a decision to seek treble damages and civil penalties for any injury to the government—an "essentially punitive" remedy. *Vt. Agency of Nat'l Res. v. U.S. ex rel. Stevens*, 529 U.S. 765, 784 (2000).

Nor does a relator's authority end there. After filing, unless the Government intervenes, the relator has the broad "right to conduct the action" on behalf of the United States. 31 U.S.C. § 3730(c)(3), and can litigate as the relator wishes, making decisions such as pursuing certain theories and forfeiting others. Those decisions generally bind the United States upon final judgment. *See U.S. ex rel. Eisenstein v. City of N.Y.*, 556 U.S. 928, 936 (2009); *U.S. ex rel. Lusby v. Rolls-Royce Corp.*, 570 F.3d

849, 853 (7th Cir. 2009). Even when the Government does intervene, the relator has the "right to continue" as an "unrestricted" party unless the Government makes certain specified showings, such as that the relator is using the litigation "for purposes of harassment." 31 U.S.C. § 3730(c).

Finally, but crucially, the relator exercises all those authorities "for" and "in the name of the Government." 31 U.S.C. § 3730(b)(1). The FCA delegates to the relator the power to assert the Government's "proprietary [interests] resulting from the alleged fraud" and also the "injury to its sovereignty." *Stevens*, 529 U.S. at 771. But under the FCA, the United States is always a "real party in interest," *Eisenstein*, 556 U.S. at 934, and the relator is a "stand-in" or "avatar" for the Government, *Yates v. Pinellas Hematology & Oncology, P.A.*, 21 F.4th 1288, 1309–10 (11th Cir. 2021) (citation omitted).

In short, both the FCA's text and longstanding precedent make clear that relators exercise broad enforcement authority on behalf of the government—a quintessential executive power. The question thus becomes whether relators may constitutionally do so. The answer is that they may not.

2. The FCA's *Qui Tam* Provisions Violate the Appointments Clause.

The FCA's *qui tam* provisions violate the Appointments Clause, which is one of the most "significant structural safeguards of the constitutional scheme" because it helps ensure the "public accountability" of those who wield Government power. *Edmond v. United States*, 520 U.S. 651, 659–60 (1997). Relators function as officers of the United States and thus are subject to the Appointments Clause because they (1) exercise significant authority pursuant to the laws of the United States and (2) occupy a continuing position established by law. Because Plaintiff-Relators have not been appointed consistent with the Appointments Clause, the FCA's *qui tam* provisions are therefore unconstitutional.

To be an officer, one must exercise "significant authority pursuant to the laws of the United States." *Buckley*, 424 U.S. at 126. That requirement focuses on "the extent of power an individual wields in carrying out his assigned functions." *Lucia v. SEC*, 585 U.S. 237, 245 (2018). Relators exercise significant authority because they wield one of the most important forms of executive power: the

power to bring enforcement actions on behalf of the United States. In *Buckley*, the Supreme Court held that members of the Federal Election Commission ("FEC") were officers because they had authority to "conduct[] civil litigation in the courts of the United States for vindicating public rights." 424 U.S. at 140. Such authority could not "possibly be regarded as merely in aid of the legislative function of Congress," because a lawsuit on behalf of the United States "is the ultimate remedy for a breach of the law." *Id.* at 138. More recently, the Court reaffirmed that the authority to seek "daunting monetary penalties against private parties on behalf of the United States in federal court" is a "significant" and "quintessentially executive" power. *Seila Law*, 591 U.S. at 219, 224–25.

A relator exercises effectively identical authority "for" and "in the name of the Government." 31 U.S.C. § 3730(b)(1). Where the Government does not intervene, relators can conduct the litigation as they wish, and may deploy all of the ordinary tools of litigation in the name of the United States. In some respects, a relator has even greater authority than other officials whose power has been deemed significant. Unlike the independent counsel in *Morrison v. Olson*, 487 U.S. 654 (1988), for example, a relator does not need his appointment to be authorized by an officer accountable to the President before suing, and cannot be removed by such an officer. *See id.* at 660–61, 671. And whereas an independent counsel's jurisdiction is specifically defined, *see id.* at 672, the relator herself determines the limits of her reach and of the complaint. Likewise, unlike the members of the FEC in *Buckley*, relators face none of the institutional constraints of multimember boards: a relator has "no colleagues to persuade" and so may act "unilaterally." *Seila Law*, 591 U.S. at 225 (emphasis omitted).

