**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TEXAS**
**SAN ANTONIO DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA ex rel. RANDALL MOLNAR and ANDREA HUGHES,** | § | |
| **Plaintiff-Relator** | § | |
| **v.** | § | Civil Action No. 5:24-cv-522-JKP |
| **CADENCE MCSHANE CONSTRUCTION COMPANY, LLC,** | § | |
| **Defendant.** | § | |

**UNITED STATES' STATEMENT OF INTEREST AS TO DEFENDANT'S MOTION TO DISMISS RELATORS' SECOND AMENDED COMPLAINT**

The United States respectfully submits this Statement of Interest pursuant to 28 U.S.C. § 517 to provide the Government's view on whether the qui tam provisions of the False Claims Act ("FCA") violate Article II of the Constitution, which Defendant Cadence McShane Construction Company, LLC ("Cadence") argued in its Motion to Dismiss the Second Amended Complaint.[1] Dkt. 26. The United States did not intervene in this case and is not a party, but it remains a real party in interest. *See* 31 U.S.C. § 3730(d); *United States ex rel. Eisenstein v. City of New York*, 556 U.S. 928, 934-35 (2009). Because the FCA is the Government's primary civil tool for prosecuting fraud, it has a substantial interest in the development of law in this area.

This memorandum of law addresses only Cadence's constitutional challenges. Aside from the issue discussed herein, the Government takes no position as to the merits of the pending motion.

[1] The United States notes Cadence did not serve the United States with a notice of constitutional question as required under Federal Rule of Civil Procedure 5.1(a), nor did Cadence serve a copy of the Motion to Dismiss on the United States as required under the same Rule.

Neither the Court nor the parties should construe the fact the Government is not providing its view on other arguments or issues as support or opposition.

## ARGUMENT

Cadence argues that Relators' litigation of this declined *qui tam* case violates the Appointments Clause, Vesting Clause, and Take Care Clause of Article II of the U.S. Constitution because it allows relators to act as "exercise core executive power." Dkt. 26, at pg 14, Section D, Paragraph 1. It does not.

Cadence admits this argument is foreclosed by Fifth Circuit precedent, acknowledging "In the past, the Fifth Circuit has addressed the Article II constitutionality of the FCA *qui tam* provisions and upheld them." Dkt. 26, pg. 14 fn. 4, *citing Riley v. St. Luke's Episcopal Hosp*. 252 F.3d 749, 753-57 (5th Cir. 2001) (en banc). In *Riley*, the Fifth Circuit held that "relators are not officers of the United States" and that "the [FCA]'s qui tam provisions do not violate the Appointments Clause." *Id.* at 757-58. In addition, every court of appeals to have addressed the question has held that the 's *qui tam* provisions are consistent with Article II. *See United States ex rel. Stone v. Rockwell Int'l Corp.*, 282 F.3d 787, 804-807 (10th Cir. 2002); *United States ex rel. Taxpayers Against Fraud v. Gen. Elec. Co.*, 41 F.3d 1032, 1040–42 (6th Cir. 1994); *United States ex rel. Kelly v. Boeing Co.,* 9 F.3d 743, 749–59 (9th Cir. 1993); *see also United States ex rel. Kreindler & Kreindler v. United Techs. Corp.*, 985 F.2d 1148, 1155 (2d Cir. 1993) (explaining, in rejecting an Article III challenge, that the *qui tam* "provisions do not usurp the executive branch's litigating function").

Furthermore, almost all district courts, including those within the Fifth Circuit, have followed suit. *See, e.g.*, *Proctor v. Wound Care Mgmt., LLC*, No. 2:18-cv-04234, 2025 WL 2444133, at *3 (E.D. La. Aug. 25, 2025) (citing *Riley*, 252 F.3d at 752-53, 757-58); *United States*

