IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA ex rel. RANDALL MOLNAR AND ANDREA HUGHES, | § | |
| *Plaintiff,* | § | Civ. No. 5:24-cv-522 |
| V. | § | JURY DEMANDED |
| CADENCE MCSHANE CONSTRUCTION COMPANY LLC | § | |
| *Defendants.* | § | |

**<u>PLAINTIFF'S RESPONSE IN OPPOSITION TO CADENCE MCSHANE'S MOTION TO DISMISS</u>**

## I. SUMMARY

Cadence McShane ("CMC") boldly proclaims it "has done nothing wrong." (DKT. 26 at 2). If that is true, why did CMC maintain one accurate internal budget and one external budget that hid more than $4.2 million in "buyout savings" from its non-profit partner and the federal government? (DKT. 25 ¶¶ 52-54). Why did CMC create fake subcontracts *with itself*, even though CMC does not perform any such work? (*Id.* ¶¶ 49-50). And why did CMC Director of Operations Brian Cox tell Hughes and others, "Anything that was above the 6% [of profit allowed by HUD for affordable housing projects] should technically go back to the owner and [Opportunity Home San Antonio]. So we shifted all that money via internal change orders to those [sub]contracts we had issued, to get the money out of the 12 [account] and into the 02 job so it was shielded"? (*Id.* ¶ 57). CMC offers no explanation for its obviously fraudulent conduct, other than to say it "has done nothing wrong."

Instead, we know—based on well-pleaded facts that this Court must accept as true and which are supported in the Complaint with examples of CMC's own documents—that CMC

requested and received approximately $4.2 million in profits it has no right to keep. It obtained that money in the first place because it made false claims to its lender, to Opportunity Home San Antonio, and to the federal government misrepresenting its subcontract costs to hide its true profit. For example, the Pay Application submitted to HUD for April 2023 asserts that CMC has received $1,645,687.20 in profit out of a total allowable profit of $2,455,142.00. But CMC's Job Cost Status Journals make clear that the profit is actually far in excess of that amount. Each and every monthly Pay Application CMC signed under penalties of perjury is knowingly false, because CMC made clear, documented, and successful efforts to hide its true profits from the eyes of the federal government and its local partners. (*Id*. ¶¶ 52-55). Instead of limiting itself to HUD's safe harbor contractor fees, CMC (using Mr. Cox's words) "shielded" approximately $4.2 million taxpayer dollars that was intended to provide housing for low-income Americans. CMC submitted years of Pay Applications to HUD signed under the penalties of perjury by Vice President Sri Kasturi and other senior leadership to fraudulently shield its misconduct. (*Id*. ¶ 62). CMC's misconduct is criminal. 18 U.S.C. 1010.[1] But despite years of documented fraud and explicit acknowledgements of its bad acts by its executives, CMC asks this Court to believe it has done nothing wrong. The Court should not be fooled by CMC's claims of innocence.

## II. STANDARD OF REVIEW

"[M]otions to dismiss under Rule 12(b)(6) are viewed with disfavor and are rarely granted." *Lormand v. US Unwired, Inc*., 565 F.3d 228, 232 (5th Cir. 2009) (citation omitted). The Court must "accept all factual allegations in the complaint as true" and "must also draw all reasonable inferences in the plaintiff's favor." *Id*. When considering a motion to dismiss for

[1] "Whoever, for the purpose of obtaining any loan or advance of credit from any person, partnership, association, or corporation with the intent that such loan or advance of credit shall be offered to or accepted by the Department of Housing and Urban Development for insurance, . . . knowing the same to be false, . . . shall be fined under this title or imprisoned not more than two years, or both."

failure to state a claim, the court "is limited to the complaint, any documents attached to the complaint, and any documents attached to the motion to dismiss that are central to the claim and referenced by the complaint." *Lone Star v. Barclays Bank PLC*, 594 F.3d 383, 387 (5th Cir. 2010).

Fraud claims must be pled with particularity, which generally requires the plaintiff to set forth the "who, what, when, where, and how" of the alleged fraud. *U.S. ex rel. Steury v. Cardinal Health, Inc.*, 625 F.3d 262, 266 (5th Cir. 2010) (citation omitted); Fed. R. Civ. P. 9(b). "[T]here is no single construction of Rule 9(b) that applies in all contexts." *U.S. ex rel. Grubbs v. Kanneganti*, 565 F.3d 180, 188 (5th Cir. 2009). Specifically, "an FCA claim can meet Rule 9(b)'s standard if it alleges 'particular details of a scheme to submit false claims paired with reliable indicia that lead to a strong inference that claims were actually submitted.'" *U.S. v. Bollinger Shipyards, Inc.*, 775 F.3d 255, 260 (5th Cir. 2014) (quoting *Grubbs*, 565 F.3d at 190). This "effectuates Rule 9(b) without stymieing legitimate efforts to expose fraud" and provides "defendants adequate notice of the claims." *Grubbs*, 565 F.3d at 190-91.

