IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA ex rel. RANDALL MOLNAR and ANDREA HUGHES,<br><br>Plaintiff-Relators,<br><br>v.<br><br>CADENCE MCSHANE CONSTRUCTION COMPANY LLC,<br><br>Defendant. | § § § § § § § § § § § § § | Civil Action No. 5:24-cv-522 |

**<u>DEFENDANT CADENCE MCSHANE CONSTRUCTION COMPANY LLC'S REPLY TO PLAINTIFF-RELATORS' RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS</u>**

Citing multiple fatal defects, Defendant Cadence McShane Construction Company LLC ("CMC") filed a Motion to Dismiss (Dkt. No. 26) (the "Motion") Plaintiff-Relators' Second Amended Complaint (Dkt. No. 25) ("SAC"). Plaintiff-Relators' Response ("Response") is heavy on invective but light on the law, and confirms that the SAC should be dismissed.

CMC neither requested nor received any money from the Government in connection with the underlying project. Instead, the project was financed by a private loan that never defaulted, and therefore any paperwork CMC submitted to HUD was merely an administrative checkpoint in an insured-lending program, not a request that the United States itself pay money or transfer property to CMC. Under *United States v. McNinch*, 356 U.S. 595, 599 (1958), which is very much still good law, there cannot be a viable claim under the False Claims Act ("FCA") unless there is a default and a later reimbursement demand to the Government. Plaintiff-Relators do not allege that happened here (because it did not).

Plaintiff-Relators' fallback Low-Income Housing Tax Credit ("LIHTC") theory fares no better. Their own Response makes clear that the alleged injury turns on IRS Form 8609, qualified basis, eligible basis, credit percentages, and the amount of federal tax credits allegedly overallocated. That is exactly the sort of tax-code dispute Congress explicitly removed from the FCA's ambit through 31 U.S.C. § 3729(d).

Finally, this matter is at most a private commercial dispute between venture participants that has nothing to do with the Government,[1] not a viable FCA case. Plaintiff-Relators' counsel is also counsel for San Antonio Housing Facility Corporation ("SAHFC"). In that capacity, he is involved in a separate, private, commercial dispute regarding the allegations in this lawsuit. Plaintiff-Relators and their counsel cannot create an end-run around that private dispute by running to this Court under the guise of the FCA. This lawsuit should be dismissed with prejudice.

## I. FOR A GOVERNMENT-INSURED LOAN, AN FCA "CLAIM" ONLY ARISES IF THE LOAN DEFAULTS.

Plaintiff-Relators' Response pitches a novel yet meritless theory that certain 2009 changes to the FCA statute mean that FCA claims can survive even when the Government did not suffer a monetary loss, and indeed even when it was not involved in the payment of funds. One would think that, with that statutory change being 16 years old, this theory would have been adopted by at least some courts. However, it has not, because it is wrong. Plaintiff-Relators' theory has zero support in the case law and in fact is repeatedly invalidated by ample post-2009 decisions.

"The False Claims act is not an all-purpose antifraud statute, or a vehicle for punishing garden-variety breaches of contract or regulatory violations." *Universal Health Servs., Inc. v. U.S. ex rel. Escobar*, 579 U.S. 176, 194 (2016). The Fifth Circuit recently reaffirmed the longstanding precedent that the

[1] It bears repeating that, despite all of the heated rhetoric about fraud and accused ***criminal*** behavior packed into Plaintiff-Relators' Response, the Government investigated these claims and ***declined to intervene***. *See* Dkt. No. 12.

FCA's application is limited and can only apply to ***a false claim that deprives the Government of money***:

> The FCA attaches liability, not to the underlying fraudulent activity, but to the claim for payment. Therefore, a central question in FCA cases is whether the defendant ever presented a false or fraudulent claim to the Government. In short, even if Palmer's complaint plausibly alleges that Tata committed visa fraud, to trigger FCA liability he must allege that Tata submitted a false or fraudulent claim depriving the federal government of money or property.

*U.S. ex rel. Palmer v. Tata Consulting Servs., Ltd.*, __ F.4th __, 2026 WL 1162220, at *3 (5th Cir. Apr. 29, 2026) (cleaned up). There is no such allegation here.