Relators also occupy a "continuing position established by law." *Lucia*, 585 U.S. at 245 (cleaned up). That requirement "stresses ideas of tenure and duration" and asks whether the position is impersonal, durable, and statutory, rather than personal, transient, and discretionary. *Id.* (cleaned up). Relators bring suit in the impersonal name of the Government, and they may be replaced in their duties by others. *See Stevens*, 529 U.S. at 771–74. They perform functions that are expressly authorized

and regulated by the FCA, rather than *ad hoc* duties only as assigned. *See* 31 U.S.C. § 3730(b)–(c). They receive statutorily defined compensation. *See* 31 U.S.C. § 3730(d). And they initiate and prosecute actions that may span many years with lasting and preclusive effects.

Accordingly, relators are officers of the United States and the FCA's unique self-appointment scheme violates the Appointments Clause.

3. The *Qui Tam* Provisions Also Violate the Vesting and Take Care Clauses.

The FCA's *qui tam* provisions assign core executive power to private parties—the authority to litigate on behalf of the United States. But they do so without providing meaningful mechanisms for presidential supervision or removal. That anomalous arrangement contravenes both the Vesting and Take Care Clauses. As discussed, Article II vests "all" executive power in the President, who in turn may rely on his properly appointed and supervised subordinates to help him take care that the laws are faithfully executed. Among the most important aspects of the President's executive power is the authority to bring lawsuits on behalf of the United States. That is why the "[s]ettled rule" has long been that "[c]ivil suits, in the name and for the benefit of the United States," must be brought by government attorneys "subject to the direction, and within the control of, the Attorney-General," who answers to the President. *The Confiscation Cases*, 74 U.S. (7 Wall.) 454, 457–59 (1868).

The FCA departs from that framework by vesting private parties with powers equivalent to the Attorney General. Congress sought through the FCA to "disperse some quantum of executive authority amongst the general public," *United States ex rel. Kelly v. Boeing Co.*, 9 F.3d 743, 750 (9th Cir. 1993), because of its "generalized distrust of, and dissatisfaction with, the way the Executive Branch was carrying out its law enforcement responsibilities," *United States ex rel. Zafirov v. Fla. Med. Assocs., LLC*, 751 F. Supp. 3d 1293, 1321 (M.D. Fla. 2024), *appeal docketed*, No. 24-13581 (11th Cir.) (citation omitted). But the Constitution does not permit "dispersion" of the executive power among the general public, particularly where the President lacks meaningful control over those individuals. Such a

practice has long been viewed as "utterly inadmissible," *Martin v. Hunter's Lessee*, 14 U.S. (1 Wheat.) 304, 330 (1816), and lacks "even a fig leaf of constitutional justification," *Department of Transportation v. Association of American Railroads*, 575 U.S. 43, 62 (2015) (Alito, J., concurring).

The FCA's *qui tam* provisions also violate the Vesting and Take Care Clauses by failing to provide the President with any meaningful mechanism to supervise or remove relators. Even where a President has properly assigned executive power to a subordinate, the Constitution requires that the President retain the "ability to supervise and remove [those] who wield executive power in his stead." *Seila Law*, 591 U.S. at 238. Under the FCA, the President lacks sufficient authority to do either.

In recent years, the Supreme Court has repeatedly invalidated statutes that deprive the President of meaningful authority to supervise or remove executive officers. In *Free Enterprise Fund*, the Court concluded that it was unconstitutional for the President to "be restricted in his ability to remove a principal officer, who is in turn restricted in his ability to remove an inferior officer." 561 U.S. at 484. That structure was "contrary to Article II's vesting of the executive power in the President" and "violated the basic principle that the President cannot delegate ultimate responsibility or the active obligation to supervise that goes with it." *Id.* at 496 (cleaned up).