*ex rel. Gomez v. Koman Constr., LLC*, 796 F. Supp. 3d 353, 385 (W.D. Tex. 2025) (citing *Riley*); *United States ex rel. Gonite v. UnitedHealthcare of Georgia, Inc.*, No. 5:19-cv-246, 2025 WL 1184109, at *3-4 (M.D. Ga. Apr. 23, 2025); *United States ex rel. Penelow v. Janssen Prods., LP*, No. CV 12-7758, 2025 WL 937504, at *12 (D.N.J. Mar. 28, 2025); *United States ex rel. Butler v. Shikara*, No. 20-80483-CV, 2024 WL 4354807, at *11–13 (S.D. Fla. Sept. 6, 2024); *United States ex rel. Resolution NJ LLC v. Riverside Med. Grp., P.C.*, No. 2:22-cv-4165, 2024 WL 4100372, at *5 (D.N.J. Sept. 6, 2024); *United States ex rel. CLJ, LLC v. Halickman*, No. 20-CV-80645, 2024 WL 3332055, at *21 n.5 (S.D. Fla. June 14, 2024); *United States ex rel. Thomas v. Mercy Care et al.*, 2023 WL 7413669 (D. Ariz., Nov. 9, 2023); *United States ex rel. Miller v. Manpow, LLC*, 2023 WL 8290402 (C.D. Cal. Aug. 30, 2023); *United States v. Halifax Hosp. Med. Ctr.*, 997 F. Supp. 2d 1272, 1278 (M.D. Fla. 2014); *United States ex rel. Butler v. Magellan Health Servs., Inc.*, 74 F. Supp. 2d 1201, 1212 (M.D. Fla. 1999); *but see United States ex rel. Zafirov v. Fla. Med. Assocs., LLC,* No. 8:19-CV-01236-KKM-SPF, 2024 WL 4349242 (M.D. Fla. Sept. 30, 2024).[2]

This Court should likewise reject Cadence's arguments that the *qui tam* provisions of the FCA are unconstitutional.

## I. Relators Need Not Be Appointed In The Manner Prescribed By The Appointments Clause.

Cadence contends that the FCA's qui tam provisions are inconsistent with the Appointments Clause, which specifies the permissible means of appointing "Officers of the United States" to public offices "established by Law." U.S. Const. art. II, § 2, cl. 2. However, relators possess none of the indicia of officeholders within the meaning of the Appointments Clause: Their

[2] An appeal in *Zafirov* is pending before the Eleventh Circuit (Nos. 24-13581, -13583).

roles are limited in time and scope, confined to a particular case, and fundamentally personal in nature.

**A. Relators Do Not Occupy Continuing Positions**

To be an "Officer of the United States" subject to the Appointments Clause, a person "must occupy a 'continuing' position established by law." *Lucia v. SEC*, 585 U.S. 237, 245 (2018). This requirement comes from the Supreme Court's decision in *United States v. Germaine*, 99 U.S. 508 (1878), which "held that 'civil surgeons' (doctors hired to perform various physical exams) were mere employees because their duties were 'occasional or temporary' rather than 'continuing and permanent.'" *Lucia*, 585 U.S. at 245 (quoting *Germaine*, 99 U.S. at 508, 511-512). A hallmark of an office is that its "duties continue, though the person" occupying it "be changed." *United States v. Maurice*, 26 F. Cas. 1211, 1214 (C.C.D. Va. 1823) (No. 15,747) (Marshall, C.J.). Relators' roles, in contrast, are limited in time and scope rather than continuing from officeholder to officeholder over time, and Cadence has not shown otherwise.

Cadence likens Realtors to the independent counsel or bank receivers that have been found to be officers. *See Morrison v. Olson*, 487 U.S. 654, 671 n.12 (1988) (independent counsel); *United States v. Weitzel*, 246 U.S. 533, 541 (1918) (bank receiver); *see also United States v. Donziger*, 38 F.4th 290 (2d Cir. 2022). But unlike relators' roles, these roles were not specific to the individuals appointed to perform them. These offices were continuing in the crucial sense that their "duties" would "continue" even "though the person" performing them "be changed." *Maurice*, 26 F. Cas. at 1214. As the Supreme Court explained, Alexia Morrison was not even the first person to hold her independent counsel office: The court that appointed her had initially appointed James McKay, and Morrison replaced McKay after McKay resigned. *Morrison*, 487 U.S. at 667. Ms. Morrison's role was thus clearly "continuing" even though it was not permanent. Similarly, the duties of a

bank receiver were not limited to performance by a single individual. *See Officers of the United States Within the Meaning of the Appointments Clause*, 31 Op. O.L.C. at 111. If a given person appointed to act as a receiver became unable to perform his duties, that would not negate the need for a receivership; it would simply require the appointment of another receiver in place of the first. In *Stanton v. Wilkeson*, 22 F. Cas. 1074 (S.D.N.Y. 1876), another bank-receiver case, the court made this point clear when explaining that "[v]acation of office by the comptroller" of the currency, who delegated authority to the receiver, would not "vacate the receivership." 22 F. Cas. at 1074–75. And in *Donziger*, the Second Circuit—citing *Maurice*—specifically based its ruling on the premise that "the individuals appointed as special prosecutors could be replaced without the duties of the positions terminating." 38 F.4th at 297.