## III. ARGUMENTS AND AUTHORITIES

### A. Relators' Well-Pleaded Complaint Sufficiently Pleads Violations of the False Claims Act.

"[T]o state a claim under the FCA, a plaintiff must allege: (1) a false statement or fraudulent course of conduct; (2) made or carried out with the requisite scienter; (3) that was material; and (4) that is presented to the Government." *Steury*, 625 F.3d at 267. Relators have alleged facts satisfying all these requirements.

#### 1. Cadence McShane Engaged in Years-Long False Statements and Fraudulent Course of Conduct.

Perhaps recognizing that Relators Molnar and Hughes allege ample facts describing false statements or a fraudulent course of conduct, CMC does not move to dismiss the complaint on

this basis. However, to understand the elements of a FCA claim that CMC does deny, it is necessary to briefly describe Cadence McShane's fraudulent acts.

HUD publishes cost control regulations that firmly cap profits on public housing projects at 6%. In the 2003 Cost Control and Safe Harbor Standards for Rental Mixed-Finance Development,[2] which apply to Horizon Pointe, HUD makes clear that overhead, profit, and general conditions can never exceed a total of 14% of the total construction cost:

| | | | |
|---|---|---|---|
| Contractor Fee | • Percentages are based on hard construction cost.<br>• General Conditions includes the bond premium. | Overhead: 2%<br>Profit: 6%<br>General Conditions: 6% | 14% is the maximum for these combined costs provided that the PHA justifies why the 2/6/6 percentages for the individual costs cannot be met. |

(DKT. 25 ¶ 56; *see also* 2003 Cost Control and Safe Harbor Standards at 4).

Shortly after Molnar began work at CMC, Vice President Tyler Earle explained the company's fraudulent course of conduct by, ***first***, increasing its construction bid to $45 million in 2021 from an original bid of $39 million "to pad Cadence McShane's profits and that the scheme was Earle's own idea. Earle stated that he expected to earn Cadence McShane $7 million in profits on the project, which is approximately 17% profit" and far in excess of HUD's allowable profit. (*Id*. ¶ 44). ***Second***, Earle told Molnar that although "by 2023 it was clear that the extra $5 - $6 million was not needed to cover Cadence McShane's construction costs, Cadence McShane did not report the excess to" the federal government or CMC's non-profit partner Opportunity Homes. (*Id*. ¶ 46).

[2] This document is cited in Paragraph 56 of the Second Amended Complaint and is also available on HUD's website, https://www.hud.gov/helping-americans/public-indian-housing-mixed-finance. Additionally, at least one federal court has considered this document's application to the False Claims Act. In *United States ex rel. Hudalla v. Walsh Constr. Co.*, 834 F. Supp. 2d 816, 827 (N.D. Ill. 2011), the court recognized the Cost Control and Safe Harbor Standards mandates the "the six percent, two percent, and six percent caps on profit, builder's overhead, and general conditions."

***Third***, from at least February 2023 to the present, CMC took active steps to hide its true profits. President Will Hodges, Executive Vice President Srinath Pai Kasturi, and Vice President Earle were all actively involved in directing this fraud. (*Id.* ¶¶ 47, 51). In April 2023, Earle explained in writing that CMC anticipated $4,263,158.32 in "buyout savings" in excess of the 6% profit it already claimed. Therefore, Earle directed employees to create false subcontracts and false change orders to conceal these additional profits. (*Id.* ¶¶ 49-50). This allowed CMC to adjust its external budget to falsely state the $4.2 million had actually been spent. (*Id.* ¶¶ 50-54).

***Fourth***, this fraudulent course of conduct was then memorialized into false Pay Applications submitted monthly to HUD. Relators allege that CMC submitted a Pay Application each and every month throughout the years-long construction allowing CMC to receive payment for the work it performed the previous month. (*Id.* ¶ 26). Every month, CMC submitted a new Pay Application to HUD on a HUD-mandated form. (*Id.* ¶ 26). By at least February 2023, CMC knew it was on track to earn a total profit of $7,727,525, or 17% profit, well above the 6% percent of profits HUD permitted it to retain. (*Id.* ¶¶ 44, 63). Each and every monthly Pay Application CMC submitted to HUD from February 2023 to the end of the project in February 2025 requested payment for Builder's Profit it was not allowed to keep. For example, in February 2023, CMC requested, and HUD approved, $112,746.87 in profit:

| ITEM NO. | DESCRIPTION OF WORK | SCHEDULED VALUE | WORK COMPLETED FROM PREVIOUS APPLICATION (D + E) | WORK COMPLETED THIS PERIOD |
|---|---|---|---|---|
| 1 | General Requirements | $2,134,745.00 | $1,717,072.00 | |
| | Builder's Overhead | $818,381.00 | $421,824.00 | $37,583.00 |
| | Builder's Profit | $2,455,142.00 | $1,265,472.64 | $112,746.87 |

(*Id*. ¶ 64).[3] CMC, through various executives, attested to each Pay Application's accuracy under the penalties of perjury. (*Id*. ¶ 65).