Plaintiff-Relators' attempts to distinguish the cases cited in the Motion miss the mark. For example, they argue that *United States ex rel. Souza v. Embrace Home Loans, Inc.* did not involve the question of whether an application for a federally guaranteed loan was a "claim" for FCA purposes. Dkt. No. 31 at 16 (citing 808 F. Supp. 3d 314, 337 (D.R.I. 2025)). This is flatly untrue; *Souza* involved allegations that the defendants "made false representations to [HUD] while certifying residential mortgage loans for insurance coverage." 808 F. Supp. 3d at 330. Analyzing the element of causation, the court focused on the effect of the certifications to the Government on the later default, reasoning that "[t]he defaults are important because they are 'what triggers HUD's payment obligations under the federal insurance program.'" *Id.* at 362 (quoting *U.S. ex rel. Calderon v. Carrington Mortgage Servs., LLC*, 70 F.4th 968, 979 (7th Cir. 2023)). In other words, in the context of a private loan guaranteed by the Government, the "claim" that supports an FCA suit is not any certification to the Government for insurance purposes, but the ***lender's*** later request for reimbursement after the loan defaults.[2] *Souza* actually stands for a ***stronger*** position than this case requires: yes, a default is necessary for a valid

[2] Plaintiff-Relators' other attempts to distinguish authority cited in the Motion do not really try to explain why those cases' holdings should not control, but rather baselessly assert that those courts didn't mean what they said and complain that the language supporting CMC's arguments was not "outcome-determinative." *See* Dkt. No. 31 at 17.

FCA claim, but by itself it is not sufficient, as a relator will still need to show that any false statement foreseeably caused the eventual default. *Id.*

Plaintiff-Relators' strained statutory interpretation reads the word "money" out of the FCA. *See* 31 U.S.C. § 3729(b)(2)(A) (defining "claim" as a request "for money or property"). At no point did CMC ask the Government for money; to do so would have made no sense since there was no Government money involved in the Project. Instead, CMC's certifications to the Government were, as the HUD form[3] states, "for the purpose of inducing the [Federal Housing] Commissioner to approve [the loan] for insurance."[4] Nor is there any allegation in the SAC that the Government administered[5] the private funds—because it did not.

In any event, there is abundant post-2009 support for CMC's position that it omitted in its initial Motion—to avoid offering redundant and cumulative precedent. To list several:

- *Calderon*, 70 F.4th 968: "Understanding the process by which federal mortgage insurance is issued clarifies how a company such as Carrington might be held liable under the [FCA]. The alleged false statements occur if Carrington wrongly certifies that a loan meets federal underwriting requirements. . . . ***[I]f the loan defaults and HUD covers the cost of the default, then the false certification of compliance causes the government's loss when the loan's noncompliance is the foreseeable cause of the default.***" *Id.* at 973 (emphasis added).

- *U.S. v. Hodge*, 933 F.3d 468 (5th Cir. 2019): The court ruled for the government, denying defendant's motion for judgment as a matter of law, but acknowledged that

---

[3] HUD-92448, available at https://www.hud.gov/sites/dfiles/OCHCO/documents/92448.pdf.

[4] Plaintiff-Relators ask for permission to attach every form related to this Project, *see* Dkt. No. 31 at 6 n.3, but they already had three opportunities to do so. It is too late now.

[5] The Senate Report that Plaintiff-Relators cite reveals that the statutory changes they cling to were designed to address the unusual situation presented by *United States ex rel. DRC, Inc. v. Custer Battles, LLC*, 376 F. Supp. 2d 617 (E.D. Va. 2006). *See* S. REP. NO. 111-10 at 12. In that case, the Government had stepped in during the reconstruction of Iraq and directly managed and administered Iraqi funds on its behalf. Even though the defendant made a claim for payment to the Government and the Government paid out money, it prevailed because the Government did not hold legal title to the funds at issue. Here, there is no allegation that the Government paid out any money, either directly or indirectly, because it did not.

when the Government insures a loan, there can be no FCA claim unless the false statement proximately caused a subsequent default. *Id.* at 474–75.

- *U.S. v. TXL Mortg. Corp.*, Civil Action No. 15-1658, 2016 WL 5108019 (D.D.C. Sept. 20, 2016): "Several courts have recognized that a lender in TXL's position causes false claims to be submitted when it improperly endorses loans for such government insurance and claims are later made on that insurance. In short, ***the inchoate claim represented by the false application for government-backed insurance on the loan effectively ripens into a viable FCA claim when the government is forced to pay out the improperly acquired insurance***." *Id.* at *2 (cleaned up and emphasis added).

- *U.S. v. Movtady*, 13 F. Supp. 3d 325 (S.D.N.Y. 2014): The court found that the FCA statute of limitations did not begin to run until "HUD pa[id] out on the insurance plan." *Id.* at 332.

- *U.S. v. Americus Mortg. Corp.*, No. 4:12-cv-2676, 2014 WL 4274279 (S.D. Tex. Aug. 29, 2014): The court observed that to state a claim under the FCA, the Government must allege that the defendant's false statements caused it to pay out money, and further noted that "in the context of FHA insurance, '***the United States must demonstrate that the events which caused the defaults*** were related to the false statements in the applications.'" *Id.* at *11 (emphasis added and quoting *U.S. v. Miller*, 645 F.2d 473, 475 (5th Cir. 1981)).