Likewise, in *Seila Law*, the Court held that Congress could not limit the President's authority to remove the director of the Consumer Financial Protection Bureau only for "inefficiency, neglect, or malfeasance." 591 U.S. at 213. "If any power whatsoever is in its nature Executive," the Court explained, "it is the power of appointing, overseeing, and controlling those who execute the laws." *Id.* (cleaned up). And that power generally must include "the ability to remove executive officials, for it is only the authority that can remove such officials that they must fear and, in the performance of their functions, obey." *Id.* at 213–14 (cleaned up). Especially given the director's broad authorities—including the "quintessential[] executive power" of bringing enforcement actions against private citizens, *id.* at 219—the removal restrictions were unconstitutional.

The FCA's *qui tam* provisions intrude further on the President's supervisory authority than even the statutes in *Free Enterprise Fund* and *Seila Law*—especially given that the President has no authority at all over the appointment of relators—and the FCA lacks the mechanisms of supervision and control present in *Morrison*. Most importantly, "[t]he Executive has no power to remove the relator from the litigation under any circumstances." *Riley v. St. Luke's Episcopal Hosp.*, 252 F.3d 749, 763 & n.19 (5th Cir. 2001) (en banc) (Smith, J., dissenting).

The FCA's *qui tam* provisions authorize private parties to commence and litigate enforcement actions on behalf of the United States outside the supervision and control of the President. Whether analyzed under the Appointments Clause or the Vesting and Take Care Clauses, the outcome is the same: the *qui tam* provisions violate Article II's scheme concerning the President's constitutional authorities and duties.

### E. The SAC Should Be Dismissed with Prejudice.

Prior to filing this Motion, CMC complied with the Court's Standing Order in Civil Cases, where it states, in bold, that if after following this procedure it grants a motion to dismiss, "**the Plaintiff shall not be allowed an additional opportunity to amend its Complaint following a properly filed Motion to Dismiss**." Dkt. No. 2 at 1–2 (emphasis in original and citing *Great Plains Tr. Co. v. Morgan Stanley Dean Witter & Co.*, 313 F.3d 305, 329 (5th Cir. 2002); *Herrmann Holdings Ltd. v. Lucent Techs. Inc.*, 302 F.3d 552, 567 (5th Cir. 2002)). Relators should not be given leave to amend, and the SAC should be dismissed with prejudice.

## V. CONCLUSION

For the foregoing reasons, Defendant respectfully requests the Court grant this Motion in full and dismiss this action with prejudice.

Dated: April 28, 2026

**NORTON ROSE FULBRIGHT US LLP**

*/s/ Jay Dewald*
Jay Dewald
State Bar No. 24001990
Ashley Senary Dahlberg
State Bar No. 24075051
Joshua M. Taylor
State Bar No. 24139885
jay.dewald@nortonrosefulbright.com
ashley.dahlberg@nortonrosefulbright.com
joshua.taylor@nortonrosefulbright.com
Frost Tower
111 W. Houston Street, Suite 1800
San Antonio, Texas 78205
Telephone: 210-224-5575
Facsimile: 210-270-7205

*Counsel for Defendant Cadence McShane Construction Company LLC*

CERTIFICATE OF SERVICE

On April 28, 2026, I electronically submitted the foregoing document with the clerk of court for the U.S. District Court, Western District of Texas, using the electronic case filing system of the court, or as otherwise indicated below, which will effect service on the following counsel of record:

Lawrence Morales, II (Attorney-in-Charge)
State Bar No. 24051077
Allison Sarah Hartry
State Bar No. 24083149
THE MORALES FIRM, P.C.
6243 IH 10 West, Suite 132
San Antonio, Texas 78201
Tel: (210) 225-0811
Email: lawrence@themoralesfirm.com
Email: ahartry@themoralesfirm.com

*Attorneys for Plaintiffs-Relators*
*Randall Molnar and Andrea Hughes*

*/s/ Jay Dewald*
Jay Dewald