The role of the relator is fundamentally different. If a particular relator who has blown the whistle on a fraud by filing a *qui tam* action decides she is no longer interested in pursuing the action, another person cannot simply take her place as relator. The FCA states expressly that "[w]hen a person brings an action under" the *qui tam* provisions, "no person other than the Government may intervene or bring a related action based on the facts underlying the pending action." 31 U.S.C. § 3730(b)(5).

Cadence further asserts that the role of relator is continuing because any individual can be a relator if they satisfy the statutory prerequisites. But whether multiple people can hold the so-called office of "relator" at any given time has no bearing on whether that role is continuing. What matters is whether the duty—here, the duty of litigating a *particular qui tam* action—can continue from inhabitant to inhabitant of that office, and it clearly cannot. A relator's pursuit of a *qui tam* action is personal to that relator and not transferable from relator to relator. Cadence contends relators hold a continuing role because an individual can serve as a relator in a particular *qui tam*

case for years, but this too is irrelevant to whether a role is continuing in the relevant sense—*i.e.*, whether the duties of the role can be passed from one person who occupies the role to the next. An Attorney General is no more an officeholder with a continuing role if they serve four years than if they serve 100 days.

### B. Congress Did Not Vest Relators With Uniquely Governmental Authority

Relators are also not officeholders subject to the Appointments Clause because Congress envisioned their roles as fundamentally personal rather than governmental in nature. In *Vermont Agency of Nat. Res. v. United States ex rel. Stevens*, 529 U.S. 765 (2000), the Supreme Court held that *qui tam* relators have Article III standing to sue under the FCA on the ground that the Act "can reasonably be regarded as effecting a partial assignment of the Government's damages claim" by entitling the relator to a share of any ultimate recovery. *Id.* at 773; *see also United States ex rel. Polansky v. Executive Health Resources, Inc.*, 599 U.S. 419, 425 (2023) (same). The Supreme Court expressly rejected the theory that relators bring suit as agents of the United States. *Stevens*, 529 U.S. at 772. And in another part of the opinion holding that relators cannot pursue *qui tam* actions against States, the Supreme Court emphasized that *qui tam* actions are "private suit[s]" brought by "private parties." *Id.* at 780 n.9, 786 n.17.

*Stevens* thus recognized that when Congress authorized relators to bring *qui tam* suits under the FCA, it did not intend to create a governmental office subject to the Appointments Clause. Rather, Congress was authorizing relators to pursue a personal monetary recovery—employing "the theory, based on experience as old as modern civilization, that one of the least expensive and most effective means of preventing frauds on the treasury is to make the perpetrators of them liable to actions by private persons acting . . . under . . . the hope of gain." *United States v. Griswold*, 24

F. 361, 366 (D. Or. 1885) (quoted in *United States ex rel. Marcus v. Hess*, 317 U.S. 537, 541 n.5 (1943); *Hughes Aircraft Co. v. United States ex rel. Schumer*, 520 U.S. 939, 949 (1997)).

That a relator brings a *qui tam* suit "in the name of the Government," 31 U.S.C. § 3730(b)(1), does not alter the nature of the relator's interest in the suit. The Supreme Court explained in *Cochise Consultancy, Inc. v. United States ex rel. Hunt*, 587 U.S. 262 (2019), that the statutory provision for *qui tam* actions to be brought "'for the [relator] and for the . . . Government,'" and "'in the name of the Government,' . . . does not make the relator anything other than a private person" as opposed to an "'official of the United States.'" *Id.* at 272; *see also, e.g.*, *Taxpayers Against Fraud*, 41 F.3d at 1041 ("Although a relator may sue in the government's name, the relator is not vested with governmental power.").

The fact that relators decide whether to commence litigation by filing a *qui tam* complaint likewise does not make them governmental officeholders. The FCA provides that a *qui tam* action cannot proceed—indeed, it cannot even be unsealed—until after the government has had an opportunity to determine whether to "intervene and proceed with the action," intervene and move to dismiss it, or allow the relator "to conduct the action" subject to ongoing government oversight. 31 U.S.C. § 3730(b)(2)-(4). This upfront review by the government makes clear that relators are not acting as government officials when they bring suit. It is the government that determines whether the action should go forward and, if so, who should litigate it.