***Fifth***, CMC has wrongfully sought Low-Income Housing Tax Credits (LIHTC) based on its inflated total construction cost. (*Id*. ¶ 29-39). On IRS Form 8609, the Low-Income Housing Credit Allocation and Certification, the Texas Department of Housing and Community Affairs ("TDHCA") first uses representations from the housing project to certify the maximum applicable credit percentage allowable, the maximum qualified basis, the percentage of the aggregate basis financed by tax-exempt bonds, and the date the building was placed in service. All of this information comes from the Joint Venture, which in turn relied on CMC's representations regarding the total construction cost of the project. Because CMC falsely attested that the construction costs were approximately 4.2 million dollars more than they actually were, and because the appropriate qualified basis is 130%, CMC's false information caused and will continue to cause the TDHCA to affirm $5,460,000 in additional tax credits. (*Id*. ¶ 75). By inflating the construction costs through fabricated change orders and false cost reporting, CMC caused the project's eligible basis to be materially overstated, thereby inducing the allocation or preservation of federal tax credits in excess of the amount lawfully permitted. (*Id*. ¶ 77).[4]

**2. Relators Allege Numerous Facts Demonstrating that Cadence McShane Executives Acted Knowingly**.

The second element of a False Claims Act action is scienter. "The FCA is satisfied if the [relator] alleges the defendant either knew that [its statement] was false or acted with reckless disregard of its truth or falsity." *U.S. v. Bollinger Shipyards, Inc.*, 775 F.3d 255, 261 (5th Cir.

[3] Relators are prepared to file an amended complaint attaching each and every Pay Application CMC submitted, if the Court deems that additional factual allegations of each fraudulent Pay Application are necessary.

[4] CMC complains that Realtors' citation to a 2016 fraud conviction in Florida falsely implied that CMC was involved. This is not true. Relators never stated or implied that CMC as a company or its personnel were involved in the Florida case. Rather, the 2016 conviction makes clear that the United States sees false applications for federal tax credits as theft of government money. (DKT. 25 ¶ 80).

2014). "On the other hand, the statute's definition of 'knowingly' excludes liability for innocent mistakes or negligence." *U.S. v. Southland Mgmt. Corp.*, 326 F.3d 669, 681 (5th Cir. 2003). In other words, "a lie is actionable but not an error." *U.S. ex rel. Riley v. St. Luke's Episcopal Hosp.*, 355 F.3d 370, 376 (5th Cir. 2004).

In *United States ex rel. Monters v. Main Bldg. Maint., Inc.*, 2020 U.S. Dist. LEXIS 240473, at *10 (W.D. Tex. 2020), this Court held that a FCA complaint survived a motion to dismiss where the relator alleged the defendant knew her government applications included false statements about economic disadvantage and that the defendant repeated these lies each time she signed a report. These facts allowed the Court to easily conclude that the complaint contained sufficient allegations of scienter. *Id.* at *11.

Here, Relators allege far more facts than the relator in *Monters*, because CMC executives proudly announced their lies on more than one occasion. Not only did Vice President Earle brag to Molnar about the company's scheme (DKT. 25 ¶ 44), Earle directed employees in writing to create false subcontracts and change orders to make it appear that the buyout savings were actually paid out and, when Relators declined, he did it himself. (*Id.* ¶ 49). CMC then directed its controller to cook the books and create an internal (real) account and an external (fake) one. (ID. ¶¶ 52-54). In case there is any doubt that CMC committed fraud, Director of Operations Brian Cox bragged about it in 2025. He proudly announced to employees, included Hughes, "Anything that was above the 6% should technically go back to the owner and SAHA. So we shifted all that money via internal change orders to those [sub]contracts we had issued, to get the money out of the 12 [account] and into the 02 job so it was shielded." (*Id.* ¶ 44).

CMC claims that Relators do "not allege that CMC or any of its officers or employees knew that any allegedly false construction costs would be transmitted to the Government or would affect the amount of tax credits allocated." (DKT. 26 at 13). But that is not what

knowledge means. Instead, Relators need only allege that CMC knew its statements were false or showed reckless disregard for the truth. *Bollinger Shipyards*, 775 F.3d at 261. Even if extended knowledge were required, however, even a cursory review of the complaint proves CMC's denial false. As to the Pay Applications, Relators allege, "these false statements are subsumed within the Pay Applications Cadence McShane submitted to HUD. The Pay Application for April 2023, signed under penalties of perjury, claims that Cadence McShane has received $1,645,687.20 in profit out of a total allowable profit of $2,455,142.00. But the Job Cost Status Journals make clear that the profit is actually far in excess of that amount by, at least, April 2023. Each and every Pay Application Cadence McShane signed under penalties of perjury is knowingly false, because Cadence McShane made clear, documented, and successful efforts to hide their true profits from the eyes of the federal government and its local partners." (DKT. 25 ¶ 55; *see also* ¶¶ 64, 65, 66).