- *A1 Procurement, LLC v. Hendry Corp.*, No. 11-23582-civ, 2013 WL 12065531 (S.D. Fla. June 26, 2013): In a case with slightly different context, the defendants had submitted bids for contracts but had not asked for money from the Government. Analyzing the post-2009 statute, the court reasoned that the bids did not "constitute a 'claim' that ***calls on the government fisc***, which is a necessary requirement under the FCA." *Id.* at *6 (emphasis added).

- *U.S. v. Luce*, No. 11 C 5158, 2012 WL 2359357 (N.D. Ill. June 20, 2012): The court granted the motion to dismiss because the underlying FHA-guaranteed loans had not defaulted and "***[i]f there is no 'claim' for the United States to pay or reimburse, then there is no basis for liability under the FCA***." *Id.* at *5 (emphasis added).

To be sure, none of the above cases cite to *McNinch*. In their Response, Plaintiff-Relators claim that they surveyed all post-2009 citations to *McNinch* and that there were only two cases that supported CMC's position. Dkt. No. 31 at 15 n.7. This, too, is untrue. Below are additional such cases:[6]

- *U.S. ex rel. Patel v. Fidelity Deposit & Discount Bank*, No. 3:19-cv-1824, 2022 WL 17726308 (M.D. Pa. July 27, 2022): A bank received funding through a Government

[6] Not to mention that there are zero cases—citing *McNinch* or not—supporting Plaintiff-Relators' position.

loan program. The relevant question was when the cause of action accrued for statute of limitations purposes. The court cited *McNinch* extensively, observing that "**McNinch *and its progeny teach us that false statements made to induce a federal loan guarantee do not ripen into an actionable false claim until there is a later event of legal consequence between the lender and the government like a loan default or a claim by a third party upon this loan guarantee*.**" *Id.* at *14 (emphasis added).

- *U.S. ex rel. Sanders v. USAA Fed. Savings Bank*, No. 5:19-cv-4, 2021 WL 3513663 (W.D. Va. Aug. 10, 2021): Relators pointed to statements made to HUD related to loans, but the court noted that there was no claim for payment: "***At best, these are 'inchoate violations' because a lender's 'mere application for insurance under a government loan program is not a "claim"' within the meaning of the FCA***." *Id.* at *9 (emphasis added and quoting *McNinch*, 356 U.S. at 598).

- *U.S. ex rel. Jones v. Collegiate Funding Servs., Inc.*, No. 3:07-cv-290, 2010 WL 5572825 (E.D. Va. Sept. 21, 2010): "***When there is a government-insured loan, a valid claim pursuant to the [FCA] is viable only when a borrower defaults and the government must indemnify as guarantor***." *Id.* at *15 (emphasis added).

In sum, *McNinch* remains good law, and numerous post-2009 court decisions have endorsed the principle that when a defendant receives a private loan that is guaranteed by the Government, no FCA claim can lie unless and until the loan defaults and the lender requests reimbursement from the Government.

Because no default is alleged here, the SAC should be dismissed with prejudice.

## II. TAX ISSUES ARE NOT ACTIONABLE UNDER THE FCA.

Plaintiff-Relators' effort to relabel the supposed falsity as arising from HUD statutes and regulations does not change the nature of the claim. The alleged damages are federal tax credits that Plaintiff-Relators say were obtained or preserved in excess of the amount lawfully permitted because the project's tax basis was overstated. That is a tax-credit dispute by any name, and § 3729(d) bars using the FCA as a backdoor vehicle to litigate it.

Plaintiff-Relators try to avoid the FCA's Tax Bar by recasting their LIHTC theory as HUD-based falsity rather than a tax dispute. But Plaintiff-Relators' own theory of injury defeats that reframing. Plaintiff-Relators argue that the Texas Department of Housing and Community Affairs

("TDHCA") used project-supplied information on IRS Form 8609 to certify the maximum applicable credit percentage, the maximum qualified basis, the percentage financed by tax-exempt bonds, and the placed-in-service date. Dkt. No. 31 at 6. Plaintiff-Relators allege that, in turn, CMC's alleged overstatement of construction costs supposedly caused $5,460,000 in additional tax credits. *Id.* In other words, the claim rises or falls on recalculating tax-credit entitlements under I.R.C. § 42.

That is precisely what the Tax Bar forbids. Congress excluded from the FCA "claims, records, or statements made under the Internal Revenue Code of 1986." 31 U.S.C. § 3729(d). The Second Circuit has explained that (1) the bar applies when the theory "rises or falls on finding a violation of the Tax Code," and (2) is not limited to cases where the plaintiff seeks direct tax recovery; it also blocks claims where the legal basis for recovery hinges on proving a Tax Code violation, even if no tax liability is sought. *U.S. ex rel. Lissack v. Sakura Glob. Cap. Mkts., Inc.*, 377 F.3d 145, 154 (2d Cir. 2004).