Relators do not act on a continuing basis, and they do not perform a function that only the government can constitutionally perform. Congress routinely chooses "to rely . . . on private enforcement to implement public policy." *Alyeska Pipeline Serv. Co. v. Wilderness Soc'y*, 421 U.S. 240, 263 (1975). And as explained below, there is abundant evidence that Congress and the courts have historically viewed private *qui tam* suits as a constitutionally permissible means of redressing

and deterring violations of federal law. For all these reasons, relators need not be appointed in a manner consistent with the Appointments Clause.

## II. The Qui Tam Provisions Do Not Violate the Vesting and Take Care Clauses.

The Vesting and Take Care Clauses state that "[t]he executive power shall be vested in a President of the United States" and that the President "shall take care that the laws be faithfully executed." U.S. Const. art. II, § 3. The Defendants contend that relators exercise executive power in a manner inconsistent with these Clauses, but this Court should reject that argument too.

Congress unquestionably has the power to authorize private parties who have suffered Article III injury to sue to enforce federal statutes, like Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-5(f) or the antitrust laws, 15 U.S.C. § 15. It is long-established that Article II "does not require Congress to prescribe litigation by the Executive as the *exclusive* means of" protecting the government's interests. *Riley*, 252 F.3d at 753. Private suits under such provisions generally do not raise Article II concerns even if Congress has created a private right of action for the purpose of supplementing government enforcement actions. The Supreme Court has routinely described private suits as a means of enforcing federal statutes for the benefit of the public, not just as a means of redressing private injuries. *See, e.g.*, *Cummings v. Premier Rehab Keller, P.L.L.C.*, 596 U.S. 212, 218 (2022) ("'[P]rivate individuals may sue to enforce' … antidiscrimination statutes[.]"); *Fortner Enterprises, Inc. v. U.S. Steel Corp.*, 394 U.S. 495, 502 (1969) ("Congress has encouraged private antitrust litigation not merely to compensate those who have been directly injured but also to vindicate the important public interest in free competition.").

Private suits under statutes like these differ in significant respects from *qui tam* suits under the False Claims Act. *Qui tam* relators are authorized to pursue False Claims Act suits solely on the basis of the government's partial assignment of a share of its right to a monetary recovery, *see*

*Stevens*, 529 U.S. at 773, whereas private plaintiffs under other statutes must establish a personal injury as a basis for standing. A judgment on the merits in a *qui tam* action under the False Claims Act can have claim-preclusive effect against the United States, whereas judgments in private suits under other statutes do not. And the United States receives a share (indeed, the majority) of a monetary judgment in a *qui tam* action under the False Claims Act, whereas judgments in private suits under other statutes are payable solely to the plaintiffs. If Congress's use of the *qui tam* mechanism were a new development, these features of *qui tam* actions under the False Claims Act would give rise to substantial questions about whether such actions are consistent with the Vesting and Take Care Clauses of Article II.

Those questions are resolved, however, by the extensive body of evidence that *qui tam* provisions have, since the Founding, been understood as established features of American law. As the Supreme Court observed, "[s]tatutes providing for actions by a common informer, who himself had no interest whatever in the controversy other than that given by statute, have been in existence for hundreds of years in England, and in this country ever since the foundation of our [G]overnment." *Hess*, 317 U.S. at 541 n.4 (1943) (quoting *Marvin v. Trout*, 199 U.S. 212, 225 (1905)). In *Stevens*, the Supreme Court reviewed this "long tradition of *qui tam* actions in England and the American Colonies," as well as the "considerable number" of statutes with *qui tam* provisions passed by the First Congress. *Stevens*, 529 U.S. at 774–77. The Supreme Court found this body of history about the deep historical roots of *qui tam* provisions "well nigh conclusive" in the Article III context, *id.* 529 U.S. at 777, and it is just as "conclusive with respect to the Article II question" raised here. *Riley*, 252 F.3d at 752; *see Stevens*, 529 U.S. at 801 (Stevens, J., dissenting); *Butler*, 2024 WL 4354807, at *11 ("[D]ecades—nay, centuries—of litigation through

the use of the *qui tam* device under the [False Claims Act] undercuts [defendant's] argument" against the constitutionality of the False Claims Act's *qui tam* provisions).