This same knowledge of fraudulently inflated construction costs also establishes the scienter element related to tax credits. Approximately $4.2 million taxpayer dollars intended to provide housing for low-income Americans instead was—in CMC's own words—"shielded" inside its internal Job Cost Status Journal to hide the profits it unlawfully retained beyond HUD limits. (DKT. 25 ¶ 81). CMC's statements about its profits and the true construction costs were false, CMC knew the statements were false, and that is all the False Claims Act requires.

**3. Cadence McShane's Fraud Was Material.**

CMC next complains that Relators do not provide sufficient allegations that CMC's fraud was material. "The term 'material' means having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." *Universal Health Servs. v. U.S. ex rel. Escobar*, 579 U.S. 176, 192-93 (2016) (quoting 31 U.S.C. § 3729(b)(4)). Although the materiality standard is "demanding," *id.* at 194, "[n]o one factor is dispositive, and our inquiry is

holistic." *U.S. ex rel. Lemon v. Nurses To Go, Inc.*, 924 F.3d 155, 161 (5th Cir. 2019). A non-exhaustive list of the factors the Fifth Circuit considers "includes: (a) whether the alleged violations are conditions of payments; (b) whether the Government would deny reimbursement if it knew of the violations; and (c) whether the noncompliance is substantial or minor." *Id.* at 161-63. "As these factors indicate, a misrepresentation is material when it goes 'to the very essence of the bargain.'" *U.S. ex rel. Aldridge v. Corp. Mgmt.*, 78 F.4th 727, 737 (5th Cir. 2023) (quoting *Escobar*, 579 U.S. at 193 n.5).

All three of the non-exhaustive factors are present here. First, the National Housing Act encourages private industry to provide housing for low-income families by allowing HUD to insure lenders—and therefore eliminate lender risk—against risk of default and guarantee private mortgage loans. (DKT. 25 ¶ 11). But in exchange for guaranteeing private loans, HUD imposes extensive regulation on housing construction projects. Relevant here, pursuant to HUD Cost Control and Safe Harbor Standards, a general contractor like CMC can only retain the 2% overhead, 6% profit, and 6% general conditions out of the total contract price. (*Id.* ¶ 56). The HUD-mandated Construction Contract also specifies that CMC's Profit is limited to $2,455,142, or 6% of the total cost. (*Id.* ¶ 23); *see also* 24 C.F.R. § 200.52 (requiring the construction contract to be made on a HUD form "in accordance with terms and conditions established by" HUD). The Construction Contract further requires CMC to make a monthly request on HUD-92448 for payment for work done in the preceding month (a "Pay Application"). HUD required each and every Pay Application to certify "that the Work covered by this requisition has been completed in accordance with the Contract Documents" and to specifically list profit, general conditions, and overhead (both the scheduled value and the amount billed that month) and those amounts were directly tied to the percentage of the contract price as permitted by the Safe Harbor rules. (*Id.* ¶¶ 64, 66); *see also* HUD-92448 ("The information regarding completed work items is

used by HUD to ensure that payments from mortgage proceeds are made for work actually completed in a satisfactory manner."). Without these certifications, HUD would not approve the Pay Application and CMC would not be able to receive compensation from the lender. 24 C.F.R. § 200.62. HUD relied on CMC's claims by authorizing and guaranteeing payments under the applicable loan. (DKT. 25 ¶ 66).

Second, not only would the government refuse CMC's monthly pay applications if it knew CMC was hiding millions of profits, the government would investigate and pursue criminal charges as well. Texas courts regularly note that "serious, consequential, felony transgressions of law that the Government actively enforces" are material because they are "precisely the kind of violation the FCA is supposed to reach." *U.S. ex rel. Capshaw v. White*, 2018 U.S. Dist. LEXIS 197495, at *11 (N.D. Tex. 2018); *see also U.S. v. Marlin Med. Sols. LLC*, 579 F. Supp. 3d 876, 890 (W.D. Tex. 2022). When lenders and contractors violate the safe harbor provisions to line their own pockets, the federal government has prosecuted bad actors and sent them to prison. (DKT. 25 ¶ 80); *see U.S. v. Runyan*, 15-20473, S.D. Fla. (2015) (DKT. 72-73). The U.S. Code has a specific criminal statute outlawing precisely what CMC executives did here. 18 U.S.C. § 1010 (outlawing false claims made to HUD for mortgage guarantees); *see also U.S. v. I-12 Garden Apartments*, 703 F.2d 900, 903 (5th Cir. 1983) (describing conviction for HUD false claims where defendant "set out to deceive HUD for hefty profits through hidden margins"). CMC's HUD violations are a "serious, consequential, felony transgressions of law that the Government actively enforces," making them easily qualify as material. *See White*, 2018 U.S. Dist. LEXIS 197495, at *11. The U.S.'s commitment to prosecuting defendants whose fraud allows them to make "hefty profits" on the backs of our country's poor demonstrates that CMC hiding millions in illegal profit is material.