Plaintiff-Relators invoke *Lissack*, but *Lissack* cuts the other way here because adjudicating Plaintiff-Relators' LIHTC theory would necessarily require determining whether the alleged cost overstatement altered eligible basis, qualified basis, and the amount of credits available under Section 42. Dkt. No. 31 at 6 (alleging that "CMC's false information caused and will continue to cause the TDHCA to affirm $5,460,000 in additional tax credits . . . thereby inducing the allocation or preservation of federal tax credits in excess of the amount lawfully permitted"). The Tax Code itself also explicitly bars such actions. *See* I.R.C. § 7401. Indeed, the claims at issue in *Lissack* did not seek to recover taxes—that case involved municipal bonds—and *Lissack*'s holding ***expanded*** the application of the Tax Bar. Here, by contrast, Plaintiff-Relators' LIHTC theory expressly seeks to recover federal tax revenue.

*Sears* is even more damaging to Plaintiff-Relators' position since it specifically deals with LIHTCs. In *Sears v. Livingston Management, Inc.*, the court dismissed an FCA cause of action based on

LIHTCs while allowing a separate rural-development-loan theory to proceed. Civil Action No. 09-45, 2013 WL 5816690 (M.D. La. Oct. 29, 2013). Plaintiff-Relators try to minimize *Sears* as thinly reasoned, but they still identify no contrary authority holding that an LIHTC over-allocation theory may proceed under the FCA notwithstanding § 3729(d). None. *Sears* makes plain that "to the extent that Plaintiffs seek to recover, Qui Tam, for allegedly ill-gotten tax credits under the LIHTC, this Court lacks jurisdiction." *Id.* at *1. Just as in *Sears*, "Plaintiffs' LIHTC claims fall within the category of claims precluded by the FCA's Tax Bar," and thus "all claims relating to the LIHTC Program" should be dismissed with prejudice. *Id.*

## III. TO THE EXTENT ANY CASE EXISTS, IT IS NOT AN FCA CASE.

As explained above, *supra* § I, the SAC should be dismissed because there is no allegation that CMC made a false claim that deprived the Government of money. In other words, even if the allegations in the SAC were true—they are not—it would not be the Government that was harmed, but SAHFC.

Any dispute here is purely private and commercial. Plaintiff-Relators' counsel in this dispute is also counsel for SAHFC in connection with a separate, private dispute between CMC and SAHFC. That dispute is underway. There, the parties are bound to mediate before the American Arbitration Association ("AAA") and the AAA has already appointed the parties' mediator. That posture is consistent with a private dispute being addressed through the parties' agreed dispute-resolution mechanism, not an FCA case.

## IV. CONCLUSION

The SAC should be dismissed with prejudice. Plaintiff-Relators plead no default and therefore no federal reimbursement demand under the guaranteed-loan framework recognized in *McNinch* and carried forward by the (many) cases since that landmark decision. Their LIHTC theory depends on I.R.C. § 42 tax-credit calculations and is barred by 31 U.S.C. § 3729(d) and by the logic of *Lissack* and

*Sears*. Nothing in Plaintiff-Relators' Response cures those defects. For those reasons, CMC respectfully requests the Court dismiss the SAC with prejudice.

Dated: May 14, 2026

**NORTON ROSE FULBRIGHT US LLP**

*/s/ Jay Dewald*
Jay Dewald
State Bar No. 24001990
Ashley Senary Dahlberg
State Bar No. 24075051
Joshua M. Taylor
State Bar No. 24139885
jay.dewald@nortonrosefulbright.com
ashley.dahlberg@nortonrosefulbright.com
joshua.taylor@nortonrosefulbright.com
Frost Tower
111 W. Houston Street, Suite 1800
San Antonio, Texas 78205
Telephone: 210-224-5575
Facsimile: 210-270-7205

*Counsel for Defendant Cadence McShane Construction Company LLC*

CERTIFICATE OF SERVICE

On May 14, 2026, I electronically submitted the foregoing document with the clerk of court for the U.S. District Court, Western District of Texas, using the electronic case filing system of the court, or as otherwise indicated below, which will effect service on the following counsel of record:

Lawrence Morales, II (Attorney-in-Charge)
State Bar No. 24051077
Allison Sarah Hartry
State Bar No. 24083149
THE MORALES FIRM, P.C.
6243 IH 10 West, Suite 132
San Antonio, Texas 78201
Tel: (210) 225-0811
Email: lawrence@themoralesfirm.com
Email: ahartry@themoralesfirm.com

*Attorneys for Plaintiff-Relator*
*Randall Molnar and Andrea Hughes*

*/s/ Jay Dewald*
Jay Dewald