This is because legislation "'passed by the first Congress assembled under the Constitution, many of whose members had taken part in framing that instrument, … is contemporaneous and weighty evidence of its true meaning.'" *Marsh v. Chambers*, 463 U.S. 783, 790 (1983); *see also Consumer Fin. Prot. Bureau v. Cmty. Fin. Servs. Ass'n*, No. 22-448, 610 U.S. 416, 432 (2024) (same); *Bowsher v. Synar*, 478 U.S. 714, 723 (1986) (same). Likewise, "'traditional ways of conducting government … give meaning' to the Constitution." *Mistretta v. United States*, 488 U.S. 361, 401 (1989) (quoting *Youngstown Sheet & Tube v. Sawyer*, 343 U.S. 579, 610 (1952) (Frankfurter, J., concurring)).

The history here shows that *qui tam* provisions are consistent with the original understanding of Article II. The First Congress enacted "a considerable number of" *qui tam* provisions, including those that "provided both a bounty and an express cause of action" for informers. *Stevens*, 529 U.S. at 776-777, 777 n.6. For example, one statute allowed "informer[s] to sue for, and receive half of [the] fine for, [a] failure to file [a] census return." *Stevens*, 529 U.S. at 777 n.6 (citing Act of Mar. 1, 1790, ch. 2, § 3, 1 Stat. at 102). Another allowed "private individual[s] to sue for, and receive half of [the] fine for, carriage of seamen without contract or illegal harboring of runaway seamen." *Id.* (citing Act of July 20, 1790, ch. 29, §§ 1, 4, 1 Stat. at 131, 133). And another allowed "private individual[s] to sue for, and receive half of [the] goods forfeited for, unlicensed trading with Indian tribes." *Id.* (citing Act of July 22, 1790, ch. 33, § 3, 1 Stat. at 137-138). The enactment of *qui tam* statutes immediately after the Founding clearly indicates that the Framers viewed them as fully compliant with Article II of the Constitution.

The Executive Branch likewise recognized *qui tam* litigation as an established feature of American law when the Attorney General included, in draft legislation in 1795, a cost-shifting provision for *qui tam* suits. *See* 1 William S. Hein & Co., *American State Papers, Class X, Miscellaneous* 117, 121 (1998) (provision for cost-shifting in suits brought by "any informer or plaintiff, on a penal statute, to whose benefit the penalty, or any part thereof, if recovered, is directed by law to accrue"), https://perma.cc/JGR5-8AQA. This suggests that the early Executive Branch also perceived no constitutional problem with *qui tam* suits.

The Supreme Court has repeatedly recognized *qui tam* provisions as common and legitimate. For example, in *Marvin v. Trout*, 199 U.S. 212 (1905), the Supreme Court commented, while upholding the constitutionality of a state *qui tam* provision, that to reach a contrary conclusion "would be in effect to hold invalid all legislation providing for proceedings in the nature of *qui tam* actions," even though such statutes had "been in existence for hundreds of years in England, and in this country ever since the foundation of our government." *Id.* at 225. And in *United States ex rel. Marcus v. Hess*, 317 U.S. 537 (1943), the Supreme Court found that a court of appeals construing the False Claims Act narrowly "on the premise that *qui tam* or informer actions 'have always been regarded with disfavor'" was wrong to do so because "*[q]ui tam* suits have been frequently permitted by legislative action" and "Congress has power to choose this method to protect the government from burdens fraudulently imposed upon it." *Id.* at 540-542. The historical record thus suggests that all three branches of the early American government accepted *qui tam* statutes as an established feature of the legal system.

Further, the False Claims Act's *qui tam* provisions provide greater means for governmental control than the early *qui tam* statutes did. As explained *supra*, the government performs an upfront review before a *qui tam* action can proceed, or even be unsealed. *See* 31

U.S.C. § 3730(b)(2)-(4). Even if the government initially declines to intervene, it may still intervene at a later time for good cause. *See* 31 U.S.C. § 3730(c)(2)(D)(3). And the government may move to dismiss a False Claims Act action over a relator's objection, subject to highly deferential review under Federal Rule of Civil Procedure 41(a). *Id.* § 3730(c)(2)(A). The Supreme Court emphasized that district courts must grant dismissal "in all but the most exceptional cases … even if the relator presents a credible assessment to the contrary." *Polansky*, 599 U.S. at 437. The government may also settle a pending suit over the objections of the relator, *see* 31 U.S.C. § 3730(c)(2)(B); and veto a relator's proposed settlement or voluntary dismissal of his action, *id.* § 3730(b)(1). The United States may also stay any discovery by the relator that "would interfere with the Government's investigation or prosecution of a criminal or civil matter arising out of the same facts," *id.* § 3730(c)(4). If early *qui tam* statutes, which lacked such controls, were understood to pose no Article II problem, then the False Claims Act's *qui tam* provisions cannot be understood to pose any Article II problem either.