Third, Relators' allegations are far from the hypothetical examples described in *Escobar* that would not meet the materiality requirements. The U.S. argued in *Escobar*, "If the Government contracts for health services and adds a requirement that contractors buy American-made staplers, anyone who submits a claim for those services but fails to disclose its use of foreign staplers violates the False Claims Act." *Escobar*, 579 U.S. at 195. The Court rejected this argument, as well as any suggestion that simply requiring contractors to "aver their compliance with the entire U.S. Code and Code of Federal Regulations" would lead to liability without looking at the "likely or actual behavior of the recipient of the alleged misrepresentation." *Id.* at 193, 196. Relators allege far more than sourcing staplers from the wrong country or noncompliance with an irrelevant statute. Far from being an insignificant part of the HUD regulations, the Safe Harbor provisions are a fundamental requirement to protect public housing funds and HUD from unscrupulous contractors who might be tempted to earn too much profit. It is even more straightforward to understand why CMC's misrepresentations regarding the total contract cost was material. The larger the total cost of the project, the larger the eligible basis, which directly caused the TDHCA to affirm over $5 million in tax credits to which the lender is not entitled. (DKT. 25 ¶¶ 38, 73-78). There should be no question but that this false statement led to a material underpayment in taxes that should benefit low-income Americans.

CMC claims its misrepresentations were not material. But if CMC really thought that HUD would not care, why did it work for years to conceal its misdeeds instead of simply disclosing its true profits to HUD? Because Relators allege ample facts demonstrating that CMC's misconduct was material, the Court should deny the motion to dismiss.

**4. Relators Allege that CMC's Claims Were Presented to the Government.**

The final element of the False Claims Act requires that the claim be presented to the Government. *Steury*, 625 F.3d at 267. Relators describe two types of claims that meet this

requirement: first, CMC presented monthly Pay Applications to HUD from at least February 2023 through February 2025, that those Pay Applications were approved by HUD, and that CMC could and did only receive payment from the lender for each month's work after HUD approved the claim. CMC claims that the Pay Application allegations are barred because the government did not pay out its own funds. However, this argument depends on a Supreme Court case that has been overruled by statute since 2009.

Second, and separately,[5] CMC moves to dismiss Relators' allegations that, because the project owner relied on CMC's false representations of the total construction cost, the project owner applied for and received over $5 million of tax credits from the federal government to which the owner was not entitled. CMC claims that these claims should be dismissed by the FCA's Tax Bar. However, the Tax Bar is inapplicable because the falsity of CMC's representations is revealed by HUD statutes and regulations, not by the Tax Code.

### A. Through Pay Applications Submitted Each Month to HUD for Approval, Cadence McShane Presented False Claims to HUD Subject to the False Claims Act.

CMC argues that despite its years of fraudulent conduct, its false monthly Pay Applications are essentially "no harm no foul" because CMC never defaulted on its HUD-insured loan. In making this argument, CMC relies on Supreme Court precedent that has been overruled by statute.

It is true that, *in 1958 under a previous version of the statute*, the Supreme Court held that a government agency in "agreeing to insure a home improvement loan the FHA disburses no funds nor does it otherwise suffer immediate financial detriment. It simply contracts, for a premium, to reimburse the lending institution in the event of future default, if any." *U.S. v.*

[5] To obtain full dismissal of Relators' claims under the presentment element of the FCA statute, CMC would need to persuade the Court to dismiss both of Relators' theories, the Pay Application violations and the tax credit violations.

*McNinch*, 356 U.S. 595, 599 (1958). The FCA at that time did not define "claim," allowing the Supreme Court to apply its own common-sense definition: "the conception of a claim against the government normally connotes a demand for money or for some transfer of public property." *Id.* (quoting *U.S. v. Tieger*, 234 F.2d 589, 591). The *McNinch* Court therefore reasonably analyzed the statute and concluded that, without a default, a government-backed loan application could not constitute a claim under the FCA.

By at least 1992, the FCA included a statutory definition for "claim" which closely tracked the *McNinch* application. A "claim" was:

> any request or demand, whether under a contract or otherwise, for money or property which is made to a contractor, grantee, or other recipient if the United States Government provides any portion of the money or property which is requested or demanded, or if the Government will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded.

31 USCS § 3729 (1992). Under this definition, use of government funds or property was a necessary component of a "claim," so the result in the 1990s was the same as it was in the 1950s. *See U.S. v. Rivera*, 55 F.3d 703, 710 (1st Cir. 1995) (applying *McNinch* but concluding that a claim existed when the lending bank notified the government of the default of a government-backed loan).