It is true that if relators exercised executive power, then constraints on the President's "ability to supervise and remove" relators would be unconstitutional. *Seila Law LLC v. Consumer Fin. Prot. Bureau*, 591 U.S. 197, 238 (2020). But defendants are incorrect to suggest that this renders the *qui tam* provisions unconstitutional in full and requires dismissal of the instant suit. Instead, the appropriate remedy would be to hold invalid—and sever from the rest of the *qui tam* provisions—the statutory constraints on the government's ability to control *qui tam* litigation, including 31 U.S.C. § 3730(c)(3) (requiring good cause to intervene after initial decision not to); 31 U.S.C. § 3730(c)(2)(A)-(B) (constraints on government's settlement or dismissal of action over relator's objection); and 31 U.S.C. § 3730(c)(2)(C) (relator's right to participate in litigation after government intervention). This is consistent with the Supreme Court's treatment of what it

regarded as unconstitutional restrictions on the supervision of administrative patent judges in *United States v. Arthrex, Inc.*, 594 U.S. 1, 24-25 (2021), and respects the judicial obligation to "limit the solution to the problem" "when confronting a constitutional flaw in a statute," by "sever[ing] its problematic portions while leaving the remainder intact." *Ayotte v. Planned Parenthood of N. New England*, 546 U.S. 320, 328 (2006).]

The historical context of the False Claims Act's *qui tam* provisions demonstrates that they are consistent with the Take Care Clause and the Vesting Clause and with the original understanding of Article II. Defendants' arguments to the contrary should be rejected.

**III. Defendant's Arguments to Refute 5th Circuit Precedence Rely on Speculation Alone.**

Defendant Cadance's fourth footnote on page 14 of the Motion to Dismiss claims "any perceived settled precedent appears to be in legal doubt given more recent developments in the law." This effort to undermine the current precedence would require this Court engage in inappropriate speculation.

Cadence's citation to Judge Duncan's concurring opinion in *U.S. ex rel. Montcrief v. Peripheral Vascular Assocs., P.A.* 133 F.4th 395 (5th Cir. 2025) ignores a crucial statement by Judge Duncan, wherein he acknowledges *Riley* remains the binding law of this circuit. *See* 133 F.4th at 410 ("I write separately to point out the constitutional flaws in the [False Claims Act's] *qui tam* device, *which our precedent prevents us from addressing*.") (emphasis added). Cadence may believe that the Supreme Court would disagree with *Riley's* holding if asked. However, "speculation is no substitute for precedent." *Koman Constr., LLC*, 796 F.Supp.3d at 385. When binding precedent such as *Riley* exists, it is not within this Court's authority to try to predict if the Fifth Circuit or Supreme Court might at some later date reexamine or overrule the precedent in

question. *See Big Time Vapes, Inc. v. FDA*, 963 F.3d 436, 447 (5th Cir. 2020). *Riley* remains dispositive until the Fifth Circuit or the Supreme Court determines otherwise.

**CONCLUSION**

As set forth above, the False Claims Act's *qui tam* provisions are consistent with the Constitution. The Court should reject Cadence's arguments – as every federal Circuit Court to address these issues has done – and deny Cadence's motion based on the alleged unconstitutionality of the *qui tam* provisions of the False Claims Act.

Date: May 4, 2026

Respectfully submitted,

JUSTIN R. SIMMONS
United States Attorney

By: ERIN VAN DE WALLE Digitally signed by ERIN VAN DE WALLE Date: 2026.05.04 15:15:13 -05'00'

ERIN M. VAN DE WALLE
Assistant United States Attorney
Florida Bar No. 0099871
601 N.W. Loop 410, Suite 600
San Antonio, Texas 78216
Tel: (210) 384-7300
Fax: (210) 384-7322
Email: Erin.Van.De.Walle@usdoj.gov

*Attorneys for the United States of America*

**CERTIFICATE OF SERVICE**

I certify that, on May 4, 2026, I caused the United States' Statement of Interest to be served on all parties via the Court's electronic filing system.

Erin M. Van De Walle
Erin M. Van De Walle
Assistant United States Attorney