The definition of "claim" within the FCA stayed the same until 2009, when Congress enacted the Fraud Enforcement Recovery Act of 2009 ("FERA"). *See generally* Pub. L. No. 111-21, § 4; 123 Stat. 1617 (2009). "FERA expressly amended the FCA to overrule the Supreme Court's decision in *Allison Engine Co. v. United States ex rel. Sanders*, 553 U.S. 662, 128 S. Ct. 2123, 170 L. Ed. 2d 1030 (2008), which held that a false record or statement implicated the FCA only when it was made with the specific 'purpose of getting a false or fraudulent claim' paid by 'the Government itself.'" *U.S. ex rel. Wall v. Vista Hospice Care, Inc.*, 778 F. Supp. 2d 709, 717

n.39 (N.D. Tex. 2011); *see also Steury*, 625 F.3d at 267 n.1 (noting that FERA was intended to overrule *Allison*).

FERA made critical changes to the definition of "claim," overruling the result in *McNinch*. A "claim" now—

> (A) means any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the money or property, that—
>
> (i) is presented to an officer, employee, or agent of the United States; or
>
> (ii) is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest, and if the United States Government—
>
> (I) provides or has provided any portion of the money or property requested or demanded . . . .

31 U.S.C. § 3729(b)(2) (2009-2026). In other words, there are now two types of claims, only the second of which—when the request is made to a third party and not directly to the United States—requires the use of government funds. 31 U.S.C. § 3729(b)(2)(A)(ii). The type of claim CMC submitted in its Pay Applications is the first kind: "any request or demand . . . for money or property and whether or not the United States has title to the money or property, that – (i) is presented to an officer, employee, or agent of the United States." 31 U.S.C. § 3729(b)(2)(A)(i). In other words, the FCA still requires a claim for payment, but if the claim is presented to the government directly there is no requirement that the payment be *from government funds*.

Congress made clear that its decision to include claims submitted to the United States but not involving government funds was intentional:

> When the U.S. Government elects to invest its resources in administering funds belonging to another entity, or providing property to another entity, it does so because use of such investments for their designated purposes will further the interest of the United States. False claims made against Government-administered funds harm the ultimate goals and U.S. interests and reflect negatively on the United States. The FCA should extend to these administered funds to ensure that the bad acts of contractors do not harm the foreign policy goals or other objectives of the Government. Accordingly, this bill includes a clarification to the definition of the term "claim" in new Section 3729(b)(2)(A) and attaches FCA liability to

> knowingly false requests or demands for money and property from the U.S. Government, without regard to whether the United States holds title to the funds under its administration.

S. Rep. No. 111-10 at 12-13.[6] In sum, CMC can no longer avoid the legal implications of its fraud by relying on *McNinch* and its progeny, because the law has changed.[7] Since 2009, a False Claims Act plaintiff need only plead (1) a request or demand for money or property that is (2) presented to an officer, employee, or agent of the U.S. There is simply no requirement that government funds be part of the process.

Applying the current statutory language to Relators' lawsuit, the Court should deny CMC's motion to dismiss. Relators allege that CMC submitted a Pay Application each and every month throughout the years-long construction project, allowing Cadence McShane to receive payment for the work it performed the previous month. (DKT. 25 ¶ 26). Every month, CMC submitted this Pay Application to HUD on a HUD-mandated form. (*Id.* ¶ 26). CMC could only receive payment from the lender once HUD approved each Pay Application. (*Id.* ¶ 26). This process is a critical part of the National Housing Act, which encourages private industry to provide housing for low-income families by allowing HUD to insure lenders against risk of default and guarantee private mortgage loans. (*Id.* ¶ 11).

---

[6] Numerous courts, including the Fifth Circuit, have relied on Senate Report No. 111-10 to assist in interpreting the FCA as amended by FERA. *See, e.g.*, *United States ex rel. Simoneaux v. E.I. DuPont de Nemours & Co.*, 843 F.3d 1033, 1037 (5th Cir. 2016); *Steury*, 625 F.3d at 267 n.1.

[7] Relators have conducted an extensive review of all federal courts citing *McNinch* since 2009, when FERA became law. Only two—both Georgia district courts—have applied *McNinch* in the manner urged by CMC. In one, the court held that FERA amendments did not apply retroactively, which is not at issue here. *U.S. ex rel. Bibby v. Wells Fargo Bank, N.A.*, 906 F. Supp. 2d 1288, 1295 (N.D. Ga. 2012). In the other, the relator does not appear to have argued that presentment claims were altered by FERA, and the court therefore did not consider that issue. *U.S. ex rel. Kartozia v. Freedom Mortg. Corp.*, 2021 U.S. Dist. LEXIS 194657, at *15 (M.D. Ga. 2021) (citing *McNinch* regarding presentment claims and concluding, without considering FERA, that "submission of a fraudulent loan application to the Government is actionable when the Government approves the loan and disburses the funds."). Even before FERA, the Fifth Circuit did not require a FCA plaintiff bringing a presentment claim to prove damages. *Grubbs*, 565 F.3d at 188 (stating a claim under § 3729(a)(1) does not require actual or specific damages, as the statute imposes a liquidated civil penalty on violators). Therefore, the *Kartozia* court's analysis cannot be persuasive authority in the Fifth Circuit, even without considering FERA.

But in exchange for guaranteeing private loans, HUD imposes extensive regulation on housing construction projects. Relevant here, a general contractor like CMC can only retain 2% overhead, 6% profit, and 6% general conditions. By at least February 2023, CMC was on track to earn a total profit of $7,727,525, or ***17%*** profit, well above the percent of profits HUD permitted it to retain. (*Id.* ¶¶ 44, 63). Each and every monthly Pay Application CMC submitted to HUD from February 2023 to the end of the project in February 2025 requested payment for Builder's Profit it was not allowed to keep. For example, in February 2023, CMC requested, and HUD approved, $112,746.87 in profit:

| ITEM NO. | DESCRIPTION OF WORK | SCHEDULED VALUE | WORK COMPLETED | |
|---|---|---|---|---|
| | | | FROM PREVIOUS APPLICATION (D + E) | THIS PERIOD |
| 1 | **General Requirements** | $2,134,745.00 | $1,717,072.00 | |
| | **Builder's Overhead** | $818,381.00 | $421,824.00 | $37,583.00 |
| | **Builder's Profit** | $2,455,142.00 | $1,265,472.64 | $112,746.87 |

(*Id.* ¶ 64). CMC, through various executives, attested to each Pay Application's accuracy under the penalties of perjury. (*Id.* ¶ 65).

The post-2009 cases that CMC cites do not change this statutorily-mandated result. In *United States ex rel. Souza v. Embrace Home Loans, Inc.*, 808 F. Supp. 3d 314, 337 (D.R.I. 2025), for example, whether the loan applications were "claims" under the statute was not at issue. The same is true of *United States ex rel. Montcrieff v. Peripheral Vascular Assocs., P.A.*, 507 F. Supp. 3d 734, 758 (W.D. Tex. 2020), which in fact supports Relators' argument. *Id.* The court there noted, "The FCA attaches liability 'not to the underlying fraudulent activity or to the government's wrongful payment, but to the claim for payment,'" making clear that the funds paid out do not need to be government funds. *Id.* (quoting *U.S. ex rel. Longhi v. United States*, 575 F.3d 458, 467 (5th Cir. 2009)).

To be sure, there are recent Fifth Circuit and Texas district court cases that recite shorthand appearing to require a claim for payment be "by the Government." *See, e.g.*, *U.S. v. Marlin Med. Sols. LLC*, 579 F. Supp. 3d 876, 883 (W.D. Tex. 2022); *see also U.S. ex rel. Porter v. Magnolia Health Plan, Inc.*, 810 F. App'x 237, 240 (5th Cir. 2020) (describing the prima facia case as requiring a claim "caused the government to pay out money or to forfeit moneys due."). But in none of these cases was this shorthand actually outcome-determinative and instead was merely part of the courts' recitation of the legal standards. The Southern District of Texas has pointed out this discrepancy and described "some confusion regarding the fourth element of a presentment claim." *U.S. v. Cornerstone Reg'l Hosp., L.P.*, 2022 U.S. Dist. LEXIS 255727, at *15 (S.D. Tex. 2022) (summarizing the evolution of the Fifth Circuit's description of the prima facie case). Ultimately, even though "the Fifth Circuit continues to quote the language from *Longhi* [requiring the government to pay out money] when introducing the four elements of a presentment claim," "these cases do not directly address the fourth element, merely reciting *Longhi* in their overview, and *Grubbs* stands as a clear contradiction to this repeated language, imposing liability even when there is no payment." *Id.* (citing *Longhi*, 575 F.3d at 467, and *Grubbs*, 565 F.3d at 189). The Southern District therefore correctly held it would "not require Relator to specifically allege that [the defendant] was paid by the government . . . . This Court can instead require Relator to allege that Dr. Marquez submitted those claims to the government." *Id.* CMC does not cite, and Relators are not aware of, *any* post-FERA cases where a defendant submitted a request for payment to the government and the court dismissed the case because the request did not seek funds owned by the government.

Since 2009, the False Claims Act has not required relators or the government to plead that the federal government paid its own money. Therefore, the Court should deny CMC's Motion to Dismiss.

**B. The Tax Bar Does Not Exclude Relators' Low Income Housing Tax Credit Claims**.

CMC next moves to dismiss Relators' claims for the overpayment of Low-Income Housing Tax Credits following CMC's false certifications of its construction costs. CMC correctly describes a "Tax Bar" to the FCA, which excludes "claims, records, or statements made under the Internal Revenue Code of 1986." 31 U.S.C.S. § 3729(d). But CMC cites no persuasive authority, and certainly no binding authority, applying the Tax Bar to claims where the false statements are false because of other federal laws and regulations. Instead, CMC's cited authority bars FCA lawsuits where the relator's claim "rises or falls on finding a violation of the Tax Code." *U.S. ex rel. Lissack v. Sakura Glob. Capital Mkts., Inc.*, 377 F.3d 145, 154 (2d Cir. 2004). Relators' claims do not depend on the interpretation of the Tax Code and are therefore not covered by the Tax Bar.

In *United States ex rel. Barber v. Paychex, Inc.*, for example, the allegedly false claims were contained exclusively within tax returns. 2010 U.S. Dist. LEXIS 83789, at *16 (S.D. Fla. 2010). The relator in *Hardin v. Scandinavia*, 731 F. Supp. 1202, 1204 (S.D.N.Y. 1990), sued on behalf of the IRS. "[P]reparing fraudulent tax returns" was similarly the basis of claims dismissed in *Patriot Tax Int'l, LLC v. Diaz*, 2008 U.S. Dist. LEXIS 57577, at *1 (E.D. Ky. 2008). As the *Patriot Tax* court explained, "[t]he allegedly fraudulent tax returns, for the purpose of the FCA, are false precisely *because* they violate the Tax Code. Whether a child is qualifying, and thus whether the defendants are fraudulently preparing their clients' tax return forms, depends on whether the child meets the definition under the Tax Code." *Id.* (emphasis in original).

But CMC's false claims are neither contained within CMC's tax returns nor are the claims false *because* they violate the Tax Code. Instead, Relators plead that CMC's false

representations of total construction costs are false because they violate: (1) the National Housing Act of 1934, 12 U.S.C. §§ 1703, 1701t (DKT. 25 ¶ 11); the HUD loan backing statute, 18 U.S.C. 1010 (DKT. 25 ¶ 25); and the HUD Cost Control and Safe Harbor Standards (DKT. 25 ¶ 56). Relators' claims therefore do not depend on any interpretation or application of the Tax Code and are not precluded by the Tax Bar.

CMC relies on *Sears v. Livingston Mgmt.*, 2013 U.S. Dist. LEXIS 158590, at *3 (M.D. La. 2013). There, the relators brought two claims, one relating to rural development program loans and one related to LIHTCs. Noting that the relators provided no case support for their argument that the Tax Bar applied "only where the Plaintiffs' claims depend <u>entirely</u> on an interpretation of the Tax Code," the district court dismissed the cause of action based on LIHTCs without analysis and allowed the rural development loans to continue. *Id.* (emphasis in original). The court did not consider the Second Circuit's conclusion that the Tax Bar applies when the relator's claim "rises or falls on finding a violation of the Tax Code." *Lissack*, 377 F.3d at 154. It is likely that, with additional argument and factual development, the *Sears* court would have reached a different conclusion. Therefore, its holding is not persuasive authority that the Tax Bar extends to LIHTCs simply because the tax credits themselves are housed within the Tax Code.

Instead of applying a complete Tax Bar whenever the Tax Code is tangentially involved, this Court should consider that the reason CMC's claims are false is because they violate HUD statutes and regulations, not the Tax Code.

**B. Cadence McShane's Constitutional Claims Are Squarely Foreclosed by Binding Fifth Circuit Precedent.**

Finally, Cadence McShane argues that even if Relators adequately pled their FCA claims, the Court should dismiss them as unconstitutional. This Court is bound by circuit precedent that holds otherwise. *Riley v. St. Luke's Episcopal Hosp.*, 252 F.3d 749, 758 (5th Cir. 2001) (en banc)

(holding that the FCA's private right of action does not violate the Take Care or Appointments Clauses of Article II). CMC attempts to avoid this binding precedent by citing a handful of concurrences calling the FCA into question, but "speculation [as to the intentions of the Fifth Circuit or the Supreme Court] is no substitute for precedent." *U.S. ex rel. Gomez v. Koman Constr., LLC*, 796 F. Supp. 3d 353, 385 (W.D. Tex. 2025); *see also Proctor v. Wound Care Mgmt., LLC*, 2025 LX 394045, at *6-8 (E.D. La. 2025). Just like other district courts in the Fifth Circuit, this Court should decline CMC's invitation to holding contrary to binding precedent.

Relators also adopt and fully incorporate herein the United States' Statement of Interest as to Defendant's Motion to Dismiss Relators' Second Amended Complaint. (DKT. 29).

## IV. CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that this Court deny Defendant's Motions to Dismiss and order any and all relief, in law or in equity, to which Plaintiff is justly entitled. To the extent the Court identifies any factual deficiencies in Relators' live pleading, Relators respectfully request the opportunity to replead.

/s/ Lawrence Morales II
Lawrence Morales II
State Bar No. 24051077
lawrence@themoralesfirm.com
Allison S. Hartry
State Bar. No. 24083149
ahartry@themoralesfirm.com
**THE MORALES FIRM, P.C.**
6243 Interstate 10 West, Suite 132
Telephone No. (210) 225-0811
Facsimile No. (210) 225-0821

***ATTORNEYS FOR PLAINTIFF***

**CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the foregoing was filed electronically with the Court and delivered by CM/ECF to all counsel of record on this 7th day of May, 2026.

/s/ Allison S. Hartry
Allison S. Hartry